BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN 175783)
Albert Y. Chang (SBN 296065)
Yury A. Kolesnikov (SBN 271173)
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:    (858) 914-2001
Facsimile:    (858) 914-2002
Email:        fbottini@bottinilaw.com
              achang@bottinilaw.com
              ykolesnikov@bottinilaw.com

THE SHUMAN LAW FIRM
Kip B. Shuman (SBN 145842)
1 Montgomery Street, Suite1800
San Francisco, California 94104
Telephone:    (303) 861-3003
Facsimile:    (303) 536-7849
Email:        kip@shumanlawfirm.com

*Counsel for Plaintiff George J. Hannon*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| GEORGE J. HANNON, derivatively on behalf of WELLS FARGO & COMPANY,<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL J. LOUGHLIN, TIMOTHY J. SLOAN, JOHN G. STUMPF, CARRIE TOLSTEDT, JOHN R. SHREWSBERRY, JOHN D. BAKER, II, ELAINE L. CHAO, JOHN S. CHEN, LLOYD H. DEAN, ELIZABETH A. DUKE, SUSAN E. ENGEL, ENRIQUE HERNANDEZ, JR., DONALD M. JAMES, CYNTHIA H. MILLIGAN, FEDERICO F. PEÑA, JAMES H. QUIGLEY, STEPHEN W. SANGER, SUSAN G. SWENSON, SUZANNE M. VAUTRINOT, JUDITH M. RUNSTAD, AMERICAN EXPRESS COMPANY, and DOES 1–10,<br><br>Defendants,<br><br>- and -<br><br>WELLS FARGO & COMPANY, a Delaware corporation,<br><br>Nominal Defendant. | Case No. _____<br><br>**Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Aiding and Abetting Breach of Fiduciary Duty, Abuse of Control, Unjust Enrichment, Declaratory Relief, and Violations of the Securities Exchange Act of 1934**<br><br>**Demand for Jury Trial** |

**Table of Contents**

NATURE OF THE ACTION ................................................................................. 1

JURISDICTION AND VENUE ........................................................................... 7

INTRADISTRICT ASSIGNMEMNT ................................................................. 8

THE PARTIES ..................................................................................................... 8

    I.       Plaintiff .................................................................................. 8

    II.     Nominal Defendant ............................................................... 8

    III.    Defendant American Express Company.................................. 8

    IV.    The Individual Defendants .................................................... 8

           A.     The Director Defendants ......................................... 8

           B.     The Officer Defendants ......................................... 10

    V.     The Doe Defendants ............................................................ 12

FACTUAL ALLEGATIONS ............................................................................. 12

    I.       The Board-Approved Great 8 Campaign Results in Significant
           Harm to the Company ......................................................... 16

    II.     The OCC's Consent Order and Findings............................... 18

    III.    The Director Defendants and the Officer Defendants Knew of the
           Unlawful Business Practices for Years .............................. 21

    IV.    The Individual Defendants Violated the Company's Code of Ethics ......... 30

    V.     The Individual Defendants Cause Wells Fargo to Enter Into a
           Partnership with American Express to Allow More Fake Accounts to
           Be Opened in the Form of American Express Credit Cards......................... 31

    VI.    On the Heels of the Announcement of the American Express
           Partnership, Wells Fargo Continues to Be Sued by Its Customers for
           Opening Fake Accounts, and the Los Angeles Times Publishes Two
           Articles on the Misconduct Based on Detailed Interviews with Wells
           Fargo Employees................................................................ 32

    VII.   Wells Fargo Implements the "Full Scale Launch" of Its Partnership
           with American Express to Keep the Fake Account Scandal Going
           and to Increase Its Ability to Open More Fake Accounts........................... 41

VIII.   The Individual Defendants Breached Their Duties of Candor and Loyalty By Causing Wells Fargo to Make False and Misleading Statements During the Relevant Period ...................................... 45

IX.   The Individual Defendants Caused the Company to File False Proxy Statements in 2015 and 2016 ........................................................... 60

    A.   The False and Misleading 2016 Proxy Statement ........................... 60

    B.   The False and Misleading 2015 Proxy Statement ........................... 69

X.   The True Facts Begin to Be Disclosed ......................................... 72

XI.   Stumpf, Tolstedt, Sloan, and Loughlin Received Lavish, Unwarranted Compensation in 2011–2015 ................................................ 80

XII.   The Director Defendants Caused Wells Fargo to Spend Over $21.3 Billion to Repurchase Over 409 Million Shares of Its Own Stock at Inflated Prices During the Relevant Period, Resulting in *Damages of Over $2.7 Billion* to Wells Fargo ............................................... 81

XIII.   Tolstedt, Stumpf, Sloan, and Loughlin Sold Wells Fargo Stock While in Possession of Material Insider Information ................................ 92

THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES ............................................. 97

    I.   General Duties as Directors and Officers ..................................... 97

    II.   Compliance with GAAP ................................................................... 99

    III.   The Duty of Reasonable and Prudent Supervision .................. 100

BREACHES OF FIDUCIARY DUTIES ........................................................... 101

CONTROL, ACCESS, AND AUTHORITY ..................................................... 103

CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION .................... 103

DELAYED ACCRUAL, FRAUDULENT CONCEALMENT, AND EQUITABLE TOLLING ......................................................... 105

DAMAGES TO WELLS FARGO ..................................................................... 107

DERIVATIVE ALLEGATIONS ....................................................................... 109

    I.   Demand Is Futile as to a Majority of the Current Board Because They Face a Substantial Likelihood of Personal Liability ....................... 109

    II.   Demand is Futile as to Sloan ....................................................... 110

    III.   Demand Is Futile as to Peña, Baker, Dean, Hernandez, and Milligan ...... 111

IV.  Demand is Futile as to Chen, James, Sanger, and Dean ........................... 112

V.  Demand Is Futile as to Director Defendants Sloan, Baker, Chen, Dean, Duke, Hernandez, James, Milligan, Peña, Quigley, Sanger, Swenson, and Vautrinot Because They Face a Substantial Likelihood of Liability for Making False Statements and Acting in Bad Faith by Consciously Ignoring Known Material Risks Posed by the Community Banking Division .............................................................. 114

CLAIMS FOR RELIEF ....................................................................................... 119

COUNT I
Breach of Fiduciary Duty
Against All Individual Defendants ........................................................................ 119

COUNT II
Breach of Fiduciary Duty for Insider Selling
and Misappropriation of Information
Against the Insider Selling Defendants ............................................................... 121

COUNT III
Abuse of Control
Against All Individual Defendants ....................................................................... 121

COUNT IV
Gross Mismanagement
Against All Individual Defendants ....................................................................... 122

COUNT V
Unjust Enrichment
Against All Individual Defendants ....................................................................... 122

COUNT VI
Contribution and Indemnification
Against Defendants Stumpf, Shrewsberry, Sloan, and Tolstedt ........................ 123

COUNT VII
Declaratory Relief
Against All Individual Defendants ....................................................................... 124

COUNT VIII
Aiding and Abetting Breach of Fiduciary Duty
Against All Individual Defendants ....................................................................... 124

COUNT IX
Derivative Claim for Aiding and Abetting Breachy of
Fiduciary Duty Under California Law
Against Defendant American Express Company ................................................. 126

COUNT X
Derivative Claim for Unjust Enrichment Under California Law
Against Defendant American Express Company ................................................. 130

COUNT XI
Accounting
Against All Individual Defendants.......................................................................... 130

COUNT XII
Violation of Section 14(a) of the Exchange Act
Against the Director Defendants .......................................................................... 131

COUNT XIII
Violation of Section 29(b) of the Exchange Act
Against All Individual Defendants........................................................................133

PRAYER FOR RELIEF.......................................................................................134

DEMAND FOR JURY TRIAL............................................................................135

Verified Shareholder Derivative Complaint

Plaintiff George J. Hannon ("Plaintiff"), derivatively on behalf of Wells Fargo & Company ("Wells Fargo" or the "Company"), submits this Verified Shareholder Derivative Complaint against American Express Company ("American Express") and certain current and former members of Wells Fargo's Board of Directors (the "Board") and executive officers (collectively, the "Individual Defendants") for breaches of fiduciary duties, aiding and abetting breaches of fiduciary duties, unjust enrichment, violations of the Securities Exchange Act of 1934 (the "Exchange Act"), insider trading, and other wrongdoing. Plaintiff's investigation is based upon an extensive review of (a) lawsuits filed against Wells Fargo by former employees and the Los Angeles City Attorney; (b) investigations of Wells Fargo by the United States Senate, the Consumer Financial Protection Bureau ("CFPB"), and other governmental agencies; (c) Wells Fargo's filings with the United States Securities Exchange Commission ("SEC"), analyst reports, transcripts of conference calls with analysts, and other information. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery. In support of these derivative claims, Plaintiff alleges as follows:

## NATURE OF THE ACTION

1. This is a shareholder derivative action to remedy the wrongdoing committed by defendants pertaining to the opening of unauthorized accounts on behalf of Wells Fargo customers. The claims asserted herein against the Individual Defendants are brought with respect to the time period from approximately 2011 to September 8, 2016. The claims asserted herein against Defendant American Express are brought with respect to the time period between approximately **August 7, 2013 through September 8, 2016** (the "Relevant Period" or "Relevant Periods").

2. This complaint asserts claims against American Express and certain of Wells Fargo's current and former officers and directors for their wrongdoing in connection with the now infamous "fake account" scandal. To further its aggressive "Great 8" cross-selling campaign — the goal of which was to open eight different

1
Verified Shareholder Derivative Complaint

accounts for each customer — Wells Fargo enlisted the aid of American Express in a self-described "partnership" to open American Express credit cards for Wells Fargo's customers.

3.     American Express's assistance was critical to the continuation and perpetuation of Wells Fargo's unlawful fake account scandal.  In 2013, at least eight years into the fake account scandal, Wells Fargo's executives were urgently looking for more fuel with which to feed the ravenous Great 8 beast.  Once employees had been pressured to open new fake accounts for family and friends, and exhausted those means with which to attempt to satisfy management's demands to open more new accounts or be fired or demoted, Wells Fargo executives were urgently looking for new avenues to open new accounts.  American Express filled that need by allowing Wells Fargo to open new credit cards (and thus new accounts) for its customers beginning in 2013.

4.     Driven by earnings and profits, American Express was highly motivated to partner with Wells Fargo.  American Express operated this partnership through its Global Network Services segment, which focused on partnering with third-party banks (such as Wells Fargo) to issue American Express credit cards.  By its own account, American Express's operating expenses and credit losses were generally lower in these third-party-card-issuing arrangements than in its proprietary card-issuing business (in which American Express issues credit cards through its banking subsidiaries).  The return on equity in American Express's third-party-card-issuing business was thus significantly higher than that of its proprietary card-issuing business.  As a result, American Express's partnership with Wells Fargo generated an attractive earnings stream and risk profile that required a lower level of capital support.

5.     As demonstrated in more detail herein, American Express aided and abetted the Individual Defendants' breaches of fiduciary duties by providing substantial assistance to the Individual Defendants, even after American Express knew of Wells Fargo's illegal activities via multiple news articles and lawsuits alleging that Wells Fargo

1  was opening unauthorized credit cards for its customers and forging customer
2  signatures on new account applications.

3        6.      Interestingly, American Express's co-founders were none other than the
4  founders of Wells Fargo — Henry Wells and William Fargo.  In the August 7, 2013 press
5  release announcing the partnership with Wells Fargo to issue credit cards to Wells Fargo
6  customers,  American Express stated:

7                  "Given the fact that two of our founders were Henry
                Wells and William Fargo, this partnership is especially
8                  significant to all of us at American Express," said Kenneth I.
                Chenault, Chairman and CEO, American Express.  "Wells
9                  Fargo is an outstanding addition to our global network of
10                 card-issuing partners."

11       7.      In the same press release, Defendant Stumpf stated: "We are delivering on
12 our strategy to expand our credit card business.  ***We are proud to have American***
13 ***Express as a partner in this effort***."

14       8.      Headquartered in San Francisco, California, Wells Fargo is a diversified,
15 community-based financial services company with $1.9 trillion in assets.  Founded in
16 1852, Wells Fargo provides banking, insurance, investments, mortgage, and consumer
17 and commercial financial services through more than 8,600 locations, 13,000 ATMs,
18 online (wellsfargo.com), and mobile devices.   The Company has three reportable
19 operating segments: Community Banking, Wholesale Banking, and Wealth and
20 Investment Management.

21       9.      During the Relevant Period, the Individual Defendants breached their
22 fiduciary duties as Wells Fargo's officers and directors in connection with the "Great 8"
23 campaign and Daily Solution incentive compensation program.   The Individual
24 Defendants knew that these programs imposed unreasonable sales quotas on Wells
25 Fargo employees and incentivized them to engage in unlawful banking practices,
26 including opening unauthorized accounts on behalf of Wells Fargo's customers and
27 forging customer signatures on such accounts.

28

10.     As set forth in detail below, the CFPB and the Office of Comptroller of the Currency ("OCC") determined that the Company's "Great 8" campaign and Daily Solution incentive program caused employees to engage in widespread unlawful banking practices, including opening as many as two million accounts without customers' knowledge and charging customers nearly $2 million in unauthorized fees. As a result of these potential breaches of fiduciary duties, the Company was forced to pay $185 million in government fines and faces additional lawsuits by employees and customers, as well as investigations by the United States Department of Justice ("DOJ") and by the United States Senate.

11.     Wells Fargo was also forced to agree to pay a $100 million penalty from the CFPB, the largest such penalty the agency has imposed.

12.     On September 8, 2016, the CFPB and OCC shocked the public markets when they announced Consent Orders reached with Wells Fargo based on a massive and pervasive scheme of illegal sales practices that duped thousands of Wells Fargo customers.   The Consent Orders exposed a far-reaching, systemic breakdown in corporate governance at Wells Fargo, including the Board of Directors' utter failure to implement, monitor, and enforce basic systems of internal controls over its sales and risk management, and compensation programs approved by the Company's senior management and Board of Directors that incentivized illegal behavior impacting **2 million accounts** where Wells Fargo entered into transactions **without customers' knowledge or consent** — actions which are tantamount to identity theft.  Since the regulatory Consent Orders were executed, Wells Fargo has increased its estimate of the number of fraudulent accounts to be approximately **3.5 million**.[1]   According to a review conducted by PricewaterhouseCoopers LLP ("PWC"), an independent consulting

---

[1] *See Jabbari v. Wells Fargo & Co.*, No. 15-cv-2159-VC, Dkt. No. 133 (Plaintiffs' Reply in Support of Preliminary Approval of Settlement) at 9:22-23 (N.D. Cal. May 11, 2017).

Verified Shareholder Derivative Complaint

firm retained by Wells Fargo, the fraudulent accounts included at least 623,000 consumer and small business unsecured credit card accounts.[2]

13.     Reaction to these revelations was swift.  Since September 2016, other governmental agencies have opened investigations and inquiries into the Company's conduct.  For instance, the California Labor Department is investigating its practices, and the California Attorney General has opened a criminal investigation into whether employees involved in the scandal committed identity theft crimes.

14.     The United States Senate and House of Representatives have also conducted separate investigations into Wells Fargo's illegal practices, subpoenaed records, obtained written testimony from Wells Fargo, and held hearings where Wells Fargo's then-Chief Executive Officer ("CEO") and Chairman, John G. Stumpf, testified about the illegal practices.  Stumpf admitted that Wells Fargo's senior management and Board of Directors obtained knowledge of the illegal practices prior to the 2016 consent orders with regulators, including knowledge by all Board members dating back at least to 2014, and for some members of the Board, many years earlier.

15.     Faced with relentless pressure from management, Wells Fargo employees opened unauthorized accounts, including American Express credit cards, forged customer signatures, and engaged in widespread, known violations of the law.

16.     The Individual Defendants named herein, as well as other Wells Fargo supervisors, reaped the benefits of the illicit conduct by paying themselves tens or hundreds of millions of dollars in compensation tied directly or indirectly to results achieved through the unlawful means they imposed on the rank and file employees.

17.     American Express benefitted financially from the wrongdoing by earning annual fees on the credit cards and by earning a percentage of the amounts charged by consumers who used the Wells Fargo American Express cards to buy items.

---

[2] Wells Fargo's November 3, 2016 Form 10-Q (for the quarter ended September 30, 2016) at 3, *available at* https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/sec-filings/2016/third-quarter-10q.pdf (last visited Dec. 19, 2017).

18.     Throughout the Relevant Periods, the Individual Defendants and American Express were presented with detailed information giving them actual knowledge of the unlawful conduct with respect to the Great 8 Campaign and Daily Incentive programs.

19.     At Wells Fargo, Defendant Carrie Tolstedt presided over the Community Banking division, where the wrongdoing occurred.   In July 2016, when announcing Tolstedt's retirement, Defendant Stumpf described Tolstedt as "one of our most valuable Wells Fargo leaders, a standard bearer for our culture, a champion for our customers, and a role model for responsible, principled and inclusive leadership."

20.     Just two months later, Wells Fargo settled initial government inquiries, paying $185 million in penalties.   When it became known that Stumpf and Wells Fargo's Board were allowing Tolstedt to retire with an estimated pay package of $123 million, instead of firing her for cause, the United States Senate summoned Stumpf to Washington for hearings into the wrongdoing, which created a public uproar.

21.     The DOJ, state attorneys general offices and Congressional committees have started "formal or informal" investigations into the sales practices that led to the bogus accounts.   The Department of Labor ("DOL") also is looking into lawmakers' assertions that Wells Fargo put excessive pressure on employees to meet sales quotas.

22.     Far from being isolated conduct engaged in by low-level employees, the unlawful sales quotas and conduct required to achieve such goals were mandated and monitored every two hours by Wells Fargo District Managers, as alleged by the Los Angeles City Attorney in its complaint against Wells Fargo filed on May 4, 2015:

> Wells Fargo enforces its sales quotas by constant monitoring.  Daily sales for each branch, and each branch employee, are reported and discussed by Wells Fargo's District Managers four times a day, at 11:00 a.m., 1:00 p.m., 3:00 p.m., and 5:00 p.m.  Those failing to meet daily sales quotas are approached by management, and often are reprimanded and/or told to 'do whatever it takes' to meet their individual sales quotas.

23.     The Individual Defendants' conduct constitutes bad faith and disloyal

conduct.  As then-CEO John Stumpf testified before the U.S. House of Representatives, "[w]e could have done more sooner."  By egregiously firing employees who relied on their paycheck to support their families and who had simply done what Wells Fargo management pressured them to do, the Individual Defendants protected their own lavish compensation but exposed Wells Fargo to immense damages and reputational harm.  That predictable harm has now materialized, and the executive officers and directors of the Company – and those who aided and abetted the wrongdoing such as Defendant American Express -- should be held liable for damaging Wells Fargo.

## JURISDICTION AND VENUE

24.    The claims asserted herein arise in part under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and SEC regulation 14a-9 promulgated thereunder, as well as Section 29(b) of the Exchange Act.  Jurisdiction is conferred by the Exchange Act, and supplemental jurisdiction over Plaintiff's state-law claims is conferred by 28 U.S.C. § 1367.

25.    Venue is proper pursuant to the Exchange Act.   Wells Fargo's headquarters are located in San Francisco, California, and the false statements were made in this District.   Wells Fargo and American Express formed a partnership in San Francisco to open American Express credit cards for Wells Fargo's customers, and American Express issued an August 7, 2013 press release announcing the partnership from San Francisco.  Much of the wrongdoing in furtherance of the partnership took place in San Francisco.

26.    The Court has jurisdiction over each named defendant because such defendants are either entities that conduct business in and maintain offices in this District or individuals who have sufficient minimum contacts with California so as to render the exercise of jurisdiction by this Court permissible.

27.    A substantial portion of the transactions and wrongs complained of herein occurred in this District. Wells Fargo's headquarters are located in San Francisco,

Verified Shareholder Derivative Complaint

California, one or more of the individual defendants reside in San Francisco, and the acts giving rise to the violations complained of occurred in this District.

## INTRADISTRICT ASSIGNMEMNT

28.     A substantial portion of the transactions and wrongdoings which give rise to the claims in this action occurred in the County of San Francisco, and as such, this action is properly assigned to the San Francisco Division of this district.

## THE PARTIES

**I.      Plaintiff**

29.     Plaintiff George J. Hannon is a current shareholder of Wells Fargo. Plaintiff has continuously held Wells Fargo stock since June 6, 2008, and continues to hold such stock.   Plaintiff will hold his shares of Wells Fargo stock through the conclusion of this lawsuit.

**II.     Nominal Defendant**

30.     Nominal Defendant Wells Fargo & Company is a Delaware corporation with its principal place of business located at 420 Montgomery Street, San Francisco, California 94104.

**III.    Defendant American Express Company**

31.     Defendant American Express Company is a New York corporation with its headquarters located at 200 Vesey Street, New York, New York.

**IV.    The Individual Defendants**

**A.      The Director Defendants**

32.     Defendant John D. Baker, II has been a director of Wells Fargo since 2009.   Baker is a member of Wells Fargo's Audit and Examination Committee, Corporate Responsibility Committee, and Credit Committee.

33.     Defendant Elaine L. Chao was a director of Wells Fargo from 2011 until 2017.  Chao was a member of Wells Fargo's Credit Committee, and Finance Committee. Chao made over $1.2 million as a Wells Fargo director during the time the fake account scandal was ongoing.

Verified Shareholder Derivative Complaint

34.     Defendant John S. Chen has been a director of Wells Fargo since 2006. Chen is a member of Wells Fargo's Human Resources Committee.

35.     Defendant Lloyd H. Dean has been a director of Wells Fargo since 2005. Dean is a member of Wells Fargo's Corporate Responsibility Committee, Governance and Nominating Committee, Human Resources Committee, and Risk Committee.

36.     Defendant Elizabeth A. Duke has been a director of Wells Fargo since January 2015.   Duke is a member of Wells Fargo's Credit Committee, Finance Committee, and Risk Committee.

37.     Defendant Susan E. Engel was a director of Wells Fargo from 1998 until approximately April 2017.   Engel was a member of Wells Fargo's Credit Committee, Finance Committee, and Human Resources Committee.

38.     Defendant Enrique Hernandez, Jr. has been a director of Wells Fargo since 2003.   Hernandez is a member of Wells Fargo's Corporate Responsibility Committee, Finance Committee, and Risk Committee.

39.     Defendant Donald M. James has been a director of Wells Fargo since 2009.  James is a member of Wells Fargo's Finance Committee and Human Resources Committee.

40.     Defendant Cynthia H. Milligan has been a director of Wells Fargo since 1992.   Milligan is a member of Wells Fargo's Corporate Responsibility Committee, Credit Committee, Governance and Nominating Committee, and Risk Committee.

41.     Defendant Federico F. Peña has been a director of Wells Fargo since 2011. Peña is a member of Wells Fargo's Audit and Examination Committee, Corporate Responsibility Committee, Governance and Nominating Committee, and Risk Committee.   Peña took over as Chair of the Corporate Responsibility Committee on March 1, 2016 and currently serves in that role.

42.     Defendant James H. Quigley has been a director of Wells Fargo since 2013.  Quigley is a member of Wells Fargo's Audit and Examination Committee, Credit Committee, and Risk Committee.

Verified Shareholder Derivative Complaint

43. Defendant Stephen W. Sanger has been a director of Wells Fargo since 2003. Sanger is Lead Director and a member of Wells Fargo's Governance and Nominating Committee, Human Resources Committee, and Risk Committee.

44. Defendant Susan G. Swenson has been a director of Wells Fargo since 1998. Swenson is a member of Wells Fargo's Audit and Examination Committee and Governance and Nominating Committee.

45. Defendant Suzanne M. Vautrinot has been a director of Wells Fargo since 2015. Vautrinot is a member of Wells Fargo's Audit and Examination Committee and Credit Committee.

46. Defendant Judith M. Runstad was a director of Wells Fargo from 1998 until April 26, 2016. Runstad was the Board member who headed the Corporate Responsibility Committee, which, according to Wells Fargo's proxy had the job of monitoring "customer service and complaint matters." Runstad was paid $384,027 in cash and stock in 2015. When Runstad retired on April 26, 2016, she exited with more than $7.2 million in stock and options. Defendant Peña took over Runstad's role as Chair of the Corporate Responsibility Committee on March 1, 2016, shortly before Runstad retired. Runstad also signed the false and misleading annual reports Wells Fargo filed with the SEC on February 26, 2014 and February 25, 2015, and upon information and belief reviewed and approved the 2016 Annual Report since she was still on the Board at the time the Form 10-K was filed with the SEC and was still Chair of the Corporate Responsibility Committee at such time.

**B.   The Officer Defendants**

47. Defendant John G. Stumpf, until his resignation on October 12, 2016, had been the Chairman of Wells Fargo since 2010 and named CEO in 2007 and has been a director since 2006. He also served as President from August 2005 to November 2015. Stumpf received 2014 and 2015 compensation of $19.3 million and $19.3 million, respectively.

48.     Defendant Timothy J. Sloan was named CEO, President, and a director of the Company on October 12, 2016.  Prior to his recent appointment, Sloan was the President and Chief Operating Officer ("COO") of Wells Fargo since November 2015 and was responsible for the operations of the Company's four main business groups: Community Banking, Consumer Lending, Wealth and Investment Management and Wholesale Banking.  As COO, Sloan was Tolstedt's direct supervisor.  Sloan is a member of Wells Fargo's Operating and Management Committee.  Sloan has worked for Wells Fargo for 29 years, having previously served as the chief financial officer and was responsible for the financial management functions including controllers, financial reporting, tax management, asset liability management, treasury, corporate development, investor relations, investment portfolios, strategic planning and the Company's corporate properties functions. Prior to that, Sloan was chief administrative officer and managed Corporate Communications, Corporate Social Responsibility, Enterprise Marketing, Government Relations and Corporate Human Resources.

49.     Defendant Michael J. Loughlin has been the Senior Executive Vice President and Chief Risk Officer of Wells Fargo since 2006.  Loughlin oversees all risk-taking activities at Wells Fargo.  He is the leader of the Corporate Risk group and is a member of Wells Fargo's Operating and Management Committee.

50.     Defendant Carrie Tolstedt was at all relevant times during the Relevant Period until her resignation on July 31, 2016, the Company's Senior Executive Vice President of Community Banking.  Tolstedt received 2014 and 2015 compensation of $9.5 million and $9.05 million, respectively. As Defendant Stumpf testified in September 2016 before the United States Senate, Stumpf and his fellow board members allowed Tolstedt to "retire" instead of firing her for cause, resulting in Tolstedt being allowed to receive $124.6 million in stock and options upon her retirement.

51.     Defendant John R. Shrewsberry is, and was at all relevant times during the Relevant Period, the Company's Chief Financial Officer ("CFO").  Shrewsberry received 2014 and 2015 compensation of $8.1 million and $9.05 million, respectively.

Verified Shareholder Derivative Complaint

## V.     The Doe Defendants

52.     Various other individuals, partnerships, corporations, and other business entities have participated in the violations alleged herein and have performed acts and made statements in furtherance thereof.   The true names and capacities, whether individual, corporate, associate, or otherwise of Defendants Does 1 through 10, inclusive, are unknown to Plaintiff at this time.   Plaintiff therefore sues Defendants Does 1 through 10 by such fictitious names.   Plaintiff further alleges that each of the Doe Defendants is responsible for the acts and occurrences hereinafter set forth.   Plaintiff will amend this complaint to (a) show their true names and capacities when such information is ascertained; and (b) allege the manner in which each Doe Defendant is responsible for the damages sustained by Wells Fargo and its public shareholders.

## FACTUAL ALLEGATIONS

53.     Wells Fargo is a diversified, community-based financial services company headquartered in San Francisco, California.   The Company has three reportable operating segments: Community Banking, Wholesale Banking, and Wealth and Investment Management.

54.     Cross-selling has long been considered central to Wells Fargo's business and growth prospects.   The Individual Defendants caused Wells Fargo to consistently emphasize the importance of cross-selling to its investors and others.   As early as 1999, according to Wells Fargo's Annual Report for that year, Wells Fargo was "[g]oing for gr-eight product packages," establishing what would become a long-held objective. The 1999 Annual Report further stated, "We need to take advantage of cross-sell opportunities with our business customers and increase the number of products they have with us."

55.     Wells Fargo's 2006 Annual Report emphasized that "[s]elling more products to [its] customers—or 'cross-selling'—is the foundation of [its] business model and key to [its] ability to grow revenue and earnings."   The Wells Fargo's 2007 Annual Report stated its "vision" was "to satisfy all [its] customers' financial needs, help them

succeed financially, be recognized as the premier financial services company in our markets and be one of America's great companies," and the Wells Fargo's "primary strategy to achieve this vision" was "to increase the number of products our customers buy from us and to give them all of the financial products that fulfill their needs." Wells Fargo's cross-sell strategy and diversified business model, the Annual Report added, "facilitate growth in strong and weak economic cycles, as we can grow by expanding the number of products our current customers have with us." The Annual Report also highlighted that Wells Fargo was "known across [its] industry as number one, second to none, for cross-sell and revenue growth."

56. The 2010 Annual Report echoed Wells Fargo's sentiment that it was the best in the business when it came to cross-selling. Stumpf's introduction to the Annual Report called Wells Fargo the "king of cross-sell":

> If anyone tells you it's easy to earn more business from current customers in financial services, don't believe them. We should know. We've been at it almost a quarter century. We've been called, true or not, the "king of cross-sell." To succeed at it, you have to do a thousand things right. It requires long-term persistence, significant investment in systems and training, proper team member incentives and recognition, taking the time to understand your customers' financial objectives, then offering them products and solutions to satisfy their needs so they can succeed financially.... The bad news is it's hard to do. The good news is it's hard to do, because once you build it, it's a competitive advantage that can't be copied.

57. The 2013 Annual Report further discussed the impact of Wells Fargo's cross-selling efforts in each of its key business segments, stating: "cross-sell of our products is an important part of our strategy to achieve our vision to satisfy all our customers' financial needs.... We believe there is more opportunity for cross-sell as we continue to earn more business from our customers." The Annual Report highlighted the "Great 8" initiative, explaining the Company's "goal is eight products per household" — effectively unattainable quotas for its employees.

58.     In addition, the 2013 Annual Report identified the Company's cross-selling efforts as a key to its success while also warning investors that if those efforts were unsuccessful, the Company's financial results could suffer.  Specifically, the filings stated:

> Our "cross-selling" efforts to increase the number of products our customers buy from us ... is a key part of our growth strategy, and our failure to execute this strategy effectively could have a material adverse effect on our revenue growth and financial results. Selling more products to our customers-"crossselling" — is very important to our business model and key to our ability to grow revenue and earnings....

59.     Cross-selling has bolstered sales and profitability at a time when both have been under pressure from a sluggish economy and historically low interest rates.  By November 2014, one of every four of the Company's retail banking households had eight or more of Wells Fargo's products.  ***The Board routinely monitors the success of the Great 8 Campaign.***

60.     Wells Fargo senior executives, with Board oversight, provided financial-based incentives to its employees to induce and enhance banking activity by customers and potential customers to achieve the stated Great 8 Campaign goal.  Specifically, the employee incentive plan included what is known internally as the Daily Solution program.  According to this program, Wells Fargo employees were expected to induce customers to open additional or new accounts and to accept other financials products and services such as ATM cards, credit cards, checks, saving accounts and brokerage accounts.  Each new or additional financial product that a Wells Fargo employee sold counted as a Daily Solution.

61.     Wells Fargo obligated all bankers, branch managers, and regional managers to secure a quota of Daily Solutions, which is to say that Wells Fargo placed a strict quota on the number of financial products Wells Fargo employees must sell ***each day***.  Wells Fargo employees would either earn bonuses and rewards by meeting or exceeding the Daily Solution quotas ***or*** face disciplinary action for failing to do so.

62.    The number of products per household, a metric for the number of accounts opened by Wells Fargo employees, were closely monitored and reported at the Company.

63.    Yearly cross-sell numbers were also tracked and reported. Indeed, it was often the first metric announced in the Annual Reports to shareholders. In the introduction to the 2010 Annual Report, for example, Stumpf reviewed the average products per retail banking household, which had progressively grown since 1998, when the products per retail banking household was 3.2:

> 1999: 3.4.  2000: 3.7.  2001: 3.8.  2002: 4.2. 2003: 4.3.
> 2004: 4.6.  2005: 4.8.  2006: 5.2.  2007: 5.5.  2008: 5.7.
> 2009: our legacy Wells Fargo households, just under 6.0.
> This year [2010], we crossed a major cross-sell threshold.
> Our banking households in the western U.S. now have an
> average of 6.14 products with us.  For our retail households
> in the east, it's 5.11 products and growing.

64.    The same was true for the following years, as the products per household continued to grow toward Defendants' goal of eight:

- The 2011 Annual Report reported 5.92 products per household in 2011, up from 5.7 in the fourth quarter 2010.

- The 2012 Annual Report reported retail bank household cross-sell of 6.05.

- The 2013 Annual Report stated: "Our retail bank household cross-sell was a record 6.16 products per household in November 2013, up from 6.05 in November 2012 and 5.93 in November 2011.  We believe there is more opportunity for cross-sell as we continue to earn more business from our customers."

- The 2014 Annual Report touted increased products per household numbers: "Our retail banking household cross-sell was 6.17 products per household in November 2014, up from 6.16 in November 2013 and 6.05 in November 2012....  We believe there is more opportunity for

cross-sell as we continue to earn more business from our customers. Our goal is eight products per household, which is approximately one-half of our estimate of potential demand for an average U.S. household."

- The 2015 Annual Report stated: "Our retail banking household cross-sell was 6.11 products per household in November 2015, compared with 6.17 in November 2014 and 6.16 in November 2013."

**I.    The Board-Approved Great 8 Campaign Results in Significant Harm to the Company**

65.    On September 8, 2016, Wells Fargo announced the settlement of three separate government actions brought by the CFPB, OCC, and Los Angeles City Attorney relating to unlawful sales practices.  Wells Fargo agreed to pay $185 million in fines, including a $100 million penalty from the CFPB, the largest such penalty the agency has issued.

66.    Richard Cordray, then-Director of the CFPB, stated that "Wells Fargo built an incentive-compensation program that made it possible for its employees to pursue underhanded sales practices."

67.    According to the CFPB Consent Order, for a period of at least five years, Wells Fargo employees engaged in the following sales tactics and practices in order to meet unreasonable sales quotas:

(a)    Opening unauthorized deposit accounts for existing customers and transferring funds to those accounts from their owners' other accounts, all without their customers' knowledge or consent.  This practice resulted in Wells Fargo employees opening 1,534,280 deposit accounts without customer knowledge or authorization and charging a total of about $2 million in fees.

(b)    **Submitting applications for credit cards in consumers' names using consumers' information without their knowledge or consent.  This practice resulted in Wells Fargo employees submitting**

Verified Shareholder Derivative Complaint

**applications for 565,443 credit-card accounts without customer knowledge or authorization and charging $403,415 in fees**.

(c)     Enrolling consumers in online-banking services they did not request.  Wells Fargo employees carried out this practice by using email addresses not belonging to customers to enroll them in online-banking services without their knowledge or consent.

(d)     Ordering and activating debit cards using customers' information without their knowledge or consent.  Wells Fargo employees carried out this practice by requesting debit cards and creating personal identification numbers ("PINs") to activate them without customers' knowledge or consent.

68.     Further, in the course of its ongoing supervision of Wells Fargo, the OCC identified the following deficiencies and unsafe and unsound practices in the Company's risk management and oversight of its sales practices:

(a)     The Company's incentive compensation program and plans within the Community Bank Group were not aligned properly with local branch traffic, staff turnover, or customer demand, and they fostered unsafe and unsound sales practices and pressured Wells Fargo employees to sell products not authorized by the customer.

(b)     The Company lacked an Enterprise-Wide Sales Practices Oversight Program and thus failed to provide sufficient oversight to prevent or detect unsafe or unsound sales practices and failed to mitigate the risks that resulted from such sales practices.

(c)     The Company lacked a comprehensive customer complaint monitoring process that impeded Wells Fargo's ability to:

(i)     Assess customer complaint activity across the Company;

(ii)     Adequately monitor, manage, and report on customer complaints; and

(iii)     Analyze and understand potential sales practices risk.

17

(d)     The Company's Community Bank Group failed to adequately oversee sales practices and failed to adequately test and monitor branch employee sales practices.

(e)     The Company's audit coverage was inadequate because it failed to include in its scope an enterprise-wide view of the Company's sales practices.

## II.     THE OCC'S CONSENT ORDER AND FINDINGS

69.     On September 8, 2016, the OCC announced the results of its own investigation into Wells Fargo's sales practices, as well as entry of two separate Consent Orders against Wells Fargo: (a) a "cease and desist" order designed to immediately stop the "unsafe" sales practices, and (b) an order requiring Wells Fargo to pay a civil monetary penalty of $35 million.  The OCC's release stated that the large amount of the fine "reflects a number of factors, including [Wells Fargo's] failure to develop and implement an effective enterprise risk management program to detect and prevent the unsafe or unsound sales practices, and the scope and duration of the practices."

70.     Each of the OCC's Consent Orders were based upon, and specifically incorporated by reference, a "Stipulation and Consent" signed by Defendants Stumpf, Dean, Hernandez, Milligan, Peña, Quigley, and Sanger, in their capacity as directors.

71.     The OCC's Consent Orders, incorporating by reference the Stipulations and Consents signed by the referenced Individual Defendants, made a number of findings about Wells Fargo's "deficiencies and unsafe or unsound practices in [Wells Fargo's] risk management and oversight of [its] sales practices" including the following:

- Wells Fargo's "incentive compensation program and plans within the Community Bank Group were not properly aligned with local branch traffic, staff turnover, or customer demand, and they fostered the unsafe or unsound sales practices ... and pressured Bank employees to sell Bank products not authorized by the customer;

- "[Wells Fargo] lacked an Enterprise-Wide Sales Practices Oversight Program and thus failed to provide sufficient oversight to prevent and

Verified Shareholder Derivative Complaint

detect the unsafe or unsound sales practices ... and failed to mitigate the risks that resulted from such practices";

- "[Wells Fargo] lacked a comprehensive customer complaint monitoring process that impeded [its] ability to" assess complaint activity, adequately monitor, manage and report on complaints, and analyze and understand the potential sales practices at risk;

- "[Wells Fargo's] Community Bank Group failed to adequately oversee sales practices and failed to adequately test and monitor branch employee sales practices"; and

- "[Wells Fargo's] audit coverage was inadequate because it failed to include in its scope an enterprise-wide view of [its] sales practices."

72. The OCC's investigation specifically identified "unsafe and unsound sales practices in Wells Fargo's Community Bank Group" including selling unwanted deposit or credit card accounts, opening accounts without authorization, transferring funds to unauthorized accounts to "simulate" funding, and unauthorized credit inquiries to enable this conduct.

73. The OCC also rejected any notion that Wells Fargo's illegal behavior was somehow isolated in scope or duration, concluding instead that Wells Fargo "engaged in reckless unsafe or unsound banking practices that were part of a pattern of misconduct." The OCC required full restitution to customers.

74. Most notably, there is stark evidence of the Individual Defendants' utter failure to monitor and oversee Wells Fargo's bank and sales operations, causing the OCC to mandate that Wells Fargo make large-scale revisions to its internal corporate governance structure, including the following:

- The Board is required to appoint and maintain a Compliance Committee, including at least three non-employee directors, responsible for overseeing compliance with the OCC-mandated relief and preparing reports to the Board and the OCC;

19

Verified Shareholder Derivative Complaint

- Wells Fargo must submit a "Comprehensive Action Plan" to ensure that it "achieves and maintains an enterprise-wide risk management program designed to prevent and detect unsafe or unsound sales practices";
- Wells Fargo is required to retain an independent consultant to conduct an "Enterprise-wide Risk Review of Sales Practices Risk," including a review of its enterprise-wide governance and risk management of sales practices related to deposit accounts, credit card accounts, unsecured lines of credit, and related services, and then to provide a report to the OCC, including a root cause analysis;
- Wells Fargo must develop a comprehensive "Enterprise-wide Sales Practices Risk Management and Oversight Program," for review by the OCC, which must include: (a) a written corporate values statement regarding compliance, to be communicated across Wells Fargo; (b) implementation of policies and procedures for reporting and escalating sales practices information to the Board and executive management in a timely manner; (c) establishment of key risk indicator metrics at both the enterprise and line of business levels, including customer surveys, complaints, employee ethics allegations or complaints, and corporate investigation metrics; (d) a comprehensive written assessment of any new or revised incentive structure for personnel engaging in sales practices; (e) policies to review, evaluate, and escalate customer complaints; (f) policies to assess customer harm and remediation when employees are terminated; (g) training Bank personnel regarding applicable laws, rules, and Bank policies; (h) policies to identify and report sales practice issues to a specified executive risk manager at Wells Fargo; and (i) policies to ensure that risk management, legal, internal audit, and corporate compliance programs have the requisite

20

Verified Shareholder Derivative Complaint

authority and status within Wells Fargo so that deficiencies are identified and remedied;

- Wells Fargo must adopt an "Enterprise Complaints Management Policy" and related procedures to track, manage, and report customer complaints; and

- Wells Fargo must revise its existing monitoring and testing program, Wells Fargo Audit Services, and require the program to include written policies and procedures to ensure that there is an "enterprise view of sales practices" and policies to ensure that investigations, customer complaints, and ethics line processes are included in the monitoring and testing program, with a written audit opinion of each of these areas.

### III. The Director Defendants and the Officer Defendants Knew of the Unlawful Business Practices for Years

75.     The Individual Defendants were aware of extensive internal as well as publicly-available information prior to and during the Relevant Period which credibly demonstrated that serious unlawful and unethical conduct related to the Great 8 and Daily Incentive programs was endemic at the Company.

76.     The Officer Defendants were aware of this due to knowledge gained from performing their daily job duties.  Tolstedt was in charge of the Community Banking division where the fraud was occurring and where managers reviewed workers achievement or non-achievement with the quotas mandated by the Great 8 and Daily Incentive Program every two hours (at 11:00 a.m., 1:00 p.m., 3:00 p.m., and 5:00 p.m.).  The number of accounts Wells Fargo employees opened were also closely tracked.  Several former Wells Fargo employees have recounted they were required to open 15 new accounts for products each day.  Employees who were unable to meet their sales goals faced the prospect of termination.

77.     Loughlin, as Chief Risk Officer, was advised of the endemic problem, including the claims of the opening of unauthorized accounts, forgery of customer signatures, and the firing of 5,300 employees.   In fact, in just 2011, Wells Fargo terminated nearly 1,000 employees in the retail banking section for improper sales practices.   Loughlin was a member of the Company Operating Committee, which required him to attend (per Wells Fargo's Corporate Governance Guidelines) Board meetings and "most" Board committee meetings.   Plaintiff is thus entitled to a reasonable inference that Loughlin did attend those meetings and did advise the Director Defendants of the substantial unlawful conduct occurring in the Company's Community Banking division and advise Board Members of the numerous lawsuits filed against the Company by former employees alleging fraud.

78.     The Director Defendants and then-CEO Stumpf also had knowledge of the problems or recklessly disregarded the problems in bad faith.  A majority of the Director Defendants had knowledge of the negative impact the Company's cross-selling initiative was having on employee sales practices as early as 2007, when two letters from a Wells Fargo employee addressed to then-CEO Stumpf and the members of the Audit Committee stated that the Great 8 Campaign created a high pressure and toxic sales culture that resulted in "unethical and illegal activity," including "routine deception and fraudulent exploitation of [Wells Fargo's] clients."   Eerily, the letters seemed to predict the current crisis, stating: "Left unchecked, the inevitable outcome shall be one of professional and reputational damage, consumer fraud and shareholder lawsuits, coupled with regulator sanctions."   Five of the current Board members (Dean, Hernandez, Milligan, Quigley, and Swenson) sat on the 2007 Audit and Examination Committee, and a majority of the current Board was members of the 2007 Board. Despite this red flag, the Director Defendants failed to act and the illegal and fraudulent business practices continued unabated.  Copies of these letters, dated September 13, 2007, are attached as Exhibits D and E.

79.   In another letter dated December 27, 2005 to Tolstedt, a retired branch manager who had worked at Wells Fargo for 35 years reported that Wells Fargo employees had opened checking, savings, and debit card accounts for customers seeking mortgage loans without their authorization.  The letter also cited instances of "gaming" — a method of inflating loan amounts where, for example, a customer applying for a $10,000 personal loan would be issued a loan of $50,000, $40,000 of which would be immediately repaid to Wells Fargo.  A copy of this December 27, 2005 letter is attached as Exhibit F.

80.   Multiple Wells Fargo employees, including branch managers, from Arizona, California, Idaho, New Jersey, and Pennsylvania reported to management, including directly to Stumpf, regarding the illegal practice of opening fake accounts to meet sales quotas:

(a)   Christopher Johnson, who worked as a business banker at a Wells Fargo branch in Malibu, California, learned shortly after being hired in 2008 that his colleagues "routinely opened unauthorized accounts for customers who they thought wouldn't notice, like elderly clients or those who didn't speak English well."  He called the ethics line to report the behavior, and was fired three days later purportedly for "not meeting expectations."  *See* Stacy Cowley, *Wells Fargo Workers Claim Retaliation for Playing by the Rules*, THE NEW YORK TIMES, Sept. 16, 2016.

(b)   Rebecca Lewis, a Wells Fargo teller in Idaho, flagged unauthorized accounts to the ethics line in 2009.  *See* Matt Egan, *I called the Wells Fargo ethics line and was fired*, CNNMONEY, Sept. 21, 2016.

(c)   Bill Brado, who worked as a Licensed Personal Banker at a Wells Fargo branch in Richboro, Pennsylvania, recalled that he reported similar unethical sales activities, including orders to open phony bank accounts and credit accounts, to the ethics line and sent an email to the Human Resources department in September 2013 recounting the same behavior.  *Id.* Eight days

after he sent that email, he was terminated, purportedly for tardiness. *Id*. A former Wells Fargo Human Resources official confirmed that there was a history at Wells Fargo of terminating employees "in retaliation for shining light" on improper practices.

(d)     Rasheeda Kamar, a former branch manager in New Milford, New Jersey, was fired in 2011. The day she learned she would be fired for falling short of the branch's goals, she sent an email to Stumpf warning him that Wells Fargo bankers were reaching the Company's goals by creating fake accounts. Kamar's 2011 email was read to Stumpf by Senator Menendez during Stumpf's September 2016 Senate testimony: "There are challenges that team members are faced with, but those should not be the reason to move money from one account to another and to fool the motivator [*i.e.*, supervisor] that we have new accounts. These funds that are moved to new accounts to show growth, when in actuality there is no net gain to the company's deposit base, is wrong. In the past months I was placed on warning for not meeting these goals and the reason that the bankers underneath me do not is because I will not tolerate the movement of existing money just because we need checking account solutions and profit proxy to move to the motivator. These accounts make no sense for the customer."

(e)     Ricky M. Hansen Jr., a former branch manager in Scottsdale, Arizona, related: "Everybody knew there was fraud going on, and the people trying to flag it were the ones who got in trouble." *See* Stacy Cowley, *Wells Fargo Workers Claim Retaliation for Playing by the Rules*, THE NEW YORK TIMES, Sept. 16, 2016. He recalled that he was aware, from the time he started in 2008, that certain of his region's top performers openly cheated to meet sales quotas, but in 2011, while covering another branch for a colleague, he learned of a particularly egregious case: the branch's bankers were inventing fake businesses and opening accounts in their names. *Id*. Hansen immediately called Human Resources to ask what he should do with that information and was told to report the activity to

Verified **Shareholder** Derivative Complaint

the ethics line.  *Id.*  Hansen did so and, at the request of an investigator on the ethics line, looked up the specifics of the fake accounts at issue.  *Id.*  One month after calling the ethics line, he was fired, purportedly for improperly looking up account information.  *Id.*  After being fired, Hansen sent an email to Stumpf and several Human Resources executives regarding his ordeal.

81.    In addition, the Individual Defendants were informed by current and former Wells Fargo employees about illicit account-creation activities, including through litigation by former employees alleging they were wrongfully terminated for attempting to report unlawful activity.  Among other actions by former Wells Fargo employees, in 2008 an employee won a federal whistleblower case against Wells Fargo relating to the creation of fake brokerage accounts, which violated SEC rules and thus triggered whistleblower protections under the Sarbanes-Oxley Act of 2002 ("SOX").  In the case, a division of the DOL found there was "reasonable cause to believe" Wells Fargo violated whistleblower protection laws by transferring the employee after he flagged illegal activity.

82.    In 2009 a Wells Fargo employee named Amber Salazar sued Wells Fargo in Nevada, alleging that the Company forced employees to work late at night and on weekends to meet the unrealistic and aggressive sales quotas imposed by the Company's executives, but refused to pay overtime wages required by state law.

83.    Ms. Salazar's lawsuit was certified as a class action and Wells Fargo was forced to pay $100,000 to settle the lawsuit.

84.    In 2009, six former Wells Fargo employees sued Wells Fargo in federal court in Montana alleging wrongful termination (*Finstad v. Wells Fargo Bank, N.A.*, No. 09-cv-0046-CCL (D. Mont.)).  They alleged that they had been fired in mid-2008 for reordering debit cards without customer authorization — *i.e.*, "gaming."  But they claimed to have been instructed to do so by their branch manager.  They also claimed that they had been terminated for the activity only after reporting it to Wells Fargo's ethics line.

85.     On August 6, 2010, former Wells Fargo employees Yesenia Guitron and Judi Klosek filed a complaint against Wells Fargo alleging unlawful conduct, *Guitron v. Wells Fargo Bank, N.A.*, No. 10-cv-3461-CW (N.D. Cal.).   The complaint alleged that Wells Fargo and one of its bank managers Pam Rubio employed "unlawful and unfair marketing practices" regarding opening customer accounts.   The complaint specifically alleged that "Wells Fargo set forth unreasonably aggressive and ambitious marketing goals to its employees and managers through the implementation of the Daily Solution reward system."

86.     The *Guitron* complaint also alleged that Wells Fargo's Daily Solution program "fosters employees and managers at Wells Fargo to artificially increase bank activity and sell financial products to customers regardless of the need of those products and in breach of ethical and statutory duties owed by Wells Fargo to its customers."

87.     Ms. Guitron alleged that she was a single mother with two children and the sole wage earner for her family.   Ms. Guitron was pressured to meet unrealistic and aggressive goals of opening new customer accounts under the Daily Incentive program. Guitron was awarded employee of the month three times at the Wells Fargo branch in St. Helena and never received any personnel or discipline warnings from Wells Fargo. Ms. Guitron began to notice that another employee, Corinia Zavaleta, was opening customer accounts without customer authorization in order to meet the aggressive and unrealistic Daily Incentive quotas set by Wells Fargo management.

88.     When Ms. Guitron complained to management about the unethical and unlawful opening of customer accounts without customer authorization to bank manager Rubio, she was retaliated against and given a false and negative performance review.

89.     When her complaints to Wells Fargo bank manager Rubio were ignored and the conduct of Zavaleta continued to occur, Ms. Guitron called the Wells Fargo Ethics Hotline on August 26, 2009 and reported her concerns about the unethical and unlawful conduct of Zavaleta.

90.     Upon information and belief, the members of Wells Fargo's Audit Committee received or should have received a report of all complaints made to the Ethics Hotline.  Even if they did not, Ms. Guitron's complaint was filed in federal court in San Francisco and was public knowledge.  The lawsuit also received the attention of the press.  *See* Jesse Duarte, "Lawsuit Accuses Wells Fargo of Ethical Violations," THE ST. HELENA STAR (Sept. 2, 2010).  Guitron also told the New York Times that she, like other employees, reported the fraudulent activity to her branch manager, her branch manager's boss, the ethics line, and the Human Resources department.  *See* Stacy Cowley, *Wells Fargo Workers Claim Retaliation for Playing by the Rules*, THE NEW YORK TIMES, Sept. 16, 2016.

91.     Ms. Guitron's concerns were ignored or brushed aside by supervisors.  Faced with such retaliation, Guitron relayed her complaints to Susan Eagles-Williams, the District Head of Wells Fargo Human Resources, in a January 15, 2010 email.  On January 26, 2010, Eagles-Williams finally responded to Guitron and requested a teleconference with Guitron.  Ms. Guitron never received a teleconference with Eagles-Williams and the next day her access to Wells Fargo's computer system was blocked and then she was fired the same day, allegedly for "insubordination" to her supervisor Rubio.

92.     Ms. Guitron was fired without severance and without any means to support her two young children.  In stark contrast, Zavaleta, Rubio and others at Wells Fargo who engaged in the wrongful conduct earned bonuses for their actions.

93.     On May 11, 2010, Guitron further filed a complaint against Wells Fargo alleging a violation of SOX.  Upon information and belief, the Wells Fargo Board was advised of the SOX complaint.

94.     Further, according to then-CEO Stumpf, Wells Fargo developed a program known as the "Quality-of-Sale Report Card"—a program designed to detect misconduct through monitoring of sales patterns that correlate with unethical behavior—that would have put senior executives on notice of the misconduct as early as 2011.  Also in 2011,

Wells Fargo formed a dedicated team known as the "Sales and Service Conduct Oversight Team," which proactively monitored data for the specific purpose of rooting-out sales practice violations.  Pursuant to these programs, then-CEO Stumpf testified before the U.S. House of Representatives that the Director Defendants received high-level information regarding employee complaints made on the ethics hotline from 2011-2013.  Despite these warnings, the Director Defendants did not take any meaningful action in good faith to remedy known unethical and illegal behavior resulting from the Great 8 Campaign.

95.    Additionally, in 2011, the Company entered into a consent order with the Federal Reserve Bank ("FRB") in connection with unethical and fraudulent mortgage practices.  Of particular importance, the FRB found that Wells Fargo sales performance standards and incentive compensation programs imposed unreasonable quotas of sales personnel, which resulted in employees altering and falsifying income documents and inflating prospective borrowers' incomes to qualify those borrowers for loans that they would not have otherwise been qualified to receive.  Despite this clear signal that sales quotas incentivized employees to cut corners, the Director Defendants did not take any meaningful action to investigate whether other business segments suffered from similar issues.

96.    In a July 6, 2012 summary judgment order, the district court presiding over Ms. Guitron's case held that Guitron had established a *prima facie* case of Wells Fargo's retaliation against Guitron for making the SOX complaints, holding that Ms. Guitron had "established a genuine dispute of material fact as to whether Ms. Guitron's reports related to bank fraud.  Plaintiffs presented evidence that Ms. Guitron reported that her former colleagues were engaging in practices such as opening and closing accounts without customer permission or awareness or without proper identification, which would allow them to obtain otherwise unearned bonuses from Wells Fargo,

thereby defrauding it." July 6, 2012 Order at 32–33.[3]  Ironically, Wells Fargo argued that the district court should nonetheless dismiss Ms. Guitron's claims since Wells Fargo was justified in firing her since she did not meet the sales quotas imposed by the Daily Incentive program, and that since such alleged cause for firing was justified, any retaliatory motive was mooted by the allegedly lawful motive.  The district court credited this argument, coming as it did prior to the time that the full extent of Wells Fargo's wrongful conduct with respect to the Daily Incentive program was disclosed.

97.     The other plaintiff in the case, Judi Klosek, testified as part of her case that "accounts were excessively being opened and closed, and that I suspected bankers were unethically forcing customers to open and close accounts unnecessarily to gain" sales credits.  Klosek also testified about "unethical conduct, opening and closing accounts, forced sales, ordering products that customers don't want, … shoving products down customers' throats."   The district court denied Wells Fargo's motion for summary judgment as to Klosek's claims in the July 6, 2012 Order, and later Wells Fargo settled the claims asserted by Ms. Klosek.

98.     On October 25, 2012, seven former Wells Fargo employees sued Wells Fargo again, making similar allegations as those asserted in the *Guitron* case.  *See Govan v. Wells Fargo & Co.*, No. 2012-CP-07-03709 (S.C. Ct. of Common Pleas, Cnty. of Beaufort).[4]  The complaint alleged that the Wells Fargo employees were required to meet quotas for opening new accounts to keep their jobs, and that when their branch manager complained about the practice Wells Fargo fired all the employees in the branch in an attempt to cover up its own wrongdoing.  One of the plaintiffs, Ms. Govan, recounted an episode in which she and the other plaintiffs were ordered to open new accounts for 31 cultural exchange students from China who lived in a single apartment complex and spoke little English.

---

[3] *See Guitron v. Wells Fargo Bank, N.A.*, No. 10-cv-3461, Dkt. No. 136 (N.D. Cal. July 6, 2012).

[4] A true and correct copy of the November 28, 2012 amended complaint filed in *Govan* is attached as Exhibit A.

## IV.    The Individual Defendants Violated the Company's Code of Ethics

99.    Wells Fargo has a Code of Ethics which it makes available to all employees, posts on its website.

100.    The Code of Ethics states that all employees, as well as all officers and directors of the Company, must abide by the Code or risk discipline and/or termination, as well as potential lawsuits involving civil and even criminal liability.

101.    During the Relevant Period, the Individual Defendants completely disregarded the values and ethics set forth in the Code of Ethics in order to benefit themselves at the expense of rank and file workers and the Company itself.

102.    Most notably for purposes of the present lawsuit is the Code's mandate that Wells Fargo does not tolerate retaliation of any kind.  In fact, under the Individual Defendants' watch, however, Wells Fargo fired thousands of hard-working individuals in an effort to cover up the managers' and executives' own illegal conduct.

103.    The Code of Ethics states:

> We do not engage in or tolerate retaliation of any kind against anyone for providing information in good faith about suspected unethical or illegal activities, including possible violations of this Code, violations of laws, rules, or regulations by others, or concerns regarding accounting, internal accounting controls, or auditing matters.
>
> *          *          *
>
> We are all accountable for complying with the Code, as well as all company policies and applicable laws, rules, and regulations that apply to us.  Likewise, we are all accountable for our decisions and actions, especially managing the risks inherent in our roles and appropriately escalating issues and violations of which we become aware. If mistakes are made, we acknowledge them and act to correct them.
>
> Violation of the provisions of this Code or the referenced policies and guidelines is grounds for corrective action, which may include termination of your employment. Certain actions may also result in legal proceedings, including prosecution for criminal liability.

104.    As set forth in detail herein, the Individual Defendants in fact caused or allowed Wells Fargo to harshly retaliate against employees in the Company's

30

Community Banking division who raised honest and credible concerns about the Company's unlawful conduct with respect to opening unauthorized customer accounts, forging customer signatures, and the other wrongdoing.

105.    In response to these employees doing as they were told in the Code of Ethics, the Individual Defendants caused or allowed these employees to be ridiculed, retaliated against, fired for cause, and denied severance pay or other benefits.

106.    The conduct of the Individual Defendants is truly despicable and represents conduct that shocks the conscience, in addition to being blatantly in violation of the Company's own Code of Ethics.

**V.    The Individual Defendants Cause Wells Fargo to Enter Into a Partnership with American Express to Allow More Fake Accounts to Be Opened in the Form of American Express Credit Cards**

107.    On August 7, 2013, Defendant American Express announced a partnership with Wells Fargo to open more accounts for Wells Fargo's customers in the form of American Express credit cards. American Express issued a press release from San Francisco announcing the partnership, which stated:

> SAN FRANCISCO,  August 7, 2013 —
> Two companies that share the same founders and a rich history, Wells Fargo (NYSE: WFC) and American Express (NYSE: AXP), announced today a new chapter of partnership that will see Wells Fargo issuing new credit cards accepted on the American Express network.
>
> "We are delivering on our strategy to expand our credit card business," said John Stumpf, Chairman and CEO of Wells Fargo.  "Our goal is to offer Wells Fargo customers a suite of cards that help them meet their financial goals. ***We're proud to have American Express as a partner in this effort*** — a great company with a proven brand for customer service."
>
> "Given the fact that two of our founders were Henry Wells and William Fargo, this partnership is especially significant to all of us at American Express," said Kenneth I. Chenault, Chairman and CEO, American Express.  "Wells Fargo is an outstanding addition to our global network of card-issuing partners.  We look forward to starting a new

journey with them and to delivering premium value and service to Wells Fargo's customers."

Avid Modjtabai, head of Wells Fargo's Consumer Lending Group added, "We want to give the customers who already carry our card — and the ones who don't yet — greater rewards and benefits for having a Wells Fargo card in their wallets.  The breadth of our offerings, our strong retail network and the power of this new partnership with American Express position us well to continue to deliver compelling choices and experiences to our customers."

108.    Pursuant to the American Express/Wells Fargo partnership, American Express provided key services and assistance to Wells Fargo with respect to the American Express credit cards.  As the press release announcing the partnership stated:

> **As part of the card-issuing partnership, American Express is providing its Partner Advantage capabilities and services to support Wells Fargo in developing a suite of products that will offer a superior set of experiences, exclusive benefits and customized offers from the American Express network, both online and offline. Separately, LoyaltyEdge from American Express will assist in the design of a new Wells Fargo loyalty program** by offering a broad range of merchandise and gift cards that Wells Fargo's consumer credit customers will be able to redeem with their points.

109.    With respect to implementation of the partnership, Defendant American Express further announced that "Wells Fargo will conduct a pilot program for customers in select U.S. markets starting in the third quarter of 2013, with a full scale launch in the first half of 2014.  The new cards will be accepted on the American Express global merchant network."

**VI.    On the Heels of the Announcement of the American Express Partnership, Wells Fargo Continues to Be Sued by Its Customers for Opening Fake Accounts, and the Los Angeles Times Publishes Two Articles on the Misconduct Based on Detailed Interviews with Wells Fargo Employees**

110.    On September 11, 2013, David Douglas sued Wells Fargo in Los Angeles Superior Court.  *See Douglas v. Wells Fargo Bank*, No. BC21016 (Cal. Super. Ct., Cnty. of Los Angeles).  He alleged that Wells Fargo employees in the Company's Century City

and Beverly Hills offices used his birth date and social security number to open unauthorized accounts in his name and those of fictitious businesses.  At least one Wells Fargo employee was alleged to have forged Mr. Douglas' name several times. The Wells Fargo employees put their own addresses on the accounts so that Mr. Douglas would not learn of the fraud.  But Douglas eventually learned of the accounts through a credit report.

111.    In October 2013, a former Wells Fargo employee sued the Company for wrongful termination, alleging that her manager forced her to open accounts in the names of her family members.

112.    On October 3, 2013, the Los Angeles Times ran an article (the "October 2013 L.A. Times Article") which stated that "Wells Fargo & Co. has fired about 30 branch employees in the Los Angeles region who the bank said had opened accounts that were never used and attempted to manipulate customer-satisfaction surveys."  The October 2013 L.A. Times Article stated that "[o]ne of the fired employees said that in some cases signatures were forged and customers had accounts opened in their names without their knowledge" and that "the pressure to meet sales goals was intense at Wells Fargo.  At times, managers required workers to stay in the branch after the close of business, calling their friends and family members, if they failed to open enough accounts during the day[.]"

113.    Then, on December 21, 2013, the Los Angeles Times published a lengthy article entitled "Wells Fargo Pressure Cooker Sales Culture Comes at a Cost" (the "December 2013 L.A. Times Article")[5]  The article noted that "The relentless pressure to sell has battered employee morale and led to ethical breaches, customer complaints and labor lawsuits, a Times investigation has found.  **To meet quotas, employees have opened unneeded accounts for customers, *ordered credit cards without customers' permission and forged client signatures on paperwork*.**"

---

[5] A true and correct copy of the December 2013 L.A. Times Article is attached as Exhibit B.

114.   The December 2013 L.A. Times Article reported that the pressure to engage in illegal sales practices had "led to ethical breaches," which was confirmed by an extensive investigation that included "a review of internal bank documents and court records, and ... interviews with 28 former and seven current Wells Fargo employees who worked at bank branches in nine states, including California."

115.   When the Los Angeles Times reached out to then-CFO Sloan about the article, he stated, however, that he was "not aware of any overbearing sales culture" at Wells Fargo.

116.   Through the December 2013 L.A. Times Article, the Defendants learned of specific acts of cross-sell fraud.  For instance, the article reported that Wells Fargo managers "coached workers on how to inflate sales numbers;" Erik Estrada, a former Wells Fargo personal banker in Los Angeles, described his manager greeting his branch staff each morning with a daily quota for products such as credit cards or direct-deposit accounts; Estrada also observed that his manager explicitly told employees that it did not matter how the accounts were created but that employees would not be allowed to leave the branch until the numbers were met; Estrada also stated "branch and district managers told [Estrada] to falsify the phone numbers of angry customers so they couldn't be reached for the bank's satisfaction surveys."  The article also reported that Estrada described "employees open[ing] duplicate accounts, sometimes without customers' knowledge," "workers us[ing] a bank database to identify customers who had been pre-approved for credit cards [and] order[ing] the plastic without asking them."

117.   Indeed, Stumpf testified before the House Financial Services Committee that he was aware of the December 2013 L.A. Times Article around the time it was published, and discussed it with the Board.  He also stated he recalls learning of the increase in the number of reports of sales practice issues in late 2013.

118.   Stumpf also addressed the December 2013 L.A. Times Article at a town hall meeting with Wells Fargo employees held in Hollywood, Florida on February 5,

2014.  At the town hall meeting, Stumpf promised that he "want[ed] to address" the issues discussed in the article "head on."

119.   The December 2013 L.A. Times Article also detailed other examples provided by employees:

- convincing a homeless woman to open "six checking and savings accounts with fees totaling $39 a month;
- "open[ing] accounts or credit lines for customers without their authorization"; and
- using a Wells Fargo customer's "birth date and Social Security number to open accounts in his name and those of fictitious businesses."

120.   The article noted that Wells Fargo had fired Estrada, together with about 30 Southern California Wells Fargo workers, who "cheated to hit their sales goals."

121.   Despite this public information available to American Express, including the specific information in the December 2013 L.A. Times Article noting that Wells Fargo employees had "ordered credit cards without customers' permission and forged client signatures on paperwork," Defendant American Express continued to provide substantial assistance to Wells Fargo in opening new American Express credit cards. Indeed, the American Express press release issued on August 7, 2013 stated that American Express's partnership with Wells Fargo was to be implemented first by a pilot program starting in Q3 2013 and then "a full scale launch in the first half of 2014."

122.   Thus, American Express's partnership with Wells Fargo was implemented in the midst of numerous public and highly specific allegations of the opening of unauthorized credit cards for Wells Fargo consumers.  Moreover, as stated by Defendant Stumpf when Wells Fargo and American Express announced the partnership, the goal of the partnership was to "deliver[] on our strategy to expand our credit card business."

123.   The 2013 Times article also noted that one former branch manager who worked in the Pacific Northwest described her dismay at discovering that employees had

1    "talked a homeless woman into opening six checking and savings accounts with fees

2    totaling $39 a month. 'It's all manipulation. We are taught exactly how to sell multiple

3    accounts,' the former manager said. 'It sounds good, but in reality it doesn't benefit

4    most customers.'"

5        124.    Upon information and belief, all the members of the Board, as well as

6    Defendant American Express, were aware of the December 2013 L.A. Times Article in

7    light of the widespread media attention it received.

8        125.    Indeed, Defendant Sloan, then-CFO of Wells Fargo, was actually aware of

9    the December 2013 L.A. Times Article because the Los Angeles Times called Sloan and

10   asked him to comment on the allegations of current and former Wells Fargo employees

11   quoted in the article.

12       126.    In response, Sloan stated "I'm not aware of any overbearing sales culture."

13   Sloan's comment was false, as he was aware of the problems and indeed was one of the

14   persons at Wells Fargo responsible for creating the "overbearing sales culture" in order

15   to meet the unrealistic and aggressive sales quotas.  Stumpf testified before the Senate

16   on September 20, 2016 that he was advised of the December 2013 L.A. Times Article

17   shortly before it was published (probably from Sloan after he was called for comment

18   before the article was published).  Both Sloan and Stumpf repeatedly boasted about the

19   number of accounts per customer that Wells Fargo had opened during the Company's

20   frequent calls with analysts to discuss the Company's financial results, as described in

21   detail *infra*.

22       127.    In addition, all Defendants knew that, at the time the December 2013 L.A.

23   Times Article was published, Wells Fargo had reported an average of 6.15 financial

24   accounts per customer in October 2013 — nearly four times the industry average.  They

25   also knew, as CEO Stumpf repeatedly stated in public comments that Wells Fargo's goal

26   was to open eight accounts per customer in pursuit of his cross-selling mandate.

27

28

128.   Moreover, the Board was regularly advised and updated regarding the Company's success in opening multiple new accounts for customers pursuant to the Great 8 campaign and Daily Incentive programs.

129.   Any director or executive officer presented with information that Wells Fargo had achieved 6.15 accounts per customer, and aimed to get that number to 8, would immediately ask how the Company was achieving results four times the industry average.  The Individual Defendants were advised of the details of the Great 8 and Daily Incentive programs.  They were and are also literate and can and do read the newspaper articles alleging fraud by Wells Fargo regarding the opening of unauthorized customer accounts, forging of customer signatures, and the resignation or firing of thousands of Wells Fargo customers due to the unlawful conduct.

130.   Indeed, the subtitle of the December 2013 L.A. Times Article was "**[w]orkers opened as many as 2 million accounts that customers never wanted**."

131.   On October 3, 2013, a former bank employee Jahedeh Zarandian sued Wells Fargo in San Mateo Superior Court, alleging she was retaliated against and wrongfully terminated after being forced by her manager to open accounts in the names of family members.  *See Zarandian v. Wells Fargo Bank, N.A.*, No. CIV 524564 (Cal. Super. Ct., Cnty. of San Mateo).

132.   In February 2015, the OCC commenced another examination of Wells Fargo's Community Bank Operational Risk Management, including an evaluation of its sales practices oversight.

133.   In April 2015, the OCC issued another Supervisory Letter to Defendants. This letter included a Matters Requiring Attention notice directing the Defendants to address deficiencies in sales practices governance within the Community Bank division.

134.   On April 3, 2015, a former Wells Fargo banker located in Chatsworth, California mailed and emailed a letter to Stumpf and the Board advising them of

"unethical practices in sales due to the continuous management threat of negative consequences if [the bankers] did not produce 'solutions.'"  The letter read:

> Dear Board Members,
>
>     I am an active Wells Fargo banker working in retail banking division. I am writing to you to start cleaning up the branches in LA [Los Angeles]/OC [Orange County] area from; unethical practice in sales due to continuous management threat of negative consequences if they do not produce "solutions" in double digits on daily basis, the threat has come to "do whatever it takes to get this numbers."
>     ...
>     I have documents, printed emails and official papers that prove my allegations.  I recommend as well if you visit this area (undercover with casual attire) on week days unannounced to see for yourselves. I tried several times to seek HR help, with no use, they end up saying "go and talk to your manager", which defies the purpose.  These areas are doing and manage their business as they please, as long as the Regional Director is happy with the fake picture they portray on the retail side, she turns on her blind side from all the corruption.

During the next several months, the former employee repeatedly emailed Wells Fargo representatives, **copying the Board**, asking for updates.  An email from August 2015 forwarded an internal Wells Fargo email from November 2014 with an example of a supervisor pushing employees to meet their "mandatory" sales goal.

135.   Then, on May 4, 2015, as a result of over 1,000 calls received from consumers and current and former Wells Fargo employees in response to the December 2013 L.A. Times Article, the Los Angeles City Attorney sued Wells Fargo.[6]   The complaint alleged among other things, that: (a) Wells Fargo opened banking and financial accounts (including credit cards), products, and services for California customers without their consent; and (b) after discovering that accounts, products, and services were opened for these customers without their consent, Wells Fargo failed to

---

[6] A true and correct copy of the Los Angeles City Attorney's May 4, 2015 complaint in *People v. Wells Fargo & Co.*, No. BC580778 (Cal. Super. Ct., Cnty. of Los Angeles), is attached as Exhibit C.

1      inform them of the opening of those accounts, products, and services without their

2      consent.

3      136.     The Los Angeles City Attorney lawsuit also alleged that **Wells Fargo had**

4      **known of the fraudulent business practices for years** and "**has done little, if**

5      **anything, to discourage its employees' behavior and protect its customers**."

6      137.     The Los Angeles City Attorney lawsuit specifically alleged that Wells Fargo

7      had repeatedly opened **credit cards** for its customers without the customers'

8      knowledge or consent:

> Wells Fargo's employees have engaged in unfair, unlawful, and fraudulent conduct, including opening customer accounts, and **issuing credit cards, without authorization**. Wells Fargo has known about and encouraged these practices for years.

12      138.     The Los Angeles City Attorney complaint also alleged that:

> **Wells Fargo enforces its sales quotas by constant monitoring. Daily sales for each branch, and each branch employee, are reported and discussed by Wells Fargo's District Managers four times a day, at 11:00 a.m., 1:00 p.m., 3:00 p.m., and 5:00 p.m.** Those failing to meet daily sales quotas are approached by management, and often are reprimanded and/or told to "do whatever it takes" to meet their individual sales quotas.

19      139.     Upon information and belief, the Individual Defendants were advised of

20      the Los Angeles City Attorney lawsuit and/or provided with a copy of the complaint.

21      140.     As a result of the recent settlement of the Los Angeles City Attorney

22      lawsuit, Wells Fargo was ordered to include the following notice in customers' monthly

23      account statements by October 2016:

> It's important for you to have peace of mind.
>
> We want to ensure you're comfortable with your accounts and have the tools you need to manage your money. We recommend you visit your local Wells Fargo bank location, or call the toll-free customer service number that appears on your statement or other account documents, to

> make sure you are satisfied with all your accounts and
> services.
>
> We'll spend time understanding your financial needs
> and reviewing your accounts and options. We'll also help you
> close any accounts or discontinue services you do not
> recognize or want, and discuss the process that's been
> established to address any remaining concerns resulting
> from accounts and services opened on your behalf.

141.   As a result of the settlement with the Los Angeles City Attorney, Wells Fargo has also been forced to incur substantial costs to retain the services of an independent third party consulting firm to identify potentially Unauthorized Accounts opened between May 2011 and July 2015 (or September 2015, in the case of credit cards) as a result of which current or former customers may have sustained a direct monetary loss.

142.   On May 14, 2015, a class action was filed by Wells Fargo customers in the United States District Court for the Northern District of California.  The class action, naming Wells Fargo as a defendant, detailed the same improper sales practices previously identified by Bank employees, the OCC, the Los Angeles Times, and the Los Angeles City Attorney's own complaint.  The class action complaint included evidence from Wells Fargo employees describing the sales quotas and the illegal sales practices necessary to meet such practices, including the creation of sham accounts.

143.   In June 2015, the OCC issued an additional Supervisory Letter directly to the Board's Chairman and CEO, Stumpf, mandating that Wells Fargo take immediate corrective action to address deficiencies in its enterprise-wide risk management and oversight of its sales practices.  Remarkably, the OCC's 2015 Supervisory Letter included *five* Matters Requiring Attention that directed the Company and the Board to correct their "inappropriate tone at the top," address their lack of control and oversight structure surrounding cross-selling, and remedy any consumer harm from sales practice misconduct.

144.   From 2011 to September 2016, the Individual Defendants consciously abdicated their fiduciary duties to Wells Fargo.  They knew about or consciously ignored

Verified Shareholder Derivative Complaint

the plethora of news articles, lawsuits, governmental investigations, and other developments demonstrating a clear pattern of illegal conduct by the Company's managers and executives.  They did nothing in response to all these bright red flags.  Their conduct constitutes bad faith, self-dealing, and a breach of their fiduciary duty of loyalty to Wells Fargo.

145.    In imposing the massive fine against Wells Fargo, the CFPB noted that the fine was required due to the extent and pervasiveness of the wrongdoing at Wells Fargo.  In testimony before the Senate Banking Committee, ***CFPB Director Richard Cordray*** said that Wells Fargo's sales practices constituted "***fraudulent conduct*** ... ***on a massive scale***" and justified the record fine "***by the outrageous and abusive nature of these fraudulent practices on such an enormous scale***."

## VII.  Wells Fargo Implements the "Full Scale Launch" of Its Partnership with American Express to Keep the Fake Account Scandal Going and to Increase Its Ability to Open More Fake Accounts

146.    American Express's assistance was very important to the continuation of Wells Fargo's unlawful fake account scandal.  As noted above, in 2013, at least eight years into the fake account scandal, Wells Fargo's executives were urgently looking for more fuel with which to feed the ravenous Great 8 beast.  Once employees had been pressured to open new fake accounts for family and friends, and exhausted those means with which to attempt to satisfy management's demands to open more new accounts or be fired or demoted, Wells Fargo executives were urgently looking for new avenues to open new accounts.

147.    Wells Fargo first adopted a pilot program in Q3 2013 to implement its partnership with American Express to open new credit cards for Wells Fargo customers.  Then, in Q1 2014, Wells Fargo and American Express engaged in a full scale launch of the program.

148.    While the exact number of credit cards opened by Wells Fargo pursuant to its partnership with American Express has not been disclosed, Wells Fargo has disclosed that its employees submitted **565,443** applications for credit-card accounts by using

consumers' information without their knowledge or consent (this number includes all credit cards, not just American Express credit cards).  Approximately 14,000 of those accounts incurred $403,145, collectively, in annual fees, overdraft-protection fees, finance or interest charges, and late fees.  Wells Fargo has two main credit card partners — American Express and Visa.  Upon information and belief, thousands of American Express credit cards were issued to consumers who may not have authorized the credit cards.

149.    Unlike Visa and MasterCard, American Express is not part of an association that has members to interact with cardholders on its behalf.  Rather, American Express operates both the card network and issuing banks.  When it started its relationship with Wells Fargo, American Express licensed its credit cards to Wells Fargo.

150.    The active involvement and participation of both American Express and Wells Fargo were required to issue and operate the Wells Fargo American Express credit cards.  For Wells Fargo, the partnership was perceived as a vital part of its cross-selling strategy.  For American Express, the partnership was seen as a way for American Express to benefit by increasing the number of its cards issued, thereby financially benefitting American Express since American Express charged a yearly fee for the cards and also obtained a percentage fee of each purchase made with the cards.

151.    One author identified the advantages of the American Express-Wells Fargo partnership as follows:

> American Express recently announced a joint product with Wells Fargo (NYSE:WFC) called the "Propel" cards, which come in two varieties.
>
> **This could open up American Express'[s] products to a whole new batch of prospective customers, namely Wells Fargo's 70 million banking customers. Wells has said it wants to put a Wells Fargo credit card in every one of their creditworthy account holders' wallets, and Wells Fargo is very good at cross-selling their products to their customers**.

*See* Matthew Frankel, "How American Express's Partnership With Wells Fargo & Co Has Huge Potential," THE MOTLEY FOOL, June 4, 2015 (emphasis added).[7]

152.   The Motley Fool article noted the following huge potential benefits of the partnership with American Express for Wells Fargo:

### What's the potential?

> According to Wells Fargo's "Vision and Values" brochure, only about one in three of the bank's customers currently have a Wells Fargo credit card. So, using the estimate of 70 million total customers, this implies there are nearly 47 million customers who don't yet have a credit card with the bank.

153.   As to the benefit for American Express, the Motley Fool article noted:

> Even if Wells Fargo is successful in only getting 10% of their customers who don't already have a card to sign up, it would mean a 4.5% increase in American Express's customer base.

> According to the most recent data available, the average American Express cardholder charges about $4,200 per year to their card. So, if each Propel customer uses their card for this amount, it would mean nearly $700 million in new merchant fee income alone, since [American Express] charges merchants about 3.5% of sales.

154.   After utilizing auditor PWC to examine the opening of credit cards, Wells Fargo announced in October 2016 that 330,000 of the 565,443 credit cards had been closed and 234,000 accounts were still open.  About 192,000 of these cards were still open but had never been active, while 42,000 were still opened and activated. According to Wells Fargo's November 3, 2016 Form 10-Q, the PWC review identified 623,000 consumer and small business unsecured credit card accounts.  And as a result of the review, $2.6 million was refunded to customers for the fees associated with the unauthorized accounts.   It was unclear from Wells Fargo's disclosures whether employees or customers activated those accounts.

---

[7] *Available at* https://www.fool.com/investing/general/2014/06/04/how-american-expresss-partnership-with-wells-fargo.aspx (last visited Dec. 15, 2017).

155.     During the Relevant Period, Wells Fargo conducted audits, but gave its employees a 24-hour notice period prior to commencement of the audit.  This practice was discontinued after the fake account scandal came to light.[8]

156.     After receiving the results of the PWC audit, Wells Fargo also said it was investigating the impact on consumers' FICO credit scores.  In turn, Wells Fargo said it would determine if the opening of an unwanted credit card made it more expensive for the customer to receive another financial product because of a lower credit score.

157.     In February 2017, Wells Fargo announced that credit card applications in January 2017 were down 47% compared to the prior year.

158.     The CFPB determined that the unlawful conduct associated with opening credit cards constituted "unfair" and "abusive" conduct in violation of CFPA sections 1031(c)(1),  (d)(1),  (d)(2)(B),  and  1036(a)(1)(B)  of  the  CFPA,  codified  at  12  U.S.C. §§ 5531(c)(1), (d)(1), (d)(2)(B), 5536(a)(1)(B).

159.     When a potential card issuer pulls a consumer's credit report for the purpose of granting credit, it is called a "hard inquiry."  Under many of the most common credit score formulas, a "hard inquiry" typically lowers a consumer's credit score by a few points, even if the card is never issued or activated.  Further, the fact that an issuer has pulled a consumer's report will show on the consumer's credit history for two years.

160.     During the Relevant Period, American Express knew or recklessly disregarded the fact that unauthorized credit cards were being opened in the name of

---

[8] Other remedial issues recently implemented by Wells Fargo to attempt to remedy the credit card fraud include:  "Wells Fargo has implemented a system to send an automated email to a customer shortly after the opening of a consumer or small business checking, savings or credit card account to confirm that the account was properly authorized by the customer. In addition, revised credit card application procedures require an applicant's documented consent before a credit report is pulled." *See* Independent Directors of the Board of Wells Fargo & Company Sales Practices Investigation Report, April 10, 2017, at 51, *available at* https://www08.Wellsfargo media.com/assets/pdf/about/investor-relations/presentations/2017/board-report.pdf (last visited Dec. 19, 2017).

Wells Fargo customers.  First, American Express was aware of the publicly-available information alleged herein, which put it on notice of the fake account scandal at Wells Fargo.  Second, a substantial number of the Wells Fargo American Express credit cards issued to Wells Fargo customers were never activated, thus raising a red flag that the accounts had not been requested or authorized by the customers.

161.    Despite the information available to American Express, including the publicly-available information and the red flags known internally at the company, American Express continued to operate the partnership with Wells Fargo, including continuing to license its credit cards to Wells Fargo, thus substantially assisting the Individual Defendants in their breaches of fiduciary duties.

162.    Additional other conduct engaged in by American Express during the term of the partnership that constituted substantial assistance provided to the Individual Defendants included, as stated by American Express itself:  "providing its Partner Advantage capabilities and services to support Wells Fargo in developing a suite of products that will offer a superior set of experiences, exclusive benefits and customized offers from the American Express network, both online and offline.  Separately, LoyaltyEdge from American Express will assist in the design of a new Wells Fargo loyalty program by offering a broad range of merchandise and gift cards that Wells Fargo's consumer credit customers will be able to redeem with their points."[9]

**VIII. The Individual Defendants Breached Their Duties of Candor and Loyalty By Causing Wells Fargo to Make False and Misleading Statements During the Relevant Period**

163.    On February 26, 2014, years after first learning of the unethical and unlawful conduct permeating the Company's Great 8 and Daily Incentive programs, the Individual Defendants caused the Company to file its Annual Report on Form 10-K for the fiscal year ended December 31, 2013.  The Form 10-K and Annual Report were

---

[9] *See* American Express August 7, 2013 press release, *available at* http://about.americanexpress.com/news/pr/2013/wells-fargo-amex-partnership.aspx (last visited Dec. 17, 2017).

1   reviewed, approved, and signed by Defendants Stumpf, Sloan, Baker, Chao, Dean,

2   Engel, Hernandez, James, Milligan, Peña, Quigley, Runstad, Sanger and Swenson.

3         164.   Claiming Wells Fargo's status as "America's most profitable bank" in 2013,

4   the Annual Report highlighted Wells Fargo's "cross-sell" strategy and touted its "record

5   earnings":

6           Our vision is to satisfy all our customers' financial
      needs, help them succeed financially, be recognized as the

7         premier financial services company in our markets and be
      one of America's great companies. ***Our primary strategy***

8   ***to achieve this vision is to increase the number of***
***our products our customers utilize and to offer***

9   ***them all of the financial products that fulfill their***
***needs. Our cross-sell strategy, diversified business***

10  ***model and the breadth of our geographic reach***
***facilitate growth in both strong and weak economic***

11  ***cycles. We can grow by expanding the number of***
***products our current customers have with us***, gain

12  new customers in our extended markets, and increase

13  market share in many businesses.

14        165.   In fact, the Individual Defendants caused Wells Fargo to highlight the

15  importance of the cross-selling efforts, citing them to be a key to its success:

16          Our "cross-selling" efforts to increase the number of

17  products our customers buy from us … is a key part of our
growth strategy, and our failure to execute this strategy

18  effectively could have a material adverse effect on our
revenue growth and financial results.  ***Selling more***

19  ***products to our customers — "cross-selling" — is***
***very important to our business model and key to***

20  ***our ability to grow revenue and earnings***….

21        166.   Specifically, the Individual Defendants caused Wells Fargo to include in its

22  Annual Report a discussion regarding the impact of the cross-selling efforts in its

23  Community Banking segment:

24          Community Banking offers a complete line of
      diversified financial products and services for consumers and

25  small businesses….  ***Cross-sell of our products is an***
***important part of our strategy to achieve our***

26  ***vision to satisfy all our customers' financial needs.***
***Our retail bank household cross-sell was a record***

27  ***6.16 products per household in November 2013, up***
***from 6.05 in November 2012 and 5.93 in November***

28   

1
2
3

> **2011.** We believe there is more opportunity for cross-sell as
> we continue to earn more business from our customers. **Our
> goal is eight products per household**, which is
> approximately one-half of our estimate of potential demand
> for an average U.S. household.

4

167.  Similarly, the Annual Report touted the positive impact of Wells Fargo's

5

cross-selling efforts in its two other key business segments — Wholesale Banking and

6

Wealth Brokerage and Retirement:

7
8
9
10

> Wholesale Banking provides financial solutions to
> businesses across the United States and globally with annual
> sales generally in excess of $20 million.... **Wholesale
> Banking cross-sell was a record 7.1 products per
> customer in September 2013, up from 6.8 in
> September 2012 and 6.5 in September 2011**.

11

> \*       \*       \*

12
13
14

> Wealth, Brokerage and Retirement provides a full
> range of financial advisory services to clients using a
> planning approach to meet each client's financial needs....
> Wealth, Brokerage and Retirement cross-sell reached a
> record 10.42 products per household in November 2013, up
> from 10.27 in November 2012 and 10.05 in November 2011.

15

168.  The Individual Defendants continued to cause Wells Fargo to emphasize

16

its cross-selling strategy.  On April 11, 2014, Defendants Stumpf and Sloan caused the

17

Company to issue a press release announcing its first quarter 2014 financial results.  The

18

press release again highlighted the importance of cross selling to Wells Fargo's "strong

19

financial results":

20
21
22
23

> Wells Fargo & Company reported record net income
> of $5.9 billion, or $1.05 per diluted common share, for first
> quarter 2014, up from $5.2 billion, or $0.92 per share, for
> first quarter 2013, and up from $5.6 billion, or $1.00 per
> share, for fourth quarter 2013.

24
25
26
27

> "Our solid first quarter results again demonstrated the
> ability of our diversified business model to perform for
> shareholders," said Chairman and CEO John Stumpf. "**Our
> 265,000 team members remained focused on
> achieving our vision of serving the financial needs
> of our customers as we grew loans, deposits and
> increased cross-sell**."

28

\*      \*      \*

**Regional Banking**

•     Retail banking

    •     Retail Bank household cross-sell ratio of 6.17 products per household, up from 6.10 year-over-year

    •     Primary consumer checking customers up a net 5.1 percent year-over-year

\*      \*      \*

**Wholesale Banking**

\*      \*      \*

•     ***Cross-sell of 7.2 products per relationship up from 7.1 in prior quarter and 6.8 in first quarter 2013***

**Wealth, Brokerage and Retirement**

\*      \*      \*

***WBR cross-sell ratio of 10.42 products per household, up from 10.33 in first quarter 2013***.

169.   On April 11, 2014, Defendants Stumpf and Sloan also participated in a conference call with analysts to discuss the Q1 2014 financial results, in which they also emphasized additional gains in the Company's cross-sell campaign as key to the Company's success.  For example, Stumpf told analysts on the call that:

> Our outstanding deposit franchise continued to generate strong growth, with total deposits up $83.8 billion, or 8%. We deepened relationships across our Company, achieving record retail banking cross-sell of 6.17 products per household. Wholesale banking increased cross-sell to 7.2 products; and wealth, brokerage and retirement cross-sell was 10.42 products.

170.   On the same April 11, 2014 conference call with analysts, Defendant Sloan stated:

> As John highlighted, and as you can see on page 3, we had strong year over year growth in the fundamental drivers of our business: in commercial and consumer loans, deposits, cross-sell, credit, expense management, which resulted in growth in net income, capital, and earnings per share, and produced higher returns on assets and equity.

171.    During the first quarter of 2014, the Board also authorized an increase in the number of shares the Company could repurchase under its stock repurchase plan, approving an additional 350 million shares.  The April 11, 2014 press release stated: "In the first quarter, the Board approved an additional 350 million shares in the Company's authority to repurchase its common stock."

172.    After the financial results for the first quarter of 2014 were reported, Defendant Shrewsberry took over for Defendant Sloan as CFO and Sloan took over the Company's wholesale banking business, but continued to report directly to Stumpf and serve on Wells Fargo's operating committee.

173.    At the May 20, 2014 Analyst Day conference, the Individual Defendants caused Wells Fargo to emphasize its efforts on cross-selling, as well as the effectiveness of its cross-selling strategy.

174.    During the conference, Defendant Stumpf characterized Wells Fargo's cross-selling performance as "legendary," stating:

> We have the broadest coast-to-coast banking franchise, and in serving these customers, we want to help them succeed financially....
>
> ... But if I had to pick just one number, one area I would focus most on, I could only pick one, it would be revenue. Because when you are growing revenue, you are growing the business.
>
> \*      \*      \*
>
> ***And what is revenue?  It is deposits and loans and more credit cards, deeper cross-sell, longer relationships, more assets under management.***

Echoing Stumpf's statements, Defendant Shrewsberry stated:  "Our relationship focus and ***cross-sell capability*** is hopefully ***legendary*** at this point.  It has been our ***vision for decades.  We've stuck to it.***"

175.    During the conference, Defendant Tolstedt, head of Community Banking, discussed the financial performance of that segment and the growth resulting from the

1  Company's cross-selling efforts, emphasizing that Wells Fargo's cross-selling was

2  "helping [its] customers succeed financially and meet[] all of their needs."

3       176.   Tolstedt further attributed the growth in credit card business and retail

4  banking business to the cross-selling strategy:

5            [T]he ***cross-sell model*** ... ties directly to our vision
            of helping our customers succeed financially and meeting all
6            of their needs. ... [The] cross-sell model drive[s] revenue.

7                    *        *        *

8            ***The beneficial cycle of cross-sell continues.***
            The more products the customers have with us, the better
9            deal and greater value we can provide....

10           Our retail bank household cross-sell is now at 6.17
            products, up from two years ago 5.98, and at the time of the
11           merger we were at 5.2.  Our long-term goal continues to be
            an average cross-sell of 8 and achieving this goal will come
12           with higher household purchase rates and growth in
            profitability.
13

14      177.   On September 10, 2014, the Company made a presentation at the Barclays

15 Global Financial Services Conference.  During the conference, Defendant Shrewsberry

16 touted the Company's "culture of cross-sell" and financial performance, claiming that

17 the Company generated more fee income than its peers.

18      178.   After the September 10, 2014 Barclays conference, Wells Fargo's stock

19 traded above $51.00 per share.

20      179.   In November 2014, RBC Capital Markets met with Defendants Stumpf,

21 Shrewsberry, and Tolstedt to discuss the Company's financial performance and future

22 prospects.  On November 5, 2014, RBC issued a report, titled "Highlights from recent

23 company visit," which discussed the meetings:

24 **Highlights from recent company visit**

25           Our view: After meeting management, we remain positive on Wells'
26           prospects to continue to outperform many of its large bank peers.

27 Key points:

28

- **Meetings With Senior Management**. We recently visited Wells Fargo and met several of its senior executives including the CEO, CFO, Treasurer, Chief Risk Officer, and Head of Consumer Banking....

- **Attractive Growth Opportunities**. Looking forward, Wells sees multiple growth opportunities across its business. Loan growth has been broad based at a mid-to-high single-digit rate, and the pipeline looks solid heading into year-end given the improving economy and ongoing market share gains. ***To that end, Wells is willing to price more aggressively on the lending side, partly because it is confident in its ability to cross-sell other products and build a profitable relationship***.

180.   In January 2015, Morningstar issued a report discussing the Company's Q4 2014 results, specifically noting the Company's cross-selling expertise and the growth of its credit card loans by $4 billion:

> ***Wells Fargo also demonstrated a continued ability to cross-sell during the quarter.  The [C]ompany added more than $4 billion in credit card loans during the year, including an expansion of its private-label business.***

181.   On February 25, 2015, the Company filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2014.  On the same day, the Company filed its Annual Report to Stockholders for fiscal 2014.   The Form 10-K and Annual Report were reviewed, approved, and signed by Defendants Stumpf, Shrewsberry, Baker, Chao, Chen, Dean, Duke, Engel, James, Hernandez, Milligan, Peña, Quigley, Runstad, Sanger, and Swenson.

182.   Just like the Company's previous filings, the 2014 Annual Report again emphasized the Company's cross-selling strategy:

**Financial Performance**

> We completed another outstanding year of financial results in 2014 and remained America's most profitable bank. We generated record earnings, produced strong loan and deposit growth, grew the number of customers we serve, improved credit quality, enhanced our strong risk management practices, strengthened our capital and liquidity levels and rewarded our shareholders by increasing our dividend and buying back more shares....

Noteworthy items included:

\*          \*          \*

- our loans increased $40.3 billion, up 5%, even with the planned runoff in our non-strategic/liquidating portfolios, and our core loan portfolio grew by $60.3 billion, up 8%;

- our deposit franchise continued to generate strong customer deposit growth, with total deposits up $89.1 billion, or 8%;

\*          \*          \*

- we continued to maintain solid customer relationships across the Company, **with retail banking household cross-sell of 6.17 products per household** (November 2014); Wholesale Banking cross-sell of 7.2 products per relationship (September 2014); and **Wealth, Brokerage and Retirement cross-sell of 10.49 products per retail banking household** (November 2014).

183.   In addition, the February 25, 2015 Form 10-K touted the cross-selling performance in both Community Banking and Wealth, Brokerage and Retirement segments:

> **COMMUNITY BANKING** offers a complete line of diversified financial products and services for consumers and small businesses including checking and savings accounts, [and] credit and debit cards.... **Our retail banking household cross-sell was 6.17 products per household in November 2014, up from 6.16 in November 2013 and 6.05 in November 2012**.
>
> \*          \*          \*
>
> **Wealth, Brokerage and Retirement cross-sell was 10.49 products per retail banking household in November 2014, up from 10.42 in November 2013 and 10.27 in November 2012.**

184.   On April 14, 2015, the Company issued a release discussing its financial results for the first quarter of fiscal 2015.   The release touted the results of the Company's cross-selling efforts:

> **WELLS FARGO REPORTS $5.8 BILLION IN NET INCOME Diluted EPS of $1.04, Revenue Up 3 Percent from Prior Year**
>
> \*          \*          \*

52

- Net income of $5.8 billion, compared with $5.9 billion in first quarter 2014

- Diluted earnings per share (EPS) of $1.04, compared with $1.05
- Revenue of $21.3 billion, up 3 percent

\*        \*        \*

- ***Strong growth in average loans and deposits***:
- Total average loans of $863.3 billion, up $39.5 billion, or 5 percent, from first quarter 2014

\*        \*        \*

***Regional Banking***

- Retail banking

  - Primary consumer checking customers up 5.7 percent year-over-year
  - ***Retail Bank household cross-sell ratio of 6.13 products per household, compared with 6.17 year-over-year***

185.    On April 14, 2015, Morningstar issued a report underscoring that Wells Fargo had reported increased income of 6.7% sequentially for its largest unit, Community Banking.   It further reported that results in Wholesale Banking had increased 3.25%, stating that "[m]anagement attributed this growth to successful cross-selling with the Community Banking segment."   Morningstar further noted that Wells Fargo was spending a great deal to incentivize its employees to cross-sell products:

> Wells Fargo's emphasis on cross-selling is associated with significant incentive spending. We see these expenses as worthwhile in building long-term customer relationships and consequently, switching costs.

186.    On May 29, 2015, the Company gave a presentation at the Sanford C. Bernstein Strategic Decisions Conference. During the conference, Defendant Stumpf was specifically asked about regulatory investigations and whether he was concerned that the Company was pushing products onto customers that the customers did not want. Stumpf rejected the notion that Wells Fargo could cross-sell products that customers did not need, as such conduct was not in the best interests of its customers or

Wells Fargo. Instead, according to Stumpf, the Company's culture was one that helped customers succeed financially:

> [Analyst:] There's a question about the regulatory investigations. A key part of your strategy has been sales. You have always been revenue focused on cross-selling. Sometimes that might be able to go too far and I guess there's been some investigations; are you selling the wrong thing to the wrong people?
>
> How do you make sure you're pushing a sales culture but not giving a customer something that they don't need or don't understand?
>
> [Stumpf:] Absolutely. Our culture for 163 years has been to help our customers succeed financially and provide all their financial needs. ***It is not in our interest, not in our team members' interest, not in our customers' interest, surely not in our shareholders' interest to have a customer have a product or service they didn't want, don't need, or it doesn't help them***.

187.    After the May 29, 2015 Sanford C. Bernstein conference, Wells Fargo's stock price continued to trade above $56.00 per share.

188.    On June 23, 2015, Morningstar published a report, titled "Recent Housing Data Supports Our Case for an Accelerated, Above-Consensus Recovery," which consolidated its recently published research and noted that the Company's business had been expertly overseen by Stumpf and was not "too big to manage."

189.    Importantly, Morningstar noted that the Company gave employees incentives to grow their cross-selling efforts, and therefore investors should not be concerned with increases in the Company's overall headcount:

> Wells Fargo's longstanding focus on ***cross-selling helps lock in customer relationships and access to low-cost funding*** — namely, $1 trillion in deposits at a cost of only 9 basis points as 2014 came to a close.
>
> *         *         *
>
> The company's simple, domestically focused business is clearly not "too big to manage" as the company has thrived under the leadership of several CEOs. Though the company expects its efficiency ratio to be at the high end of its 55%-

59% target for 2015, we don't view increases in headcount negatively. Along these lines, ***Wells Fargo's emphasis on cross-selling is associated with significant incentive spending. We see these expenses as worthwhile in building long-term customer relationships and consequently, switching costs***.

190.   On July 14, 2015, the Company reported its financial results for the second quarter of fiscal 2015.  The Company noted the cross-selling results for its three business units, with growth in two out of the three units:

- •      Continued strong financial results:

- •      Net income of $5.7 billion, in line with second quarter 2014

- •      Diluted earnings per share (EPS) of $1.03, compared with $1.01

\*      \*      \*

- •      Strong growth in average loans and deposits ....

\*      \*      \*

***Regional Banking***

- •      Retail banking

  - •      Primary consumer checking customers up 5.6 percent year-over-year.

  - •      ***Retail Bank household cross-sell ratio of 6.13 products per household, compared with 6.17 year-over- year***.

\*      \*      \*

**Wealth, Brokerage and Retirement**

\*      \*      \*

***WBR cross-sell ratio of 10.53 products per household, up from 10.44 a year ago***

191.   In November 2015, Defendant Sloan's job duties were changed from CFO to President and Chief Operating Officer, in what the Board characterized as its "oversight of management succession planning."   This signaled that the Board was grooming Sloan to take over for Stumpf, who was scheduled to reach mandatory retirement age in 2019.

192.    On February 24, 2016, Wells Fargo filed its Report on Form 10-K for the year ended December 31, 2015.  The Form 10-K was reviewed, approved, and signed by Defendants Stumpf, Shrewsberry, Baker, Chao, Chen, Dean, Duke, Engel, Hernandez, James, Milligan, Peña, Quigley, Sanger, Swenson and Vautrinot. On the same day, the Company also issued its Annual Report to Stockholders, signed by the same Defendants, which noted the importance of cross-selling products to its customers to create a financial ecosystem purportedly for the benefit and need of its customers:

> **Cross-sell** ... Cross-sell is the result of serving our customers well, understanding their financial needs and goals over their lifetimes, and ensuring we innovate our products, services and channels so that we earn more of their business and help them succeed financially. ***Our approach to cross-sell is needs-based as some customers will benefit from more products***, and some may need fewer. We believe there is continued opportunity to meet our customers' financial needs as we build lifelong relationships with them. ***One way we track the degree to which we are satisfying our customers' financial needs is through our cross-sell metrics***, which are based on whether the customer is a retail banking household or has a wholesale banking relationship....
>
> ***We report cross-sell metrics for Community Banking and WIM based on the average number of retail products used per retail banking household...***
>
> ***Products included in our retail banking household cross-sell metrics must be retail products and have the potential for revenue generation and long-term viability.***

193.    With respect to the Community Banking segment, of which retail banking was a part, the Individual Defendants caused Wells Fargo to state that its "retail banking household ***cross-sell was 6.11 products per household in November 2015***, compared with 6.17 in November 2014 and 6.16 in November 2013."

194.    On April 14, 2016, the Company announced its financial results for the first quarter of fiscal 2016, discussing, among other things, the impact of cross-selling on its retail banking unit:

56

- • Continued strong financial results:
- • Net income of $5.5 billion, compared with $5.8 billion in first quarter 2015
- • Diluted earnings per share (EPS) of $0.99, compared with $1.04
  - • First quarter 2015 results included discrete tax benefit of $359 million, or $0.07 per share
- • Revenue of $22.2 billion, up 4 percent
- • Pre-tax pre-provision profit of $9.2 billion, up 5 percent
- • Return on assets (ROA) of 1.21 percent and return on equity (ROE) of 11.75 percent

\*        \*        \*

- • Retail Banking
  - • Primary consumer checking customers up 5.0 percent year-over-year
  - • Debit card purchase volume of $72 billion in first quarter, up 9 percent year-over-year
  - • *Retail Bank household cross-sell ratio of 6.09 products per household, compared with 6.13 year-over-year*

\*        \*        \*

**Wholesale Banking**

Wholesale Banking reported net income of $1.9 billion, down $183 million, or 9 percent, from fourth quarter 2015. Revenue of $7.0 billion increased $399 million, or 6 percent, from prior quarter and included the acquisitions of GE Railcar Services (closed 1/1/16) and GE Capital's North American Commercial Distribution Finance and Vendor Finance businesses (closed 3/1/16).

\*        \*        \*

- • *Cross-sell of 7.3 products per relationship, up from 7.2 products in first quarter 2015[.]*

195.    On May 24, 2016, the Company held an Analyst Day conference in San Francisco for analysts and investors.  The conference was hosted by Defendants Stumpf and Tolstedt. During the conference, defendant Tolstedt stated with respect to "products per household or cross-sell, the first thing we anchor ourselves on is our vision of satisfying our customers' needs and helping them succeed financially. And so everything that we do is really about that."

196.    On May 25, 2016, Evercore issued a report discussing the Company's May 24, 2016 conference titled "Investor Day Wrap: Targets Sliced, but Still a Conservative

Drive Down the Fairway." The report discussed, among other things, the growth in the Company's credit card business due to its cross-selling ability:

**Wells Fargo hosted its Investor Day yesterday in San Francisco**.

Bottom line: While long-term profitability targets were cut due to the challenging rate and operating environment, such is not a major surprise, and we remain positive on the bank's L/T above-peer returns.

\* \* \*

**Card biz growth to remain above industry pace with greater cross-sell and new products**.

WFC expects to continue to grow its $25B consumer credit card book (2.6% of loans) via new cards to existing and new customers. WFC plans to introduce a new, refreshed card product with richer rewards (1.5% cash back). ***[Management] noted they have improved their penetration rates with 43.2% of checking customers now holding a WFC card, versus 33.5% in 2012***. Lastly, competition in the card business remains brisk, albeit mainly on the co-branding side.

197. On July 15, 2016, the Company issued a press release announcing its financial results for the second quarter of fiscal 2016. The release discussed the cross-selling results, this time only for the Company's retail banking unit:

- Continued strong financial results:

    - Net income of $5.6 billion, compared with $5.7 billion in second quarter 2015
    - Diluted earnings per share (EPS) of $1.01, compared with $1.03
    - Revenue of $22.2 billion, up 4 percent

- Strong growth in loans and deposits:

    \* \* \*

- ***Regional Banking***
    - Retail Banking
        - Primary consumer checking customers up 4.7 percent year-over- year
        - Debit card purchase volume of $76.4 billion in second quarter, up 8 percent year-over-year
        - Retail Banking household cross-sell ratio of 6.27 products per household, compared with 6.32 year-over- year[.]

198. On July 15, 2016, the Company held a conference call for analysts and investors to discuss the Company's second quarter 2016 financial results. During the

Verified Shareholder Derivative Complaint

call, Defendant Stumpf noted that the Company had previously announced that defendant Tolstedt, the Head of the Community Banking segment, was retiring. Stumpf concealed the fact that the Company had made substantial findings of the unlawful activity and actual fraud in its Community Banking segment as part of its investigation, which not only exposed millions of customers to unlawful fees and potential identity theft, but put the Company in the crosshairs of federal investigation.   Instead, defendants emphasized that Wells Fargo was committed to "transparency[] and ensur[ing] customers are receiving the right products to meet their financial needs," with Stumpf claiming that Tolstedt had built an extraordinary franchise that met the needs of millions of customers:

> [Stumpf:] Before I conclude, ***I want to highlight the announcement we made earlier this week, Carrie Tolstedt, Head of Community Banking who has been with Wells Fargo for 27 years has decided to retire at year end. She and her team have built an extraordinary franchise, one that meets the needs of millions of customers nationwide, and has served investors very well for decades***.

199.   During the call, Defendant Shrewsberry stated:

> $3.2 billion in the second quarter, down 1% from a year ago, and 4% from the first quarter....
>
> ***We continually work to enhance customer satisfaction and transparency, and ensure customers are receiving the right products to meet their financial needs, because the key to our success is long-lasting customer relationships built on trust.***

200.   Following the release of Wells Fargo's financial results on July 15, 2016 through September 16, 2016, Wells Fargo stock traded at prices above $50.00 per share.

201.   The Individual Defendants' statements set forth above were materially false and misleading when made because they misrepresented and/or omitted the following material facts necessary to make the statements made therein not misleading:

(a)   as part of the purported cross-selling strategy, Wells Fargo

employees, under the Individual Defendants' watch, used forgery and other illegal means to open millions of bank deposit accounts and credit card accounts on behalf of customers without their knowledge or consent;

(b)    under the Individual Defendants' watch, Wells Fargo employees used fake e-mail addresses to enroll customers in online banking services and to request debit cards, including the creation of PINs, without their knowledge or consent;

(c)    the Individual Defendants designed and implemented a scheme to incentivize and reward employees for using illegal means to open accounts for customers they did not want or need;

(d)    the purported cross-selling strategy was nothing but the product of fraudulent conduct perpetrated by the Individual Defendants to generate fee income and, in turn, compensation rewards for themselves; and

(e)    Wells Fargo's reported cross-selling metrics and the financial results derived from them were false and misleading.

## IX.    The Individual Defendants Caused the Company to File False Proxy Statements in 2015 and 2016

### A.    The False and Misleading 2016 Proxy Statement

202.   On March 16, 2016, Defendants Baker, Chao, Chen, Dean, Duke, Engel, Hernandez, James, Milligan, Peña, Quigley, Sanger, Stumpf, Swenson, and Vautrinot reviewed, approved, and caused the Company to file its annual Proxy Statement.  The 2016 Proxy Statement contained the following statement:

**Compensation Governance and Risk Management**

*Wells Fargo employs strong and effective corporate governance practices which include active oversight and monitoring by the [Human Resources Committee ("HRC")] of our incentive compensation strategy and practices so that they are consistent with the safety and soundness of the Company and do not encourage excessive risk taking.  The HRC oversees our compensation risk management practices and monitors their effectiveness in managing compensation-related risk appropriately.*

Many of the compensation risk management policies and practices that apply to the Company's named executives discussed in the CD&A (see "Governance Framework for Compensation Decisions — Risk Management") apply equally to other senior executives and employees the Company identifies whose activities, individually or as a group, may expose the Company to material risk, including:

• an emphasis on overall Company performance in compensation decisions, and for lines of business, their contribution to overall Company performance;

• incentives that balance individual short-term performance goals with the long-term strength and stability of the Company, including longer performance periods and/or performance-based deferrals;

• evaluation of individual performance based on the individual's focus on appropriate risk management practices aligned with the Company's risk appetite as well as risk outcomes;

• ***robust compliance, internal control, disclosure review, and reporting programs***;

• strong compensation recoupment or clawback policies which can result in awards being cancelled or prior payments being recovered in appropriate circumstances so that ***incentive compensation awards encourage the creation of long-term, sustainable performance, while at the same time discourage unnecessary or excessive risk-taking that would impact the Company's performance***;

• ***an emphasis on compliance with the highest standards of ethical conduct as reflected in our Code of Ethics and Business Conduct, which requires employees to deal fairly with customers*** and others, and includes a prohibition on, and right to discipline employees for, manipulating or misrepresenting sales or reporting.

203. These statements were materially false and misleading because the Director Defendants did not genuinely believe the statements and because the Proxy failed to disclose that the Company had been sued for fraud by the Los Angeles City Attorney and it did not "require employees to deal fairly with customers" but instead lavished excessive compensation on its executive officers notwithstanding widespread, endemic wrongdoing and lying to its customers. Indeed, the Los Angeles City Attorney had sued the Company for data breach claims under California law since Wells Fargo had repeatedly misappropriated its clients' confidential financial information, used the

information without the clients' consent to open new accounts, and then failed to advise the clients of the opening of the accounts, or if questioned by clients who found out about the accounts, actually lied to the clients about the circumstances surrounding the opening of the accounts.

204.   As indicated *supra*, the Director Defendants had known since at least 2011 that Wells Fargo encouraged excessive risk taking, was disregarding controls meant to discourage excessive risk taking, was firing thousands of employees who did not meet sales quotas and in an effort to cover up management's unlawful activity, and was compensating the Company's executives based on allegedly meeting key "cross-sell" goals which had been met by defrauding Wells Fargo's customers.

205.   The Director Defendants also did not genuinely believe that the HRC "oversees our compensation risk management practices and monitors their effectiveness in managing compensation-related risk appropriately" because they knew that the committee had met only the bare minimum of required times and was not managing compensation-related risk effectively since, again, they knew management was being granted compensation tied to cross-sell goals that were being fraudulently achieved at the expense of the Company's customers and the Company itself.

206.   Indeed, as a reward for her fraudulent conduct, the HRC (comprised of Defendants Chen, James, Sanger, Dean, and Engel) gave Defendant Tolstedt a bonus of $850,000 for 2015, notwithstanding the fact that they knew the Company had been sued on May 4, 2015 by the Los Angeles City Attorney for unfair, fraudulent, and unlawful conduct perpetuated by the Community Banking division over which Tolstedt presided.  This is hardly conduct consistent with "evaluation of individual performance based on the individual's focus on appropriate risk management practices aligned with the Company's risk appetite as well as risk outcomes" nor does it reflect "an emphasis on compliance with the highest standards of ethical conduct as reflected in our Code of Ethics and Business Conduct, which requires employees to deal fairly with customers and others, and includes a prohibition on, and right to discipline employees for,

manipulating or misrepresenting sales or reporting" as misrepresented in the 2016 Proxy Statement.

207.    The 2016 Proxy noted that the HRC members (Defendants Chen, James, Sanger, Dean, and Engel) meet annually with the Company's Chief Risk Officer and are provided with detailed information from a sub-committee which reports to the HRC after assessing whether the Company's incentive compensation system encourages excessive risk taking:

> In addition to the oversight of the HRC, the Company has established a management-level governance committee, our Incentive Compensation Committee, to oversee our incentive compensation risk management program, compliance with applicable corporate policies and regulatory requirements, guidance and expectations with regard to compensation practices, the design and outcomes of business line incentive plans, and enterprise-wide efforts to enhance incentive compensation practices throughout the Company. The Incentive Compensation Committee consists of the Company's senior risk, compliance and human resources executives and reports to the HRC annually. Our incentive compensation risk management program is designed and managed by Corporate Human Resources, with input from an advisory council of senior managers from our corporate functions and business lines, including control functions. In addition, through the incentive compensation risk management program and subject to the oversight of Corporate Human Resources, (1) each line of business within Wells Fargo is accountable for identifying employees whose activities, individually or as a group, may expose Wells Fargo to material risk and (2) the management teams within Wells Fargo's international locations, with input from our control functions, are responsible for overseeing implementation and supervision of Wells Fargo remuneration policies and practices in those locations. Each line of business is responsible for understanding the risks associated with each job covered by an incentive arrangement and making sure the business' incentive arrangements are balanced and do not encourage imprudent risk-taking.

208.    After noting that the HRC members met with the Chief Risk Officer and received detailed reports from the Incentive Compensation Committee, the 2016 Proxy stated:

The Incentive Compensation Committee and HRC have reviewed the Company's incentive compensation risk management practices, including the outcome of an enterprise-wide risk assessment of business line and corporate staff incentive compensation plans. The HRC will continue to monitor our progress so that our compensation programs and practices appropriately balance risk-taking consistent with the safety and soundness of the Company and applicable regulatory guidance.

In light of the compensation policies and actions discussed above, the Company and ***the Board have not identified any risks arising from the Company's compensation policies and practices that are reasonably likely to have a material adverse effect on the Company***.

209.   This statement was false and misleading because the HRC members (Defendants Chen, James, Sanger, Dean, and Engel) as well as the rest of the Director Defendants were aware of the unlawful conduct associated with the Great 8 and Daily Incentive programs and were thus aware that the incentive compensation being provided to Defendant Tolstedt as head of the Community Banking division encouraged excessive and unreasonable risk-taking by Tolstedt that was reasonably likely to have a material adverse effect on the Company – a risk that materialized just months later.

210.   Notwithstanding such knowledge, the HRC members and other Directors approved the following compensation in 2016:

2015 Compensation Decisions

| Named Executive | Base Salary Rate ($)(4) | Annual Incentive Award ($) | Long-Term Equity Incentives | | Total ($) |
| | | | Performance Share Award ($)(2) | RSR Award ($)(3) | |
|---|---|---|---|---|---|
| John G. Stumpf | 2,800,000 | 4,000,000(1) | 12,500,000 | - | 19,300,000 |
| John R. Shrewsberry | 1,700,000 | 850,000 | 5,500,000 | 1,000,000 | 9,050,000 |
| Timothy J. Sloan | 2,000,000 | 1,000,000 | 6,500,000 | 1,500,000 | 11,000,000 |
| David M. Carroll | 1,700,000 | 850,000 | 5,500,000 | 1,000,000 | 9,050,000 |
| Avid Modjtabai | 1,700,000 | 850,000 | 5,500,000 | 1,000,000 | 9,050,000 |
| Carrie L. Tolstedt | 1,700,000 | 850,000 | 5,500,000 | 1,000,000 | 9,050,00 |

211.   The 2016 Proxy contained a proposal sponsored by the Company which urged shareholders to approve the compensation awarded above by the HRC to Defendants Tolstedt, Stumpf, Shrewsberry, and Sloan.  This was referred to on the Proxy as "Item 2 – Advisory Resolution to Approve Executive Compensation."

212.    In support of Item 2 on the 2016 Proxy, the Director Defendants caused the following false statement to be included in the Proxy:

> ***The HRC believes that its 2015 compensation decisions were consistent with our compensation principles and will benefit stockholders for short-term and long-term Company performance, and that the compensation paid to the named executives for 2015 was reasonable and appropriate.*** Although your vote is advisory and not binding on the Company, the ***Board*** values our stockholders' views on executive compensation matters and ***will consider the outcome of this vote when making future executive compensation decisions for named executives***.

213.    This statement was false because the Directors did not believe that the 2015 compensation decisions were consistent with the Company's compensation policies, did not believe that the compensation was reasonable and appropriate, and did not believe that the compensation would benefit the Company in the short and long term.   As indicated *supra*, the Director Defendants knew that the executives had breached their fiduciary duties to the Company, violated numerous provisions of the Company's Code of Ethics, and exposed the Company to significant and material risks and liability through their conduct related to the Great 8 and Daily Incentive programs.

214.    The Defendants further caused the following statement to be included in the 2015 Proxy related to Item 2:

> We are asking our stockholders to approve an advisory resolution to approve compensation paid to named executives as described in the CD&A, the compensation tables and related disclosures.  This item gives our stockholders the opportunity to express their views on our 2015 compensation decisions and policies for our named executives as discussed in this proxy statement.  Although the say on pay vote is advisory and not binding on our Board, the HRC will take the outcome of the vote into consideration when making future executive compensation decisions.  We describe in our CD&A and related compensation tables our 2015 compensation principles, governance, and decisions for our named executives.
>
> Highlights include:

- • Our four compensation principles continued to guide the HRC in making its pay decisions for our named executive officers:
  1. Pay for Performance
  2. ***Foster Risk Management Culture***
  3. Attract and Retain Top Executive Talent
  4. Encourage Creation of Long-Term Stockholder Value

- • For 2015, the HRC maintained the relative balance between base salary and annual incentive award opportunity for each of our named executive officers to reduce undue focus on short-term financial performance at the risk of the Company's long-term interests.

- • The HRC also maintained the high proportion of total pay in long-term performance-based equity compensation to align management and stockholder interests in increasing stockholder value over the long-term.

- • ***The HRC continued to enhance our strong compensation risk management practices to discourage imprudent risk taking by requiring executives to bear the long-term risk of their activities.***

215. These statements were false and misleading because the HRC's compensation decisions did not "foster a risk management culture" and because the HRC did not "continue to enhance our strong compensation risk-management practices to discourage imprudent short-term risk taking." To the contrary, the HRC's conduct rewarded the very executives who had taken excessive short-term risks and exposed the Company to severe reputational damage and liability.

216. The 2016 Proxy was also false and misleading because it contained materially false statements designed to convince shareholders to vote against a shareholder proposal calling for an independent Chairman at Wells Fargo. In opposition to this proposal, the Director Defendants caused the following statement to be included in the proxy:

The Board recommends a vote AGAINST this proposal, which is identified as Item 4 in the proxy materials, for the following reasons:

- ***The Company's corporate governance structure, including the composition of the Board, its committees, and its Lead Director who is available to meet with major stockholders to discuss governance and other matters, already provides effective independent oversight of management and Board accountability and responsiveness to stockholders;***

- If adopted, the proposal would unnecessarily restrict the Board's ability to select the director best suited to serve as Chairman of the Board based on criteria the Board deems to be in the best interests of the Company and its stockholders; and

- ***The Company's governance structure is working effectively as evidenced by the Company's strong financial performance***, and our stockholders rejected a similar independent chairman proposal for the eleventh consecutive year in 2015.

For the reasons described in "Our Board Leadership Structure and Lead Director," at this time the Board believes that combining its CEO with the Chairman of the Board position is the most appropriate structure for the Company and best serves the interests of stockholders. The Company's corporate governance structure, with its strong emphasis on Board independence, makes an absolute independent chairman requirement unnecessary. Fourteen of the 15 director nominees are independent under the Company's Director Independence Standards, including the NYSE "bright-line" standards of independence, and each of the standing Board committees is comprised entirely of independent directors. The Board and its committees each meet in executive session on a regular basis without the presence of management, and all Board members have complete access to management and outside advisors. The Company has a Lead Director, appointed by the Company's other independent directors, who provides independent Board leadership. The Lead Director has clearly defined responsibilities, including:

• approving Board meeting agendas and approving meeting schedules to assure there is sufficient time for discussion of all agenda items,

• calling and chairing executive sessions and meetings of non-management or independent directors, and calling special meetings of the Board,

• working with committee chairs to ensure coordinated coverage of Board responsibilities,

• serving as a liaison between the independent directors and the Chairman,

• facilitating communication between the Board and senior management,

• facilitating the Board's review and consideration of stockholder proposals,

• advising the Chairman and CEO on the informational needs of the Board and approving the types and forms of information provided to the Board, and being available for consultation and direct communication with major stockholders of the Company to help ensure that the Board is accountable and responsive to stockholders.

As a result, ***the Board does not believe that a policy mandating an independent Chairman is necessary to achieve effective independent leadership and management oversight***.  ***Evidence that the Board's current governance structure is working effectively includes the Company's strong financial performance despite the challenging economic and regulatory environment for financial institutions during the past few years***.  For example, the Company's net income in 2015 and 2014 was $22.9 billion and $23.1 billion, respectively, and the Company's total annual stockholder return for the one-, three- and five-year periods ended December 31, 2015 was 1.9%, 19.9%, and 14.7%, respectively.

217.   These statements were false and misleading because the Director Defendants did not genuinely believe that Wells Fargo's "***governance structure [was] working effectively as evidenced by the Company's strong financial performance.***"  Instead, as set forth herein, the Director Defendants knew that Stumpf was not exercising effective oversight of management, and that the Company's internal controls were deficient and were being intentionally overridden.

218.   In fact, as demonstrated above, the OCC identified substantial deficiencies and unsafe and unsound practices in the Company's risk management and oversight of its sales practices.  Specifically, as found by the OCC:

(a)   The Company's incentive compensation program and plans within the Community Bank Group were not aligned properly with local branch traffic, staff turnover, or customer demand, and they fostered unsafe and unsound sales practices and pressured Wells Fargo employees to sell products not authorized by the customer; and

(b)   The Company lacked an Enterprise-Wide Sales Practices Oversight Program and thus failed to provide sufficient oversight to prevent or detect unsafe or unsound sales practices and failed to mitigate the risks that resulted from such sales practices.

219.   The Director Defendants also knew that the Company's financial performance did not "demonstrate that the Board's current governance structure is working effectively," but in fact the exact opposite was true — that the Company's financial performance which had been achieved in significant part by cross-selling products at a rate more than four times the industry average was the product of endemic fraud at the Community Banking division and that Wells Fargo had fired over 5,300 employees who had been caught engaging in the wrongful conduct mandated by their supervisors in order to attempt to cover up the conduct.  There could not have been a starker example of financial performance being achieved due to ineffective internal controls and *lack* of board oversight of management.

## B.   The False and Misleading 2015 Proxy Statement

220.   On March 17, 2015, Defendants Baker, Chao, Chen, Dean, Duke, Engel, Hernandez, James, Milligan, Peña, Quigley, Sanger, Stumpf, Swenson, Vautrinot, and Runstad reviewed, approved, and caused the Company to file its 2015 Proxy Statement on Form 14A with the SEC.  The 2015 Proxy reported that the Human Resources

1   Committee and the Board had approved the following compensation to the Company's

2   Executive Officers based on the Company's 2014 financial results:

### 2014 Compensation Decision Highlights

| Named Executive | Base Salary Rate ($) | Annual Incentive Award ($)(1) | Long-Term Equity Incentives | | Total ($) |
| --- | --- | --- | --- | --- | --- |
| | | | Performance Share Award ($)(2) | RSR Award ($)(3) | |
| **John G. Stumpf** *Chairman, President and CEO* | 2,800,000 | 4,000,000 | 12,500,000 | – | 19,300,000 |
| **John R. Shrewsberry** *Senior Executive Vice President and CFO* | 1,700,000(4) | 1,600,000 | 2,800,000 | 2,000,000 | 8,100,000(4) |
| **Timothy J. Sloan** *Senior Executive Vice President (Wholesale Banking) and former CFO during part of 2014* | 2,000,000(4) | 1,600,000 | 5,500,000 | 1,500,000 | 10,600,000(4) |
| **David M. Carroll** *Senior Executive Vice President (Wealth, Brokerage and Retirement)* | 1,700,000 | 1,400,000 | 5,500,000 | 1,000,000 | 9,600,000 |
| **Avid Modjtabai** *Senior Executive Vice President (Consumer Lending)* | 1,700,000 | 1,300,000 | 5,500,000 | 1,000,000 | 9,500,000 |
| **Carrie L. Tolstedt** *Senior Executive Vice President (Community Banking)* | 1,700,000 | 1,300,000 | 5,500,000 | 1,000,000 | 9,500,000 |

12   221.   Further, the 2015 Proxy contained a proposal sponsored by the Company

13   which urged shareholders to approve the compensation awarded above by the HRC to

14   Defendants Tolstedt, Stumpf, Shrewsberry, and Sloan.   This was referred to on the

15   Proxy as "Item 2 – Advisory Resolution to Approve Executive Compensation."

16   222.   In support of Item 2 on the 2015 Proxy, the Director Defendants caused

17   the following false statement to be included in the Proxy:

18          ***The HRC believes its 2014 compensation
19   decisions were consistent with our compensation
     principles, they will benefit stockholders for short-
20   term and long-term Company performance, and
     the compensation paid to the named executives for
21   2014 was reasonable and appropriate.*** Although your
     vote is advisory and not binding on the Company, the ***Board***
22   values our stockholders' views on executive compensation
     matters and ***will consider the outcome of this vote
23   when making future executive compensation
     decisions for named executives***.

24

25   223.   This statement was false because the Directors did not believe that the

26   2014 compensation decisions were consistent with the Company's compensation

27   policies, did not believe that the compensation was reasonable and appropriate, and did

28   not believe that the compensation would benefit the Company in the short and long

term.   As indicated *supra*, the Director Defendants knew that the executives had breached their fiduciary duties to the Company, violated numerous provisions of the Company's Code of Ethics, and exposed the Company to significant and material risks and liability through their conduct related to the Great 8 and Daily Incentive programs.

224.   The Defendants further caused the following statement to be included in the 2015 Proxy related to Item 2:

> We are asking our stockholders to approve an advisory resolution regarding compensation paid to named executives as described in the CD&A, the compensation tables and related disclosures.  This item gives our stockholders the opportunity to express their views on our 2014 compensation decisions and policies for our named executives as discussed in this proxy statement.  Although the say on pay vote is advisory and not binding on our Board, the HRC will take the outcome of the vote into consideration when making future executive compensation decisions.  We describe in our CD&A and related compensation tables our 2014 compensation principles, governance and decisions for the named executives.
>
> Highlights include:
>
> •      Our four compensation principles continued to guide the HRC in making its pay decisions for our named executive officers:
>    1. Pay for Performance
>    2. ***Foster Risk Management Culture***
>    3. Attract and Retain Top Executive Talent
>    4. Encourage Creation of Long-Term Stockholder Value
>
> •      For 2014, the HRC maintained the relative balance between base salary and annual incentive award opportunity for each of our named executive officers to reduce undue focus on short-term financial performance at the risk of the Company's long-term interests.
>
> •      The HRC also maintained the high proportion of total pay in long-term performance-based equity compensation to align management and stockholder interests in increasing stockholder value over the long-term.
>
> •      ***The HRC continued to enhance our strong compensation risk-management practices to***

71
Verified Shareholder Derivative Complaint

> ***discourage imprudent short-term risk taking by***
> ***requiring executives to bear the long-term risk of***
> ***their activities.***

225.   These statements were false and misleading because the HRC's compensation decisions did not "foster a risk management culture" and because the HRC did not "continue to enhance our strong compensation risk-management practices to discourage imprudent short-term risk taking."   To the contrary, the HRC's conduct rewarded the very executives who had taken excessive short-term risks and exposed the Company to severe reputational damage and liability.

## X.   The True Facts Begin to Be Disclosed

226.   On September 8, 2016, the CFPB published its Consent Order with Wells Fargo  detailing the Company's fraudulent practices, which were centered on a corporate culture intent on growing its cross-selling opportunities and unlawfully and without its customers' consent opening millions of unauthorized deposit and credit card accounts, and imposing a fine of more than $185 million. The announcement noted that these facts were known to the Company through an internal investigation that had uncovered the fraudulent practices, and not as a result of an independent government investigation:

> **Consumer Financial Protection Bureau Fines Wells Fargo $100**
> **Million for Widespread Illegal Practice of Secretly Opening**
> **Unauthorized Accounts**
>
> Bank Incentives to Boost Sales Figures Spurred Employees to Secretly
> Open Deposit and Credit Card Accounts
>
> Today the Consumer Financial Protection Bureau (CFPB) fined Wells Fargo Bank, N.A. $100 million for the ***widespread illegal practice of secretly opening unauthorized deposit and credit card accounts***. Spurred by sales targets and compensation incentives, employees boosted sales figures by covertly opening accounts and funding them by transferring funds from consumers' authorized accounts without their knowledge or consent, often racking up fees or other charges. ***According to the bank's own analysis, employees opened more than two million deposit and credit card accounts that may not have been authorized by consumers***....

*"Wells Fargo employees secretly opened unauthorized accounts to hit sales targets and receive bonuses*," said CFPB Director Richard Cordray.

227.    The CFPB announcement explained that the illegal conduct was not only caused by rogue sales staff, but had been driven by the Company's effort to be the leader in cross-selling:

*In recent years, the bank has sought to distinguish itself in the marketplace as a leader in "cross selling"* these products and services to existing customers who did not already have them.  When cross selling is based on efforts to generate more business from existing customers based on strong customer satisfaction and excellent customer service, it is a common and accepted business practice.  *But here the bank had compensation incentive programs for its employees that encouraged them to sign up existing clients for deposit accounts, credit cards, debit cards, and online banking*, and the bank failed to monitor the implementation of these programs with adequate care.

According to today's enforcement action, thousands of Wells Fargo employees illegally enrolled consumers in these products and services without their knowledge or consent in order to obtain financial compensation for meeting sales targets.  The Dodd-Frank Wall Street Reform and Consumer Protection Act prohibits unfair, deceptive, and abusive acts and practices.  Wells Fargo's violations include:

• *Opening deposit accounts and transferring funds Without authorization*:
According to the bank's own analysis, employees opened roughly 1.5 million deposit accounts that may not have been authorized by consumers.  *Employees then transferred funds from consumers' authorized accounts to temporarily fund the new, unauthorized accounts*.  This widespread practice gave the employees credit for opening the new accounts, allowing them to earn additional compensation and to meet the bank's sales goals.  *Consumers, in turn, were sometimes harmed because the bank charged them for insufficient funds* or overdraft fees because the money was not in their original accounts.

• Applying for credit card accounts without authorization:
*According to the bank's own analysis, Wells Fargo employees applied for roughly 565,000 credit card accounts that may not have been authorized by consumers. On those unauthorized credit cards, many consumers incurred annual fees*, as well as associated finance or interest charges and other fees.

- Issuing and activating debit cards without authorization:  Wells Fargo  employees requested and issued debit cards without consumers' knowledge or consent, going so far as to create PINs without telling consumers.

- **_Creating phony email addresses to enroll consumers in online-banking services_**:  Wells Fargo employees created phony email addresses not belonging to consumers to enroll them in online-banking services without their knowledge or consent.

228.   On September 9, 2016, Piper Jaffray issued a report, titled "CFPB Settlement, Fallout May Be More Than Initially Expected," which described its expectation that Wells Fargo shares would trade lower in light of the revelations of the CFPB and the disclosure that Wells Fargo had  terminated more than 5,300 employees for the opening of unauthorized accounts:

> **_We are incrementally more negative on shares of WFC following further revelations about the unauthorized account issues that have surfaced over the past day_**.  Since our initial note (here), we learned that 5,300 employees have been let go due to their involvement in setting up unauthorized accounts, which was a bigger amount than we initially expected given WFC was considered one of the better managed large banks (2% of workforce).  **_In addition, the public relations fallout appears larger than we initially expected_** given the optics of the issue at hand. We expect this additional spotlight on WFC could open the bank to greater scrutiny from regulators and community groups, particularly if the broader public continues to take  an interest in the issue (_e.g._, an article in Vanity Fair magazine).
>
> •    ... **_We would expect the stock to see incremental pressure in the near-term_** given the issues described will bring up a series of questions about internal controls within the bank.
>
> *         *         *
>
> •    ... **_We believe WFC will have a difficult time meeting Street expectations for earnings growth in a low rate environment while the stock screens as expensive at 13.0x_**.

229.   On September 9, 2016, the price of the Company's stock fell from the prior day's close of $49.90 per share to a close of $48.72 per share on September 9, 2016, on trading volume of 32 million shares.

230.   On September 13, 2016, _The Fiscal Times_ published an article titled "The Real Scandal at Wells Fargo: Execs Got Rich by 'Sandbagging' Clients." The article noted that the purpose of the scheme, which resulted in the charges by the CFPB, was

primarily to show steady growth to investors, describing the scheme as a "securities fraud gambit":

**The Real Scandal at Wells Fargo: Execs Got Rich by 'Sandbagging' Clients**

Wells Fargo has habitually tried to cultivate a reputation as "the good bank."  Its executives maintain with pride that they stay away from high-risk investment products, and focus on traditional banking, with the highest ethical standards.

Except for the part where bank employees created over 2 million fake accounts in their customers' names.

The Consumer Financial Protection Bureau (CFPB), Office of the Comptroller of the Currency and the Los Angeles City Attorney fined Wells Fargo $185 million last week for generating fictitious accounts over a five-year period.  Employees forged signatures, conjured phony email addresses and shifted funds between real and phony accounts, sometimes generating unwarranted fees for customers.

Now, it may sound strange to say that this was not, at the root, a consumer fraud case. But it really wasn't.  ***This was more of a securities fraud gambit, combined with wage theft, and that explains why the lack of accountability at the top in this matter is so galling***.

What drove this scheme? The whole story could be found in the pages of the *Los Angeles Times* nearly three years ago (they gift-wrapped this investigation, first for the City Attorney and then for the federal regulators who piled on).  ***Wells Fargo regional managers gave their branch offices daily quotas to "cross-sell" financial products to existing customers.  If someone had a checking account, you sign them up for a savings account.  Or a credit or debit card.  Or online banking services***.

Former CEO Dick Kovacevich actually invented a target for each customer called the "[Great 8] initiative" — eight add-on products per household. This is the equivalent of a used car salesman up-selling the undercoating.  (Hilariously, Kovacevich is now on the board of another fraudulent company, Theranos).

Employees who missed sales quotas would have to work weekends or stay late to catch up.  They were also threatened with firing. To handle the pressure, some employees opened accounts or ordered credit cards without customer permission.  ***Wells Fargo says 5,300 workers have been fired for such conduct over the past five years***.

Verified **Shareholder** Derivative Complaint

The goal of this enterprise was not really to make money through fees on the add-on products. CFPB's complaint states that only 85,000 of the 1.5 million fake accounts incurred fees (of about $2 million), and just 14,000 of the half-million unauthorized credit cards incurred fees (of about $400,000)....  Consumers who have to deal with the aftermath – hits to their credit score, the mandatory arbitration they're locked into on accounts they never asked for – suffered additional harm.

*The idea here was to show steady quarterly growth to investors. The daily sales quotas weren't plucked from the sky, but designed to maintain industry leadership in cross-selling*.... The bank tracks cross-selling metrics; the average Wells Fargo retail banking customer had 6.11 products at the end of 2015.

Multiple accounts signal to Wall Street that Wells maintains deep relationships with its customers, meaning that the bank will keep making money off them.  *Growth in cross-selling plus growth in the customer base equals growth in earnings, investors assume. Wells Fargo stock doubled from 2011 to mid-August 2015, the period described in the fraud complaint*.

Now keep in mind that John Stumpf, the CEO of Wells, took $155 million in  stock options between 2012 and 2015, as the share price soared, in part based on the successful cross-selling strategy.  And, as Fortune reported yesterday, the executive who oversaw the banking unit the entire time those millions of fake accounts were opened is "retiring" with a $124.6 million golden parachute.  *So the fake accounts goosed the stock price, directly benefiting executives. That's securities fraud.  Wells Fargo knew that the cross-selling metrics, which it put in its annual reports, were bogus; it didn't fire all 5,300 employees last week, but over a five-year period.  Yet the bank continued to promote those numbers to investors without informing them of the fake account generation*.

231.   Also on September 13, 2016, *The Motley Fool* published an article about defendant Tolstedt, who oversaw the Community Banking segment wherein thousands of employees had created millions of fake bank and credit card accounts:

**Wells Fargo's Massive Fraud Made This Woman Filthy Rich Overseeing a massive fraud translated into generational wealth for one Wells Fargo executive.**

Just in case you weren't outraged enough at the fact that thousands of employees at Wells Fargo fraudulently opened up to 2 million accounts for customers without their consent, then I have a chart for you.  *It reveals the one person who, more than anyone else, appears to have personally benefited from the fraud*.

76
Verified Shareholder Derivative Complaint

I'm referring to Carrie Tolstedt, the executive who oversaw Wells Fargo's community banking division for much of the past decade. That includes the years from 2011 to 2015, when more than 5% of the employees under her watch engaged in a wide-ranging, systematic scheme to boost revenue by taking advantage of millions of unwitting customers.

As an aside, Wells Fargo claims that only 1% of its employees engaged in this behavior.  This is based on the fact that it fired approximately 1,000 employees a year over five years, equating to 1% of its branch-based staff each year.  But if you aggregate the terminations, which I believe offers a more accurate reflection of the underlying point, then you get 5,300 terminations, or 5.3% of its 100,000 branch-based employees.

Wells Fargo reported two months ago that Tolstedt had decided to retire at the end of this year, though she stepped down from her role overseeing the bank's branch network on July 31.  "A trusted colleague and dear friend, Carrie Tolstedt has been one of our most valuable Wells Fargo leaders, a standard-bearer of our culture, a champion for our customers, and a role model for responsible, principled and inclusive leadership," said chairman and CEO John Stumpf at the time.

As a parting gift, Tolstedt will earn a purported $93 million payday, according to *The Financial Times*, the lion's share of which stems from the exercise of stock awards that she received from the bank along the way. The bank's latest proxy filing shows that the 27-year Wells Fargo veteran owns more than 2.5 million shares of stock in one way, shape, or form.

232.    On September 13, 2016, the Company announced that it would eliminate the sales goals and incentives that drove the culture and environment known to defendants to have substantially contributed to the fraudulent conduct:

**Wells Fargo to Eliminate Product Sales Goals for Retail Bankers**

***Wells Fargo & Company announced today that it will eliminate all product sales goals in retail banking, effective January 1, 2017.***

"Our objective has always been and continues to be to meet our customers' financial needs and drive customer satisfaction," said CEO John Stumpf.  "We are eliminating product sales goals because we want to make certain our customers have full confidence that our retail bankers are always focused on the best interests of customers."

"We believe this decision is both good for our customers and good for our business.  The key to our success is the lifelong relationships that result from providing each customer with great value.  For the past several years, we have significantly strengthened our training programs, controls and oversight and have evolved our model to ensure we are rewarding

deeper relationships and providing excellent customer service. The elimination of product sales goals represents another step to reinforce our service culture, helps ensure that nothing gets in the way of our ability to achieve our mission, and is consistent with our commitment to providing a great place to work," concluded Stumpf.

233.  On September 13, 2016, the price of Wells Fargo stock fell another 3%, from a close of $48.54 per share on September 12, 2016, to a close of $46.96 per share on September 13, 2016, on volume of 59 million shares traded.

234.  On September 14, 2016, *Bloomberg* published an article, titled "Wells Fargo's Fake Account Scandal Snares CEO Stumpf," which reported that Stumpf had been subpoenaed to testify before Congress on September 20, 2016:

> Wells Fargo's scandal surrounding allegations that it opened two million accounts for customers without their knowledge is proving to be far-reaching. Chief Executive Officer John Stumpf faces damage to the bank's reputation and his personal legacy and has been called to testify before Congress next week, while investor Warren Buffett lost $1.4 billion after Wells Fargo shares fell 3.3 percent.

235.  On September 16, 2016, *Reuters* published an article titled "Wells Fargo faces scrutiny over lack of sales scandal disclosure." The article discusses the 7.5% stock price decline caused by revelations that the Company had created millions of bank accounts and applied for credit cards without account holders' permission. The article noted specifically that Wells Fargo had given investors no indication of the scale and scope of the problems, the disclosure of which caused $19 billion in market losses. The article stated:

> A phantom account scandal at Wells Fargo & Co has put the U.S. bank's disclosure policies under a harsh spotlight.
>
> Despite press reports that a federal regulator and the Los Angeles prosecutor were investigating sales practices at retail branches of the San Francisco-based lender, the bank, which agreed to a $190 million settlement, gave investors no indication of the scale of the problem.
>
> The surprise spooked investors and has lopped roughly $19 billion off its market value since the probe disclosed last week that Wells employees had created roughly 2 million accounts for customers without their knowledge in order to meet internal sales targets. The bank has fired 5,300 people over the scandal.

While the settlement barely makes a dent in the $23 billion of profit the bank earned last year, *the scandal's aftermath has caused a 7.5 percent drop in Wells' stock compared with a roughly 2.4 percent decline for the Dow Jones US Banks Index*.

Investors, analysts and legal experts who spoke to Reuters said Wells Fargo' silence did not mean it had broken the law.  But there is broad agreement that it made matters worse by not being more forthcoming with Chief Executive John Stumpf under pressure to explain why this happened on his watch.

"Look, they're lawyered up to the sky.  They did the minimum legally required. Do I think that that's fair to investors or that that's all that investors need to know or want to know?  No I do not," said Nell Minow, vice chair of ValueEdge advisors, a corporate governance advisory firm.

"*It further diminishes their already significantly diminished credibility in terms of their willingness to be transparent*."

\*       \*       \*

Meanwhile, Stumpf will testify before the Senate Banking Committee next week and U.S. prosecutors have begun an investigation into the bank's sales practices.

"It is a scandal of almost unimaginable proportions," former U.S. Securities and Exchange Commission Chairman Arthur Levitt told Reuters this week.  "You cannot hold management immune from its consequences."

MATERIAL OR NOT?

The tactics deployed in its branches were not a surprise for Wells. The bank had been looking into them since 2011, when it started firing employees over "inappropriate sales conduct."  A *Los Angeles Times* investigation published in 2013 described a "pressure-cooker sales culture" at the bank.

*No mention is made of the bank's internal probe, or authorities' probes in the "legal actions" section of its latest quarterly or annual securities filings*.  The bank also did not say until this week that during the second quarter it had set aside money for the settlement.

Stumpf has since apologized and said management takes responsibility for what happened. Spokesman Mark Folk said the bank did not believe it had to disclose information to investors ahead of the settlement.

Verified Shareholder Derivative Complaint

"Each quarter, we consider all available relevant and appropriate facts and circumstances in determining whether a litigation matter is material and disclosed in our public filings," he said. "Based on that review, we determined that the matter was not material."

\* \* \*

Experts said Wells Fargo would have been wise to at least flag the issue earlier.

"They should have tried to get control over the release of the news, so that it wasn't a bombshell that went off on someone else's schedule." Said Erik Gordon, a University of Michigan business professor. "Now they're in the terrible position of looking like they did something and hid it."

236.   On September 20, 2016, Stumpf testified before the Senate Committee on Banking, Housing and Urban Affairs. Among other things, Stumpf admitted:

- • The Company had pulled credit reports by the credit bureaus on cards that were not authorized.

- • Stumpf and the Board knew in late 2013 that there was wrongdoing by employees in Wells Fargo's retail banking segment, including the unauthorized opening of bank and credit card accounts.

- • In July 2016, when defendant Tolstedt announced her retirement, that retirement was in part precipitated by communications regarding the findings of an internal investigation of the unauthorized opening of accounts.

237.   During the hearing, Senator Pat Toomey asked whether Wells Fargo had ever disclosed this misconduct in its SEC filings:

[W]e haven't been able to discover such a disclosure and the SEC clearly requires disclosure of material adverse circumstances. And I don't know how this could not be deemed material. I think the market cap lost nine percent over the last couple of weeks [and] that's pretty material.

Stumpf was unable to answer the question.

## XI.   Stumpf, Tolstedt, Sloan, and Loughlin Received Lavish, Unwarranted Compensation in 2011–2015

238.   While Wells Fargo stock was trading at artificially-inflated prices, Stumpf, Tolstedt, and Sloan received lavish compensation under the Individual Defendants' watch. The compensation received by such individuals in 2014 and 2015 is noted above

in the section alleging the false and misleading Proxy Statements issued in 2015 and 2016.  The Defendants' compensation in 2011, 2012, and 2013 was as follows:

### 2011 Compensation

| Named Executive | Base Salary ($) | Annual Incentive Award ($)(1) | Long-Term Equity Incentive Award ($)(2) | Total 2011 Pay ($) |
|---|---|---|---|---|
| John G. Stumpf | 2,800,000 | 3,100,000 | 12,000,000 | 17,900,000 |
| Timothy J. Sloan | 1,500,000(3) | 1,400,000 | 5,500,000 | 8,400,000 |
| David M. Carroll | 1,500,000 | 1,400,000 | 5,000,000 | 7,900,000 |
| David A. Hoyt | 2,000,000 | 1,875,000 | 6,500,000 | 10,375,000 |
| Carrie L. Tolstedt | 1,700,000 | 1,400,000 | 5,500,000 | 8,600,000 |

### 2012 Compensation

| Named Executive | Base Salary ($) | Annual Incentive Award ($)(1) | Long-Term Equity Incentive Award ($)(2) | Total ($) |
|---|---|---|---|---|
| John G. Stumpf | 2,800,000 | 4,000,000 | 12,500,000 | 19,300,000 |
| Timothy J. Sloan | 1,700,000(3) | 1,600,000 | 5,500,000 | 8,800,000 |
| David M. Carroll | 1,500,000 | 1,425,000 | 5,500,000 | 8,425,000 |
| David A. Hoyt | 2,000,000 | 1,900,000 | 6,750,000 | 10,650,000 |
| Avid Modjtabai | 1,500,000 | 1,425,000 | 5,500,000 | 8,425,000 |
| Carrie L. Tolstedt | 1,700,000 | 1,530,000 | 5,500,000 | 8,730,000 |

### 2013 Compensation

| Named Executive | Base Salary ($) | Annual Incentive Award ($)(1) | Long-Term Equity Incentive Award ($)(2) | Total ($) |
|---|---|---|---|---|
| John G. Stumpf | 2,800,000 | 4,000,000 | 12,500,000 | 19,300,000 |
| Timothy J. Sloan | 1,700,000 | 1,615,000 | 5,500,000 | 8,815,000 |
| David M. Carroll | 1,700,000(3) | 1,615,000 | 5,500,000 | 8,815,000 |
| David A. Hoyt | 2,200,000(3) | 2,090,000 | 6,750,000 | 11,040,000 |
| Avid Modjtabai | 1,700,000(3) | 1,615,000 | 5,500,000 | 8,815,000 |
| Carrie L. Tolstedt | 1,700,000 | 1,530,000 | 5,500,000 | 8,730,000 |

239.    Defendant Loughlin also received substantial unwarranted compensation in 2011–2015, but his compensation is not publicly reported and thus Plaintiff requires discovery to allege the specific amounts received by Loughlin.

## XII.    The Director Defendants Caused Wells Fargo to Spend Over $21.3 Billion to Repurchase Over 409 Million Shares of Its Own Stock at Inflated Prices During the Relevant Period, Resulting in *Damages of Over $2.7 Billion* to Wells Fargo

240.    Between April 2014 and June 2016, Wells Fargo, under the Board's authorization, spent approximately $21,328,537,169.67 to repurchase a total of

409,527,362 shares of its common stock at an average price of $52.21, which is $6.78 higher than the closing price of $45.43 per share on September 16, 2016, when information about Defendants' misconduct emerged in the market.   The difference between the aggregate costs of these repurchases ($21,328,537,169.67) and their approximate value as of September 16, 2016 ($18,604,828,055.66) is approximately $2,723,709,114.01.

241.   The following chart lists the information regarding Wells Fargo's stock repurchases between April 2014 and June 2016:

| Period | Repurchased Shares | Weighted Average Per Share Price | Total Amount Paid |
|---|---|---|---|
| **2014** | | | |
| April | 8,695,090 | $48.74 | $423,798,686.60 |
| May | 9,910,853 | $49.40 | $489,596,138.20 |
| June | 20,791,552 | $50.01 | $1,039,785,515.52 |
| July | 32,031,505 | $51.31 | $1,643,536,521.55 |
| August | 11,802,749 | $50.52 | $596,274,879.48 |
| September | 4,835,188 | $51.79 | $250,414,386.52 |
| October | 31,116,572 | $49.81 | $1,549,916,451.32 |
| November | 10,760,726 | $53.46 | $575,268,411.96 |
| December | 19,702,495 | $54.30 | $1,069,845,478.50 |
| **2015** | | | |
| January | 22,807,070 | $52.15 | $1,189,388,700.50 |
| February | 12,232,119 | $53.97 | $660,167,462.43 |
| March | 13,387,018 | $55.44 | $742,176,277.92 |
| April | 19,846,525 | $53.89 | $1,069,529,232.25 |
| May | 7,322,611 | $55.54 | $406,697,814.94 |
| June | 9,110,037 | $56.85 | $517,905,603.45 |
| July | 16,635,418 | $55.75 | $927,424,553.50 |
| August | 34,034,185 | $56.09 | $1,908,977,436.65 |
| September | 988,453 | $51.81 | $51,211,749.93 |
| October | 1,881,955 | $53.20 | $100,120,006.00 |
| November | 4,975,556 | $55.21 | $274,700,446.76 |
| December | 20,179,945 | $54.46 | $1,098,999,804.70 |

Verified Shareholder Derivative Complaint

| Period | Repurchased Shares | Weighted Average Per Share Price | Total Amount Paid |
|---|---|---|---|
| **2016** | | | |
| January | 19,386,861 | $51.10 | $990,668,597.10 |
| February | 26,144,580 | $47.32 | $1,237,161,525.60 |
| March | 6,143,103 | $49.05 | $301,319,202.15 |
| April | 4,055,979 | $49.59 | $201,135,998.61 |
| May | 29,673,157 | $49.29 | $1,462,589,908.53 |
| June | 11,076,060 | $49.65 | $549,926,379.00 |
| | **Total Shares** | **Average Price** | **Total Amount Paid** |
| | **409,527,362** | **$52.21** | **$21,328,537,169.67** |

242.    The Board authorized the stock repurchase program and caused Wells Fargo to repurchase ***over 409 million shares of its common stock***, even though the Officer Defendants and the Director Defendants knew that Wells Fargo's stock was trading at artificially inflated prices.   In fact, as discussed above, the Director Defendants and Defendants Shrewsberry, Sloan, and Tolstedt made false and misleading statements regarding Wells Fargo's financial condition, internal controls, and regulatory compliance that artificially inflated its stock price.

243.    Because the price of Wells Fargo's shares was artificially inflated between 2014 and 2016, Wells Fargo overpaid for its stock.  Wells Fargo's stock repurchases also falsely signaled to its shareholders and the public that the repurchases were the best use of its cash.  Thus, the Officer Defendants and the Director Defendants breached their fiduciary duties, and committed corporate waste by causing Wells Fargo to repurchase its stock during the Relevant Period at the same time that they were making false and misleading statements to the investing public.

244.    The following specific allegations demonstrate the action taken by the Director Defendants with respect to authorizing and approving the massive stock repurchase program during the Relevant Period.

245.   The stock repurchase program has been an important part of Wells Fargo's strategic corporate objectives.  In fact, in Wells Fargo's Proxy Statements for both 2015 and 2016, the Director Defendants caused Wells Fargo to identify the stock repurchase program as an example of "the Company's success in attaining strategic corporate objectives."  Moreover, the "success" of the stock repurchase program was also one of the factors considered by the Human Resources Committee in determining defendant Stumpf's annual incentive compensation during the Relevant Period.

246.   The Board's Finance Committee is charged with the specific responsibility to "[r]eview[] financial and investment performance, and recommend[] to the Board the declaration of common stock dividends and securities issuances, the repurchase of securities and approval of significant capital expenditures."

247.   By early 2014, Wells Fargo had repurchased so many shares of its common stock that it nearly exhausted the 200-million-share limit authorized by the Board just two years before.

248.   As members of the Board's Finance Committee in 2013 and 2014, defendants Chao, Engel, Hernandez, James, and Runstad recommended that the Board authorize additional shares for the stock repurchase program.  According to a March 26, 2014 press release, all Director Defendants, except defendants Duke and Vautrinot, approved an increase in "the Company's authority to repurchase its common stock" by 350 million additional shares.

249.   On May 7, 2014, all Director Defendants (except defendants Duke and Vautrinot) approved the following statement regarding the stock repurchase program in a Form 10-Q filed with the SEC:

> Our first quarter 2014 dividend was $0.30 per share, and *we purchased 33.5 million shares of common stock in the quarter.  The Board approved an additional 350 million shares in our repurchase authority*.
> ...
> During first quarter 2014, we repurchased approximately 23 million shares of common stock in open

market transactions and from employee benefit plans, at a net cost of $1.0 billion, and approximately 11 million shares of common stock in settlement of a $500 million forward purchase contract entered into in fourth quarter 2013.  In addition, the Company entered into a $750 million forward purchase contract in April 2014 with an unrelated third party that is expected to settle in second quarter 2014 for approximately 16 million shares.

...

In October 2012, the Board authorized the repurchase of 200 million shares.  At March 31, 2014, we had remaining authority under this authorization to repurchase approximately 40 million shares, subject to regulatory and legal conditions.   In March 2014, the Board authorized the repurchase of an additional 350 million shares.

250.   On August 6, 2014, all Director Defendants (except defendants Duke and Vautrinot) approved the following statement regarding the stock repurchase program in a Form 10-Q filed with the SEC:

In second quarter 2014, we increased our common stock dividend by 17% to $0.35 per share and continued to reduce our common share count through the ***repurchase of 39.4 million common shares*** and the execution of a $1 billion forward repurchase contract that settled in July 2014 for 19.5 million shares.  In addition, in July 2014 we entered into a $1.0 billion forward repurchase contract with an unrelated third party that is expected to settle in fourth quarter 2014 for approximately 21 million shares.  We expect our share count to continue to decline in 2014 as a result of anticipated net share repurchases.

...

During second quarter 2014, we repurchased approximately 24 million shares of common stock in open market transactions and from employee benefit plans, at a net cost of $1.2 billion, and 15 million shares of common stock in settlement of a $750 million forward purchase contract entered into in April 2014.  In addition, the Company entered into a $1.0 billion forward purchase contract in June 2014 with an unrelated third party that settled in July 2014 for 19.5 million shares and, in July 2014, entered into a $1.0 billion forward purchase contract with an unrelated third party that is expected to settle in fourth quarter 2014 for approximately 21 million shares.

...

***In October 2012, the Board authorized the repurchase of 200 million shares, which was completed by July 2014***. The Board authorized the

repurchase of an additional 350 million shares in March 2014.  At June 30, 2014, we had remaining authority to repurchase approximately 351 million shares, subject to regulatory and legal conditions.

251.   On November 5, 2014, all Director Defendants (except defendants Duke and Vautrinot) approved the following statement regarding the stock repurchase program in a Form 10-Q filed with the SEC:

> **We continued to reduce our common share count through the repurchase of 48.7 million common shares in the quarter.**  We entered into a $1.0 billion forward repurchase contract with an unrelated third party that settled in October 2014 for 19.8 million shares.  In addition, we entered into a $750 million forward repurchase contract with an unrelated third party in October 2014 that is expected to settle in first quarter 2015 for approximately 15.1 million shares.  We expect our share count to continue to decline in 2014 as a result of anticipated net share repurchases.
> ...
> During third quarter 2014, we repurchased 29.2 million shares of common stock in open market transactions and from employee benefit plans, at a net cost of $1.5 billion, and 19.5 million shares of common stock in settlement of a $1.0 billion forward repurchase contract entered into in June 2014.  We entered into a $1.0 billion forward repurchase contract in July 2014 with an unrelated third party that settled in October 2014 for 19.8 million shares.  In addition, we entered into a $750 million forward repurchase contract in October 2014 with an unrelated third party that is expected to settle in first quarter 2015 for approximately 15.1 million shares.
> ...
> **In October 2012, the Board authorized the repurchase of 200 million shares, which was completed by July 2014. The Board authorized the repurchase of an additional 350 million shares in March 2014. At September 30, 2014, we had remaining authority to repurchase approximately 302 million shares, subject to regulatory and legal conditions.**

252.   On February 25, 2015, the Director Defendants (except defendants Duke and Vautrinot) caused Wells Fargo to make the following statement regarding its stock repurchase program in a Form 10-K filed with the SEC:

Verified Shareholder Derivative Complaint

1
2
3
4
5
6
7
8
9
10
11
12
13
14

> ***In October 2012, our Board of Directors authorized the repurchase of 200 million shares of our common stock, and we used all remaining repurchase authority under this authorization in 2014.  In March 2014, our Board of Directors authorized the repurchase of an additional 350 million shares of our common stock.***  The authorizations cover shares repurchased to meet team member benefit plan requirements.  The Company maintains a variety of retirement plans for its team members and typically is a net issuer of shares of common stock to these plans.  From time to time, it also purchases shares of common stock from these plans to accommodate team member preferences.  Share repurchases are subtracted from the Company's repurchase authority without offset for share issuances.  Shares may be repurchased as part of employee stock option exercises, from the different benefit plans or in the open market, subject to regulatory approval.

> The amount and timing of stock repurchases will be based on various factors, including our capital requirements, the number of shares we expect to issue for employee benefit plans and acquisitions, market conditions (including the trading price of our stock), and regulatory and legal considerations.

15
16
17

253.   On May 6, 2015, all Director Defendants and defendant Runstad approved the following statement regarding the stock repurchase program in a Form 10-Q filed with the SEC:

18
19
20
21
22
23
24
25
26
27
28

> ***We continued to reduce our common share count through the repurchase of 48.4 million common shares in the quarter.***  We also entered into a $750 million forward repurchase contract in January 2015 with an unrelated third party that settled in April 2015 for 14.0 million shares.  In addition, we entered into another $750 million forward repurchase contract with an unrelated third party in April 2015 that is expected to settle before August 2015 for approximately 14 million shares. We expect to reduce our common shares outstanding through share repurchases throughout the remainder of 2015.
> ...
> During first quarter 2015, we repurchased 48.4 million shares of common stock in open market transactions, private transactions and from employee benefit plans, at a cost of $2.6 billion.  We also entered into a $750 million forward repurchase contract in January 2015 with an unrelated third party that settled in April 2015 for 14.0

million shares.  In addition, we entered into another $750 million forward repurchase contract with an unrelated third party in April 2015 that is expected to settle before August 2015 for approximately 14 million shares.

...

In March 2014, the Board authorized the repurchase of 350 million shares of our common stock. At March 31, 2015, we had remaining authority to repurchase approximately 192 million shares, subject to regulatory and legal conditions.

254.  On August 5, 2015, all Director Defendants and defendant Runstad approved the following statement regarding the stock repurchase program in a Form 10-Q filed with the SEC:

***We continued to reduce our common share count through the repurchase of 36.3 million common shares in the quarter.***  We also entered into a $750 million forward repurchase contract in April 2015 with an unrelated third party that settled in July 2015 for 13.6 million shares.  In addition, we entered into a $1.0 billion forward repurchase contract with an unrelated third party in July 2015 that is expected to settle in fourth quarter 2015 for approximately 17.5 million shares.  We expect to reduce our common shares outstanding through share repurchases throughout the remainder of 2015.

...

During second quarter 2015, we issued 18.6 million shares of common stock and repurchased 36.3 million shares of common stock in open market transactions, private transactions and from employee benefit plans, at a cost of $2.0 billion.  We also entered into a $750 million forward repurchase contract in April 2015 with an unrelated third party that settled in July 2015 for 13.6 million shares.  In addition, we entered into a $1.0 billion forward repurchase contract with an unrelated third party in July 2015 that is expected to settle in fourth quarter 2015 for approximately 17.5 million shares.

...

In March 2014, the Board authorized the repurchase of 350 million shares of our common stock.  At June 30, 2015, we had remaining authority to repurchase approximately 156 million shares, subject to regulatory and legal conditions.

255.    On November 4, 2015, all Director Defendants and defendant Runstad approved the following statement regarding the stock repurchase program in a Form 10-Q filed with the SEC:

> ***We continued to reduce our common share count through the repurchase of 51.7 million common shares in the quarter.***  We also entered into a $250 million forward repurchase contract with an unrelated third party in October 2015 that is expected to settle in fourth quarter 2015 for approximately 4.8 million shares.
> ...
> During third quarter 2015, we repurchased 51.7 million shares of common stock in open market transactions, private transactions and from employee benefit plans, at a cost of $2.9 billion.  We also entered into a $250 million forward repurchase contract with an unrelated third party in October 2015 that is expected to settle in fourth quarter 2015 for approximately 4.8 million shares.
> ...
> In March 2014, the Board authorized the repurchase of 350 million shares of our common stock. At September 30, 2015, we had remaining authority to repurchase approximately 104 million shares, subject to regulatory and legal conditions.

256.    In late 2015, members of the Board's Finance Committee — defendants Chao, Duke, Engel, Hernandez, James, and Runstad — recommended to the Board a significant increase in the shares available to be repurchased under the stock repurchase program.  According to a January 26, 2016 press release, all Director Defendants and defendant Runstad "increased the [C]ompany's authority to repurchase common stock by an additional 350 million shares."

257.    According to an article published on Forbes.com on April 2, 2014, entitled "Fed Approves Wells Fargo's $24 Billion Capital Return Plan for 2014,"[10] Wells Fargo's stock repurchase program was enormous:

---

[10] *Available at* http://www.forbes.com/sites/greatspeculations/2014/04/02/fed-approves-wells-fargos-24-billion-capital-return-plan-for-2014/#11a2e605bd78    (last visited Sept. 28, 2016).

1
2
3
4

> As for the share repurchase plan, ***Wells Fargo's current market price implies that the bank will spend at least $17 billion to repurchase 350 million shares over the period. To put the magnitude of the repurchase plan in perspective, Wells Fargo bought back shares worth less than $5.5 billion over the course of 2013***.

5   258.   On February 24, 2016, all Director Defendants and defendant Runstad

6   signed the Company's Form 10-K filed with the SEC, which stated:

7
8
9
10
11
12
13
14
15
16

> In March 2014, our Board of Directors authorized the repurchase of 350 million shares of our common stock. ***In January 2016, our Board of Directors authorized the repurchase of an additional 350 million shares of our common stock.*** The authorizations cover shares repurchased to meet team member benefit plan requirements.  The Company maintains a variety of retirement plans for its team members and typically is a net issuer of shares of common stock to these plans.  From time to time, it also purchases shares of common stock from these plans to accommodate team member preferences.  Share repurchases are subtracted from the Company's repurchase authority without offset for share issuances.  Shares may be repurchased as part of employee stock option exercises, from the different benefit plans or in the open market, subject to regulatory approval.

17
18
19
20

> The amount and timing of stock repurchases will be based on various factors, including our capital requirements, the number of shares we expect to issue for employee benefit plans and acquisitions, market conditions (including the trading price of our stock), and regulatory and legal considerations.

21   259.   On May 4, 2016, all Director Defendants approved the Company's Form

22   10-Q filed with the SEC, which stated:

23
24
25
26
27

> ***We continued to reduce our common share count through the repurchase of 51.7 million common shares in the quarter.*** We also entered into a $750 million forward repurchase contract with an unrelated third party in April 2016 that is expected to settle in second quarter 2016 for approximately 15 million shares. We expect to reduce our common shares outstanding through share repurchases throughout the remainder of 2016.
>
> ...

28

During first quarter 2016, we repurchased 51.7 million shares of common stock in open market transactions, private transactions and from employee benefit plans, at a cost of $2.5 billion, which included $500 million paid in a prior quarter under a forward repurchase agreement that settled in first quarter 2016.  We also entered into a $750 million forward repurchase contract with an unrelated third party in April 2016 that is expected to settle in second quarter 2016 for approximately 15 million shares.

...

In March 2014, the Board authorized the repurchase of 350 million shares of our common stock.  In January 2016, the Board authorized the repurchase of an additional 350 million shares of our common stock.  At March 31, 2016, we had a combined remaining authority to repurchase approximately 375 million shares, subject to regulatory and legal conditions.

260.    On August 3, 2016, Wells Fargo made the following statement regarding its stock repurchase program in a Form 10-Q filed with the SEC:

> **_We continued to reduce our common share count through the repurchase of 44.8 million common shares in the quarter._**  We also entered into a $750 million forward repurchase contract with an unrelated third party in July 2016 that is expected to settle in fourth quarter 2016 for approximately 16 million shares.  We expect to reduce our common shares outstanding through share repurchases throughout the remainder of 2016.
>
> ...
>
> During second quarter 2016, we repurchased 44.8 million shares of common stock in open market transactions, private transactions and from employee benefit plans, at a cost of $2.2 billion.  We also entered into a $750 million forward repurchase contract with an unrelated third party in July 2016 that is expected to settle in fourth quarter 2016 for approximately 16 million shares.
>
> ...
>
> In January 2016, the Board authorized the repurchase of 350 million shares of our common stock. At June 30, 2016, we had remaining authority to repurchase approximately 330 million shares, subject to regulatory and legal conditions.

261.    As noted _supra_, by September 2016, Defendants had caused Wells Fargo to spend approximately $21,328,537,169.67 to repurchase a total of 409,527,362 shares of its common stock at a weighted average price of $52.21, which was $6.78 higher than

91

the closing price of $45.43 per share on September 16, 2016.   Based on the difference between the aggregate cost of these repurchase ($21,328,537,169.67) and their approximate value as of September 16, 2016 ($18,604,828,055.66), the Director Defendants caused Wells Fargo to overpay for its stock in the amount of $2,723,709,114.01.

### XIII.   Tolstedt, Stumpf, Sloan, and Loughlin Sold Wells Fargo Stock While in Possession of Material Insider Information

262.    During the Relevant Period, at the same time that the Director Defendants and the Officer Defendants caused Wells Fargo to spend *over $21.3 billion* to repurchase its own stock at inflated prices, the Insider Selling Defendants (Tolstedt, Stumpf, Sloan, and Loughlin) took advantage of the artificial inflation of Wells Fargo's stock with sales and dispositions of shares of Wells Fargo stock while in possession of material, non-public information in the following transactions:

**Defendant Tolstedt's Sales and Dispositions During the Relevant Period**:

| Sale Date | Number of Shares | Sale Price Per Share | Approximate Total Sale Value |
|---|---|---|---|
| 2011-03-01 | 107 | $31.65 | $ 3,386.55 |
| 2011-03-15 | 1,915 | $32.27 | $ 61,797.05 |
| 2012-01-11 | 32,238 | $29.62 | $954,889.56 |
| 2012-03-15 | 1,954 | $34.07 | $66,572.78 |
| 2012-03-15 | 397 | $34.07 | $13,525.79 |
| 2012-07-01 | 15,276 | $33.44 | $510,829.44 |
| 2012-07-18 | 46,162 | $33.96 | $1,567,661.52 |
| 2012-07-18 | 197,519 | $33.96 | $6,707,745.24 |
| 2013-02-12 | 69,338 | $35.51 | $2,462,192.38 |
| 2013-02-12 | 143,271 | $35.51 | $5,087,553.21 |
| 2013-02-12 | 89,340 | $35.51 | $3,172,463.40 |
| 2013-03-15 | 2,250 | $38.20 | $85,965.00 |
| 2013-03-15 | 763 | $38.20 | $29,146.60 |
| 2013-03-15 | 457 | $38.20 | $17,457.40 |
| 2013-07-01 | 17,552 | $41.36 | $728,934.56 |
| 2013-07-23 | 166,958 | $44.57 | $7,441,318.06 |

Verified Shareholder Derivative Complaint

| Sale Date | Number of Shares | Sale Price Per Share | Approximate Total Sale Value |
|---|---|---|---|
| 2014-03-15 | 470 | $47.40 | $22,278.00 |
| 2014-03-15 | 148,323 | $47.40 | $7,030,510.20 |
| 2014-03-15 | 867 | $47.40 | $41,095.80 |
| 2014-03-15 | 784 | $47.40 | $37,161.60 |
| 2014-05-29 | 47,931 | $50.27 | $2,409,491.37 |
| 2014-05-29 | 260,442 | $50.27 | $13,092,419.34 |
| 2014-07-01 | 24,053 | $52.72 | $1,268,074.16 |
| 2014-07-22 | 2,492 | $58.52 | $145,831.84 |
| 2014-11-11 | 219,835 | $53.76 | $11,818,329.60 |
| 2015-03-15 | 654 | $55.34 | $36,192.36 |
| 2015-03-15 | 769 | $55.34 | $42,556.46 |
| 2015-03-15 | 850 | $55.34 | $47,039.00 |
| 2015-03-15 | 149,359 | $55.34 | $8,265,527.06 |
| 2015-04-16 | 345,510 | $54.81 | $18,937,403.10 |
| 2015-04-16 | 362,708 | $54.81 | $19,880,025.48 |
| 2015-07-22 | 2,491 | $58.52 | $145,773.32 |
| 2016-03-15 | 618 | $49.98 | $30,887.64 |
| 2016-03-15 | 128,116 | $49.98 | $6,403,237.68 |
| 2016-03-15 | 491 | $49.98 | $24,540.18 |
| 2016-03-15 | 309 | $49.98 | $15,443.82 |
| **Total Number of Shares: 2,482,569** | | **Total Value: $118,605,256.55** | |

**Defendant Stumpf's Sales and Dispositions During the Relevant Period:**

| Sale Date | Number of Shares | Sale Price Per Share | Approximate Total Sale Value |
|---|---|---|---|
| 2011-08-03 | 34,434 | $27.30 | $940,048.20 |
| 2012-03-15 | 3,758 | $34.07 | $128,035.06 |
| 2012-08-03 | 17,077 | $34.34 | $586,424.18 |
| 2013-02-01 | 216,272 | $35.13 | $7,597,635.36 |
| 2013-03-01 | 313,553 | $35.39 | $11,096,640.67 |
| 2013-03-15 | 3,821 | $38.20 | $145,962.20 |
| 2013-03-15 | 4,267 | $38.20 | $162,999.40 |
| 2013-07-23 | 333,915 | $44.57 | $14,882,591.55 |
| 2013-07-30 | 38,000 | $43.26 | $1,643,880.00 |

| Sale Date | Number of Shares | Sale Price Per Share | Approximate Total Sale Value |
|---|---|---|---|
| 2013-10-30 | 460,696 | $43.10 | $19,855,997.60 |
| 2013-10-30 | 300,000 | $43.18 | $12,954,000.00 |
| 2014-03-15 | 3929 | $47.40 | $186,234.60 |
| 2014-03-15 | 4,388 | $47.40 | $207,991.20 |
| 2014-03-15 | 323,614 | $47.40 | $15,339,303.60 |
| 2014-10-30 | 474,272 | $52.46 | $24,880,309.12 |
| 2014-10-30 | 152,965 | $52.46 | $8,024,543.90 |
| 2014-11-03 | 627,657 | $53.37 | $33,498,054.09 |
| 2014-11-03 | 98,049 | $53.37 | $5,232,875.13 |
| 2015-03-15 | 339,450 | $55.34 | $18,785,163.00 |
| 2015-03-15 | 4,034 | $55.34 | $223,241.56 |
| 2015-03-15 | 4,805 | $55.34 | $265,908.70 |
| 2015-03-15 | 3,702 | $55.34 | $204,868.68 |
| 2015-12-11 | 30,000 | $53.72 | $1,611,600.00 |
| 2016-08-08 | 1,250,670 | $48.91 | $61,170,269.70 |
| **Total Number of Shares: 5,048,008** | | **Total Value: $239,624,577.50** | |

**Defendant Sloan's Sales and Dispositions During the Relevant Period:**

| Sale Date | Number of Shares | Sale Price Per Share | Approximate Total Sale Value |
|---|---|---|---|
| 2011-02-15 | 39,465 | $33.68 | $1,329,181.20 |
| 2011-03-15 | 5,648 | $32.27 | $182,260.96 |
| 2012-03-15 | 3,626 | $34.07 | $123,537.82 |
| 2012-03-15 | 5,761 | $34.07 | $196,277.27 |
| 2012-07-20 | 58,140 | $33.81 | $1,965,713.40 |
| 2012-12-21 | 57,499 | $34.48 | $1,982,565.52 |
| 2013-02-08 | 54,348 | $34.88 | $1,895,658.24 |
| 2013-03-15 | 4,178 | $38.20 | $159,599.60 |
| 2013-03-15 | 22,781 | $38.20 | $870,234.20 |
| 2013-03-15 | 6,638 | $38.20 | $253,571.60 |
| 2013-03-15 | 763 | $38.20 | $29,146.60 |
| 2013-04-25 | 36,386 | $37.64 | $1,369,569.04 |
| 2013-05-09 | 145,299 | $37.89 | $5,505,379.11 |
| 2013-08-01 | 45,675 | $44.26 | $2,021,575.50 |

| Sale Date | Number of Shares | Sale Price Per Share | Approximate Total Sale Value |
|---|---|---|---|
| 2013-08-01 | 38,019 | $44.26 | $1,682,720.94 |
| 2013-11-26 | 163,687 | $44.31 | $7,252,970.97 |
| 2013-12-13 | 162,803 | $44.73 | $7,282,178.19 |
| 2014-01-17 | 158,301 | $46.39 | $7,343,583.39 |
| 2014-01-24 | 75,000 | $45.84 | $3,438,000.00 |
| 2014-03-15 | 784 | $47.40 | $37,161.60 |
| 2014-03-15 | 148,323 | $47.40 | $7,030,510.20 |
| 2014-03-15 | 4,295 | $47.40 | $203,583.00 |
| 2014-03-15 | 28,110 | $47.40 | $1,332,414.00 |
| 2014-03-15 | 981 | $47.40 | $46,499.40 |
| 2014-04-28 | 80,000 | $48.65 | $3,892,000.00 |
| 2014-09-02 | 50,000 | $51.47 | $2,573,500.00 |
| 2014-12-09 | 207,244 | $54.83 | $11,363,188.52 |
| 2015-01-23 | 25,000 | $53.50 | $1,337,500.00 |
| 2015-03-15 | 769 | $55.34 | $42,556.46 |
| 2015-03-15 | 149,359 | $55.34 | $8,265,527.06 |
| 2015-03-15 | 962 | $55.34 | $53,237.08 |
| 2015-03-15 | 36,753 | $55.34 | $2,033,911.02 |
| 2015-03-15 | 759 | $55.34 | $42,003.06 |
| 2015-05-15 | 50,000 | $56.00 | $2,800,000.00 |
| 2015-07-22 | 3,737 | $58.52 | $218,689.24 |
| 2015-10-22 | 24,000 | $54.28 | $1,302,720.00 |
| 2015-10-22 | 107,379 | $54.06 | $5,804,908.74 |
| 2015-10-22 | 97,597 | $54.06 | $5,276,093.82 |
| 2016-03-01 | 109,740 | $48.72 | $5,346,532.80 |
| 2016-03-10 | 10,000 | $48.16 | $481,600.00 |
| 2016-03-15 | 619 | $49.98 | $30,937.62 |
| 2016-03-15 | 128,116 | $49.98 | $6,403,237.68 |
| 2016-03-15 | 989 | $49.98 | $49,430.22 |
| 2016-03-15 | 782 | $49.98 | $39,084.36 |
| 2016-07-22 | 3,847 | $48.32 | $185,887.04 |
| 2016-08-08 | 20,500 | $48.92 | $1,002,860.00 |
| 2016-08-08 | 68,375 | $48.91 | $3,344,221.25 |
| **Total Number of Shares: 2,443,037** | | | **Total Value: $115,423,517.72** |

**Defendant Loughlin's Sales and Dispositions During the Relevant Period:**

| Sale Date | Number of Shares | Sale Price Per Share | Approximate Total Sale Value |
|---|---|---|---|
| 2011-02-15 | 44,435 | $33.68 | $1,496,570.80 |
| 2011-03-01 | 319 | $31.65 | $10,096.35 |
| 2011-03-15 | 372 | $32.27 | $12,004.44 |
| 2012-02-03 | 16,077 | $30.63 | $492,438.51 |
| 2012-03-01 | 4 | $31.54 | $126.16 |
| 2012-03-01 | 3 | $31.54 | $94.62 |
| 2012-03-15 | 295 | $34.07 | $10,050.65 |
| 2012-07-19 | 46,362 | $34.15 | $1,583,262.30 |
| 2012-07-27 | 24,673 | $34.019.21 | $839,375.46 |
| 2013-03-01 | 309 | $35.39 | $10,935.51 |
| 2013-03-01 | 309 | $35.39 | $10,935.51 |
| 2013-03-15 | 9,670 | $38.20 | $369,394.00 |
| 2013-03-15 | 928 | $38.20 | $35,449.60 |
| 2013-03-15 | 430 | $38.20 | $16,426.00 |
| 2013-03-22 | 23,486 | $37.20 | $873,679.20 |
| 2013-04-15 | 45,000 | $36.8873 | $1,660,050.00 |
| 2013-07-15 | 12,355 | $43.35 | $535,589.25 |
| 2013-07-18 | 78,372 | $44.41 | $3,480,500.52 |
| 2013-07-26 | 70,953 | $43.5170 | $3,087,874.56 |
| 2013-11-20 | 13,377 | $44.17 | $590,862.09 |
| 2013-11-22 | 89,043 | $44.36 | $3,949,947.48 |
| 2014-03-15 | 954 | $47.40 | $45,219.60 |
| 2014-03-15 | 11,624 | $47.40 | $550,977.60 |
| 2014-09-02 | 10,000 | $51.5505 | $515,500.00 |
| 2014-10-29 | 10,000 | $51.77 | $517,700.00 |
| 2015-01-23 | 10,000 | $53.4708 | $534,700.00 |
| 2015-03-01 | 6 | $55.55 | $333.30 |
| 2015-03-15 | 15,808 | $55.34 | $874,814.72 |
| 2015-04-20 | 92,414 | $54.36 | $5,023,625.04 |
| 2015-04-27 | 19,696 | $55.10 | $1,085,249.60 |
| 2015-06-02 | 20,000 | $55.98 | $1,119,600.00 |
| 2015-07-22 | 1,246 | $58.52 | $72,915.92 |

| Sale Date | Number of Shares | Sale Price Per Share | Approximate Total Sale Value |
|---|---|---|---|
| 2015-10-23 | 68,221 | $54.75 | $3,735,099.75 |
| 2015-11-20 | 67,675 | $55.82 | $3,777,618.50 |
| 2015-12-09 | 20,000 | $54.48 | $1,089,600.00 |
| 2016-03-01 | 6 | $48.72 | $292.32 |
| 2016-03-15 | 56,775 | $49.98 | $2,837,614.50 |
| 2016-07-22 | 1,283 | $48.32 | $61,994.56 |
| **Total Number of Shares: 882,480** | | **Total Value:  $40,908,518.42** | |

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

### I.   General Duties as Directors and Officers

263.   By reason of their positions as Wells Fargo's officers and directors and because of their ability to control Wells Fargo's business and corporate affairs, the Individual Defendants owed Wells Fargo and its shareholders fiduciary obligations of trust, loyalty, good faith, candor, and due care, and were required to use their utmost ability to control and manage Wells Fargo in a fair, just, honest, and equitable manner. The Individual Defendants were required to act in furtherance of the best interests of Wells Fargo and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefit.

264.   Each director and officer owes to Wells Fargo and its shareholders the fiduciary duty to exercise good faith and diligence, as well as the highest obligations of loyalty and fair dealing, in the administration of Wells Fargo's affairs and in the use and preservation of its property and assets.

265.   The Individual Defendants, because of their positions of control and authority as Wells Fargo's directors and officers, were able to and did directly and/or indirectly, exercise control over the misconduct complained of herein.

266.   To discharge their duties as Wells Fargo's officers and directors, the Individual Defendants were required to exercise reasonable and prudent supervision over Wells Fargo's management, policies, practices, and controls of the affairs of the Company.  Accordingly, the Individual Defendants were required to:

(a)      ensure that Wells Fargo was operated in a diligent, honest, and prudent manner in accordance with its bylaws and charter, as well as the laws and regulations of California and the United States;

(b)      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      remain informed as to how Wells Fargo conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)      establish and maintain systematic and accurate records and reports of the business and internal affairs of Wells Fargo and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Wells Fargo's operations would comply with all laws and its financial statements filed with the SEC and disseminated to the public and Wells Fargo's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate; and

(g)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, among other things, each of the subjects and duties set forth above.

267.   As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NASDAQ, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, management, earnings, and present and future business prospects; and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information.   The Individual Defendants' misrepresentations and omissions during the Relevant Period violated these specific requirements and obligations.   Thus, the Individual Defendants breached their fiduciary duties by causing or recklessly permitting violations of the federal securities laws.

## II.   Compliance with GAAP

268.   In issuing its financial statements, Wells Fargo was required to comply with the Generally Accepted Accounting Principles ("GAAP") — a common set of accounting principles, standards, and procedures recognized by the accounting profession and used to compile financial statements.

269.   In fact, Wells Fargo stated in each of the Forms 10-K for 2014 and 2015, described below, that the accompanying consolidated financial statements included in the Forms 10-K had been prepared in accordance with GAAP.

270.   In reality, however, the Individual Defendants failed to ensure that Wells Fargo adhered to GAAP during the Relevant Period.

271.   Among other things, Wells Fargo's 2014 and 2015 Forms 10-K, which were reviewed, approved, and signed by the Director Defendants, falsely stated that Wells Fargo's internal controls were effective.

272.   Further, in the course of its ongoing supervision of Wells Fargo, the OCC has identified the following deficiencies and unsafe and unsound practices in the

Company's risk management and oversight of its sales practices which have existed at all times from 2011 to the present:

(a)     The Company's incentive compensation program and plans within the Community Bank Group were not aligned properly with local branch traffic, staff turnover, or customer demand, and they fostered unsafe and unsound sales practices and pressured Wells Fargo employees to sell products not authorized by the customer.

(b)     The Company lacked an Enterprise-Wide Sales Practices Oversight Program and thus failed to provide sufficient oversight to prevent or detect unsafe or unsound sales practices, and failed to mitigate the risks that resulted from such sales practices.

(c)     The Company lacked a comprehensive customer complaint monitoring process that impeded Wells Fargo's ability to:

(i)      Assess customer complaint activity across the Company;

(ii)     Adequately monitor, manage, and report on customer complaints; and

(iii)    Analyze and understand potential sales practices risk.

(d)     The Company's Community Bank Group failed to adequately oversee sales practices, and failed to adequately test and monitor branch employee sales practices.

(e)     The Company's audit coverage was inadequate because it failed to include in its scope an enterprise-wide view of the Company's sales practices.

273.    The Company's audit coverage was inadequate because it failed to include in its scope an enterprise-wide view of the Company's sales practices.

## III.    The Duty of Reasonable and Prudent Supervision

274.    The Individual Defendants are required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of

the Company.   By virtue of such duties, the Individual Defendants are required to, among other things:

(a)      ensure that Wells Fargo maintains adequate internal controls over customer accounts and federal and state regulations governing its banking operations;

(b)      refrain from acting upon material inside corporate information to benefit themselves;

(c)      ensure that Wells Fargo complies with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(d)      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(e)      properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and compliance with the law;

(f)      remain informed as to how Wells Fargo conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(g)      ensure that Wells Fargo was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## BREACHES OF FIDUCIARY DUTIES

275.   Each Individual Defendant owed to Wells Fargo and to its shareholders the fiduciary duty of loyalty and good faith, and the exercise of due care and diligence in managing and overseeing Wells Fargo's affairs, as well as in the use and preservation of

its property and assets.  The Individual Defendants' misconduct involves a knowing and culpable violation of their obligations as directors and officers of Wells Fargo, the absence of good faith on their part, or a reckless disregard of their duties that they were aware or should have been aware posed a risk of serious injury to Wells Fargo.  Each Individual Defendant ratified each other's misconduct because they collectively comprised Wells Fargo's Board and management at all relevant times.

276.  The Individual Defendants each breached their duties of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements and/or failing to disclose that:

(a)  the Company was improperly opening customer accounts, including credit cards, without the authorization or approval of its customers;

(b)  Company employees, in response to high pressure from the Company's executive officers and directors, were forging customer signatures on new accounts, including credit card applications, in order to meet very aggressive goals set by management and the Board in the Great 8 and Daily Incentive programs;

(c)  the Company's financial statements were not prepared in accordance with GAAP because they did not disclose the known unlawful conduct at Wells Fargo associated with the Great 8 and Daily Incentive programs and the lack of effective internal controls at the Company;

(d)  the Company lacked adequate internal and financial controls; and

(e)  as a result of the foregoing, the Company's financial statements were materially false or misleading at all relevant times.

277.  In addition, as a result of the Individual Defendants' actions and course of conduct, the Company is now the subject of customer lawsuits and governmental investigations that allege violations of numerous laws.  As a result, Wells Fargo has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

## CONTROL, ACCESS, AND AUTHORITY

278.   The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Wells Fargo.

279.   Because of their advisory, executive, managerial, and directorial positions with Wells Fargo, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Wells Fargo.

280.   Each of the Individual Defendants was the agent of each of the other Defendants and of Wells Fargo, and was at all times acting within the course and scope of such agency.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

281.   In committing the wrongful acts alleged herein, the Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.   The Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

282.   During the Relevant Period, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did conceal the fact that:   (a) Wells Fargo was opening fake accounts for its customers and improperly recording revenue, including the creation of non-existent revenue and booking revenue in an earlier period than when it was earned; (b) as a result, Wells Fargo's revenue and financial results were overstated; (c) Wells Fargo's financial statements were not prepared in accordance with GAAP; (d) Wells Fargo lacked adequate internal and financial controls; and (e) as a result of the foregoing, Wells Fargo's financial statements were materially false or misleading at all relevant times.   In furtherance of this plan,

1  conspiracy, and course of conduct, the Individual Defendants collectively and

2  individually took the actions set forth herein.

3      283.    The Individual Defendants engaged in a conspiracy, common enterprise,

4  and/or common course of conduct.  During this time, the Individual Defendants caused

5  Wells Fargo to issue false or misleading financial results based upon non-existent

6  revenue or based on revenue that was improperly recorded in an earlier period than

7  when it was earned.

8      284.    The Individual Defendants accomplished their conspiracy, common

9  enterprise, and/or common course of conduct by causing Wells Fargo to open

10  unauthorized checking, savings, debit card, credit card, and other accounts on behalf of

11  its customers, by falsely representing that Wells Fargo had adequate internal controls in

12  place, and by purposefully, recklessly, or negligently causing Wells Fargo to release

13  improper statements.  Because the actions described herein occurred under the

14  authority of the Board, each of the Individual Defendants was a direct, necessary, and

15  substantial participant in the conspiracy, common enterprise, and/or common course of

16  conduct complained of herein.

17      285.    Beginning on or about August 7, 2013, Defendant American Express began

18  to provide substantial assistance to the Individual Defendants by entering into the

19  partnership with Wells Fargo to open, issue, and operate the Wells Fargo American

20  Express credit cards.[11]

21      286.    The Individual Defendants, collectively and individually, initiated a course

22  of conduct that was designed to and did conceal the fact that Wells Fargo was operating

23  its partnership with American Express in such a manner as to permit Wells Fargo to

24  open credit cards for its customers under circumstances where the customer had not

25  requested or authorized the opening of the credit card, which Defendants knew would

26

27      [11] Because American Express entered into a partnership with Wells Fargo,
American Express owed a fiduciary duty to Wells Fargo.

28

result in Wells Fargo improperly recognizing revenue from such transactions and misrepresenting its financial results and the effectiveness of its internal controls.

287.    The purpose and effect of the Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to:  (a) earn or claim to have earned more money, fees, and profits from the opening of Wells Fargo American Express credit cards; (b) in the case of Wells Fargo, further the appearance of the success of the Great 8 and cross-selling programs, and in the case of American Express further the actual or perceived success of implementing its partnership with Wells Fargo which it stated earned it a higher rate of return, with lower risk, than its proprietary credit card business; (c) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties and/or aiding and abetting other defendants' breaches of fiduciary duties; and (d) disguise and misrepresent the Company's respective current and future business prospects.

288.    Each Defendant aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his (or her) overall contribution to and furtherance of the wrongdoing.

### DELAYED ACCRUAL, FRAUDULENT CONCEALMENT, AND EQUITABLE TOLLING

289.    During the Relevant Period, Plaintiff did not discover and could not have discovered, through the exercise of due diligence, Defendants' breaches of their fiduciary duties (and aiding and abetting breaches of fiduciary duties) or their violations of law because Defendants did not disclose — and, in fact, actively concealed — their wrongful conduct with respect to the fake account scandal.

290.    Plaintiff could not have discovered Defendants' breaches of fiduciary duties and violations of law prior to filing suit because Defendants made absolutely no

disclosure of the violations of law alleged herein during the Relevant Period.  None of the documents provided to Plaintiff as a shareholder of the Company made any disclosure of the wrongful conduct alleged herein by any defendant.

291.   Moreover, Defendants not only failed to disclose any information that would have allowed Plaintiff, exercising due diligence, to discover the unlawful conduct, but Defendants also intentionally concealed and attempted to disguise the unlawful conduct to avoid detection by the public.  Defendants' conduct constituted a continuing course of conduct, and the wrongful acts committed by Defendants continued uninterrupted through at least the end of the Relevant Period, on September 8, 2016.

292.   Defendants fraudulently concealed their unlawful conduct by, among other things, firing employees who reported the alleged wrongful conduct, denying reports of alleged unlawful conduct and the opening of fake and/or unauthorized accounts (including credit cards), re-setting consumers' PIN numbers to allow unauthorized new accounts to be opened in the consumers' names, forging consumers' signatures on new account applications, putting false phone numbers and email addresses on the new account applications to prevent the consumers from being contacted after the fake accounts had been opened without the consumers' authorization, and other wrongful conduct, as alleged more fully herein.

293.   Plaintiff is also entitled to the postponement of the accrual of his causes of action due to Defendants' breaches of their fiduciary duties and aiding and abetting others' breaches of fiduciary duties.  "Where a fiduciary obligation is present, the courts have recognized a postponement of the accrual of the cause of action until the beneficiary has knowledge or notice of the act constituting a breach of fidelity." *Eisenbaum v. W. Energy Res., Inc.*, 218 Cal. App. 3d 314, 324 (1990).  "The existence of a trust relationship limits the duty of inquiry." *Id.*  Thus, "when a potential plaintiff is in a fiduciary relationship with another individual, that plaintiff's burden of discovery is reduced and he is entitled to rely on the statements and advice provided by the fiduciary." *Sherman v. Lloyd*, 181 Cal. App. 3d 693, 698 (1986).  "Where a fiduciary

relationship exists, facts which ordinarily require investigation may not incite suspicion and do not give rise to a duty of inquiry." *Hobbs v. Bateman Eichler, Hill Richards, Inc.*, 164 Cal. App. 3d 174, 201–02 (1985).   Thus, "[w]here there is a fiduciary relationship, the usual duty of diligence to discover facts does not exist."  *Id.* at 202. Here, Plaintiff was not aware of the fake account scheme and relied on the Individual Defendants — who owed fiduciary duties to Wells Fargo and its shareholders — to provide disclosure of all material facts regarding Wells Fargo and its financial condition and operations in Wells Fargo's Annual Reports, Quarterly Reports, Proxy Statements, and other SEC filings and shareholder communications.   Plaintiff, therefore, was "entitled to rely on the statements and advice provided by the fiduciary."  *Sherman*, 181 Cal. App. 3d at 698–99.

294.    Further, Plaintiff's claims against the Defendants are entitled to tolling. Plaintiff Hannon originally filed the claims asserted herein against the Individual Defendants on November 15, 2016 — *Hannon v. Loughlin*, No. 16-cv-6624 (N.D. Cal.). That statute of limitations governing Plaintiff's claims against the Individual Defendants herein was tolled by the filing of that action.   Moreover, those claims are still being litigated in the related consolidated derivative action pending in this Court, as Mr. Hannon's original case was consolidated into the other related derivative action. Plaintiff's claims against American Express are also entitled to tolling based on the filing of Mr. Hannon's original complaint, as such claims relate back to the filing of Mr. Hannon's original complaint.    Moreover, Mr. Hannon's claims against American Express are governed by California, not Delaware, law because they are claims against a third party, not the officers and directors of Wells Fargo.  Mr. Hannon's claims against American Express are brought within the applicable statute of limitations.

**DAMAGES TO WELLS FARGO**

295.    Wells Fargo has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

296.    As a direct and proximate result of the Individual Defendants' misconduct, Wells Fargo has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

(a)    $185 million in damages, consisting of the amounts Wells Fargo was forced to pay to settle charges brought against the Company by the CFPB and Los Angeles City Attorney related to the Great 8 and Daily Incentive programs;

(b)    loss of good will and business, including a 44% decline in new customer account opening in October 2016 and decisions by city, municipality, and state governments – most notably, California and Illinois – to suspend doing business with Wells Fargo;

(c)    legal fees associated with the lawsuits filed against the Company for violations of the federal securities laws;

(d)    legal fees and severe reputational damage related to Defendant Stumpf's testimony before the United States Senate, which was necessitated because of the wrongdoing alleged herein;

(e)    loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Individual Defendants' false statements and lack of candor to the marketplace;

(f)    amounts paid to outside lawyers, accountants, and investigators in connection with Wells Fargo's internal investigation;

(g)    damages the Company may have to pay to settle class action lawsuits filed by customers of the bank in whose names unauthorized accounts were opened; and

(h)    damages in the class action lawsuits recently filed on behalf of current and former employees of the bank who were wrongfully fired or who received less pay because they acted honestly and ethically and refused to violate the law in response to the aggressive sales quotas imposed by managers.

**DERIVATIVE ALLEGATIONS**

297.   Plaintiff brings this action for the benefit of Wells Fargo to redress injuries suffered as a result of the Individual Defendants' breaches of fiduciary duties and violations of law, as well as the aiding and abetting thereof.

298.   Wells Fargo is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

299.   Plaintiff is and has been a Wells Fargo shareholder during the Relevant Period.  Plaintiff therefore will adequately and fairly represent the interests of Wells Fargo in enforcing and prosecuting its rights.

300.   Wells Fargo's Board at the time this action was initiated consisted of the following directors:  Baker, Chen, Dean, Duke, Hernandez, James, Milligan, Peetz, Peña, Pujadas, Quigley, Sanger, Sargent, Sloan, Swenson, and Vautrinot.  Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants because, for the reasons set forth below, such demand would be a futile and useless act.

**I.   Demand Is Futile as to a Majority of the Current Board Because They Face a Substantial Likelihood of Personal Liability**

301.   This complaint is related to *In re Wells Fargo & Co. Shareholder Derivative Litigation*, Lead Case No. 16-cv-5541-JST (N.D. Cal.).  By Order dated May 4, 2017, the Court denied Wells Fargo's motion to dismiss on demand futility grounds, holding that the complaint adequately alleged demand futility.  The Honorable Jon S. Tigar held that demand was futile as to Director Defendants Baker, Chao, Chen, Dean, Duke, Engel, Hernandez, James, Milligan, Peña, Quigley, Sanger, Stumpf, Swenson, and Vautrinot.  Of those directors, only Defendants Stumpf, Chao, and Engel are no longer on the Board.  Because Defendants Baker, Chen, Dean, Duke, Hernandez, James, Milligan, Peña, Quigley, Sanger, Swenson, and Vautrinot are still on the Board and constitute a majority of the current Board, demand is futile in this action for the same reasons identified by Judge Tigar in the May 4, 2017 Order – namely that a majority of the current Board face a substantial likelihood of personal liability for their misconduct.

## II.      Demand is Futile as to Sloan

302.    According to the Company's 2017 Proxy statement, Defendant Sloan is not an independent director under NYSE listing standards.  This decision as to Sloan's lack of independence was made by the Board itself.

303.    Moreover, Sloan is interested in this litigation for purposes of demand futility because he faces a substantial likelihood of liability for his individual misconduct.  Sloan is a named defendant in the federal class action pending in the Northern District of California, *Hefler v. Wells Fargo & Co.*, No. 16-cv-5479 (N.D. Cal., filed Sept. 26, 2016), alleging that he violated Section 10(b) of the Exchange Act and Rule 10b-5 when he disseminated or approved the false and misleading statements set forth above.

304.    If Sloan pursued these derivative claims, then that would expose his own misconduct in the class action for violations of the federal securities laws.  As such, Sloan is fatally conflicted, and therefore, unable to render a disinterested decision as to whether the Company should pursue these derivative claims.  Thus, demand is futile.

305.    Sloan cannot render an independent decision because he is a high-ranking officer of Wells Fargo.  As his principal professional occupation, Sloan has been the President of Wells Fargo since November 2015, and CEO since October 2016, when Defendant Stumpf was forced to resign from the Board in the wake of the fake account scandal involved in this case.  Previously he served as chief operating officer from November 2015 to October 2016. In that role, Sloan was responsible for the operations of the Company's four main business groups:  Community Banking, Consumer Lending, Wealth and Investment Management, and Wholesale Banking, and was Defendant Tolstedt's direct supervisor.  Sloan had led the company's Wholesale Banking business beginning in 2014 — overseeing approximately 50 different businesses, including Capital Markets, Commercial (middle market) Banking, Commercial Real Estate, Asset Backed Finance, Equipment Finance, Corporate Banking, Insurance, International, Investment Banking, and Treasury Management. Prior to that, he served as Wells

Fargo's chief financial officer, responsible for financial management functions including controllers, financial reporting, asset liability management, treasury, investor relations, and investment portfolios. From September 2010 to February 2011, Sloan served as chief administrative officer and managed Corporate Communications, Corporate Social Responsibility, Enterprise Marketing, Government Relations, and Corporate Human Resources. Sloan received 2016 compensation of $13,014,714.

306.   Demand is futile as to Sloan because instituting any action would jeopardize the lavish compensation Sloan is expected to receive in future years from Wells Fargo, and could jeopardize his right to the bonus and incentive compensation Sloan received. Thus demand is futile as to Sloan.

**III.    Demand Is Futile as to Peña, Baker, Dean, Hernandez, and Milligan**

307.   Demand is futile as to Directors Peña, Baker, Dean, Hernandez and Milligan because they are members of the Corporate Responsibility Committee ("CRC") and were members of such committee during the Relevant Period.

308.   The CRC was tasked with guarding the bank's reputation and making sure, among other things, that the bank's aggressive cross-selling goals did not lead to mistreatment of customers. The Committee met just three times in 2015, the minimum allowed by Board rules.

309.   The CRC also met the minimum number of times the year before, and the year before that, and the year before that.

310.   Wells Fargo's annual proxy filings reveal that, even as scrutiny of Wells Fargo's consumer practices was ramping up outside the bank — including the high-profile December 2013 L.A. Times Article detailing the problems with Wells Fargo's cross-selling strategies, as well as the launch of investigations by both the Los Angeles City Attorney's office and the CFPB — Directors Peña, Baker, Dean, Hernandez, and Milligan did the absolute minimum required as Board members and members of the CRC to address the bank's growing problem.

311.    Moreover, Defendant Judith Runstad, who headed the CRC until March 1, 2016, when Defendant Peña took over that role, had the job of monitoring "customer service and complaint matters."  Runstad was paid $384,027 in cash and stock in 2015.

312.    Runstad, 71, retired from Wells Fargo's Board on April 26, 2016, at the Company's Annual Meeting. When she did, Runstad exited with more than $7.2 million in stock and options despite doing the absolute minimum required as Chair of the CRC.

**IV.    Demand is Futile as to Chen, James, Sanger, and Dean**

313.    The present complaint demands that Wells Fargo clawback compensation awarded to the Individual Defendants during the Relevant Period, including but not limited to compensation awarded to Defendants Stumpf, Tolstedt, Sloan, Shrewsberry, Loughlin, and others.

314.    During his first Senate testimony on September 20, 2016, Defendant Stumpf said that he would not take a position on whether his compensation, that of Tolstedt, and the compensation of other executives at Wells Fargo should be clawed back.  Instead, Stumpf said that decision would be made by Wells Fargo's Human Resources Committee.  The members of that committee, however, cannot objectively and independently consider whether to clawback the relevant compensation.

315.    Defendants Chen, James, Sanger, and Dean comprise the Human Resources Committee of the Wells Fargo Board.  The following factors indicate such directors are interested and cannot be objective or independent:

•    John Chen has been the executive chair and CEO of Blackberry, Inc. since November 2013. In 2014, as a reward for his employment, Chen received a stock-based bonus of $84.7 million on top of $1 million in salary. The board said that the $84.7 million stock award helped "align the interests of Executive Officers with the achievement of the Company's long-term business objectives and the interests of shareholders." Chen's 2015 compensation, which included even more stock, was $3.4 million, and in 2016, it was $3 million.

•    Donald James is the retired CEO of Vulcan Materials. James served

Verified Shareholder Derivative Complaint

from 1997 to 2014, and in his final year, he earned $13.36 million, of which $3.9 million came from stock awards and another $1.3 million came from options.

• Stephen Sanger served as the CEO of General Mills from 1993 to 2008. In his final two years at the company, Sanger earned $19.15 million and $18.57 million, respectively. The majority of these earnings came in the form of stock grants and options.

• Lloyd Dean is the CEO of the nonprofit Dignity Health Foundation, one of the three largest hospital systems in California. Since Dignity Health is a privately held company, it is difficult to find executive compensation statistics, but in 2010 the Institute for Health and Socio-Economic Policy reported Dean's pay for that year at $4.76 million. Kaiser Health News reported in 2013 that Dean's compensation had increased to $5.14 million, with $2.05 million of it in "bonus and incentive pay."

• The fact that Directors Chen, James, Sanger, and Dean come from backgrounds where they received exorbitant compensation as the CEOs of other companies precludes such directors from objectively considering whether fellow Defendant Stumpf and the other defendants should have their compensation clawed back by Wells Fargo.

316. Moreover, in addition to the millions bestowed upon them by their own boards, these current and former CEOs receive a generous stipend for being on the board of Wells Fargo. According to the Company's most recent proxy statement, in 2016 Chen made $303,002; James made $326,002; Sanger made $485,630; and Dean made $376,002.

317. Moreover, the manner in which such Directors have gone about addressing the issue demonstrates their lack of independence and lack of disinterestedness. On September 20, 2016, Stumpf told the Senate that the HRC, not Stumpf, would address the clawback issue and would do so in a deliberate and considered manner.   However, just one week later, the HRC announced a rushed

decision, announcing that Stumpf would forfeit $41 million in unvested equity and that Tolstedt would forfeit $19 million in unvested equity awards, but not disclosing any other conclusions.  The HRC's "emergency" announcement was widely interpreted for what it was — a desperate attempt by the Board to deflect political pressure and submit a token offering to the Senate prior to Stumpf's follow-up testimony before the Senate two days later on September 29, 2016.  But rushing to a partial decision without adequate deliberation or investigation is hardly the hallmark of an independent and disinterested Board.

**V.    Demand Is Futile as to Director Defendants Sloan, Baker, Chen, Dean, Duke, Hernandez, James, Milligan, Peña, Quigley, Sanger, Swenson, and Vautrinot Because They Face a Substantial Likelihood of Liability for Making False Statements and Acting in Bad Faith by Consciously Ignoring Known Material Risks Posed by the Community Banking Division**

318.    The following Director Defendants currently sitting on the Board — Sloan, Baker, Chen, Dean, Duke, Hernandez, James, Milligan, Peña, Quigley, Sanger, Swenson, and Vautrinot — are all named defendants in the amended complaint filed in the related federal class action pending in the Northern District of California, *Hefler v. Wells Fargo & Co.*, No. 16-cv-5479 (N.D. Cal., Amended Complaint filed March 6, 2017), and thus face a substantial likelihood of liability for making and approving the false and misleading statements alleged in both this complaint and the related *Hefler* amended complaint.  Each such Director Defendant signed Wells Fargo's 2014 and 2015 Form 10-Ks, which contain the false and misleading financial information regarding the Company's cross-sell program and financial results based on alleged above-industry cross-sell achievements.   Because all such Director Defendants face a substantial likelihood of liability, any demand upon them is futile.

319.    All such Director Defendants had actual knowledge of the undisclosed material facts alleged herein and knowingly or consciously disregarded them and acted in bad faith by taking action inimical to the best interests of Wells Fargo.

320.    The Director Defendants' actual knowledge of the underlying misconduct is evidenced in Stumpf's testimony before Congress.  For example, Stumpf admitted on September 20, 2016 that he and the Board were informed in late 2013 of employee wrongdoing in the Company's retail banking segment.  He explained that he learned of the opening of fraudulent accounts in 2013 and that the Board learned of it "later [in] 2013 and then 2014 and on."  He further stated the reports "got to the [B]oard level — it got to the corporate level in 2013 because progress was not being made.  And the board level in [2014]."  He added the Board learned "sometime in 2013" that the regulators were informed of this growing problem.  Stumpf further testified: "[a]nd I know in 2014, various committees of the Board were made aware of this.  The risk committee, the audit and examination [committee], the corporate responsibility [committee]."

321.    On September 29, 2016, Stumpf also admitted before the House Financial Services Committee:

> The board was made aware, generally, of issues by – in committees, at high levels in the 2011, '12 time frame.  By 2013, we had talked about maybe in one — I can't remember which committee it was, surely by 2014, and then when we finally connected the dots on customer harm (ph) in '15, the board was very active on this.

322.    Moreover, according to Wells Fargo's written response to questions posed by the Senate Banking Committee, the Board's Audit and Examination Committee, Risk Committee, and Human Resources Committee regularly received reports from the ethics line and suspicious-activity reports beginning in at least 2011, including reports on "the uptick in sales integrity issues":

> From at least 2011 forward, the Board's Audit and Examination Committee received periodic reports on the activities of Wells Fargo's Internal Investigations group (which investigates issues involving team members), as well as information on EthicsLine and suspicious activity reporting.  Among other things, several of those reports discussed increases in sales integrity issues or in notifications to law enforcement in part relating to the uptick in sales integrity issues. Some reporting discussed reasons for increases in sales integrity investigations and reporting,

115
Verified Shareholder Derivative Complaint

which included improved controls, tightening existing controls, and enhancements to better facilitate referrals of potential sales integrity violations to Internal Investigations.

Later, the Risk Committee began to receive reports from management of noteworthy risk issues, which included, among other risks, sales conduct and practice issues affecting customers and management's efforts to address those risks.  The Board's Human Resources Committee also received reports from management that it was monitoring sales integrity in Community Banking.  Sales integrity issues were also discussed periodically with the Board.

323.   In addition, all such Director Defendants breached their fiduciary duties by allowing Tolstedt, who was responsible for the Community Banking division, to resign, instead of terminating and bringing claims against her.  Defendants Chen, James, Sanger, and Dean, as members of the Human Resources Committee, approved lavish compensation packages for Stumpf, Shrewsberry, Sloan, and Tolstedt despite knowledge of their involvement in the unlawful conduct and in fact even after the Los Angeles City Attorney had sued the Company for fraud related to such conduct.

324.   Moreover, all such Director Defendants are subject to Wells Fargo's Code of Ethics.  The Code went well beyond the basic fiduciary duties required by applicable laws, rules, and regulations.  Specifically, the Code required the Director Defendants to refrain from engaging in insider trading, treat all customers with respect, be truthful and honest in all communications with customers, safeguard customers' financial information, refrain from retaliating against any employee that reports suspected unethical or unlawful activity, and take appropriate action to address any violation of the Code.

325.   The Director Defendants, however, failed to comply with these requirements by allowing and failing to take action against managers and executives who lied to customers, misappropriated and breached confidential customer information, failed to advise customers of the opening of unauthorized accounts even after learning of such conduct, retaliating against rank and file employees who reported suspected unethical and unlawful conduct, and continued to lavishly compensate the

Company's high-level executives even after being advised that the Los Angeles City Attorney had sued the Company for fraud related to the wrongdoing.  As a result, the Director Defendants face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

326.   The knowledge or reckless disregard of all Board members regarding the true facts concerning the Company's cross-selling conduct and the Great 8 and Daily Incentive programs is demonstrated in great detail *supra*.

327.   Moreover, a reasonable inference of the Director Defendants' actual knowledge can be drawn based on the Company's own admission that the Director Defendants were provided with detailed and frequent updates regarding the Company's operations.  The Company's Corporate Governance Guidelines state:

> ***Board members have complete access to the Company's management. In addition, the Company's management is expected to update the Board on any significant Company or competitive developments or matters between Board meetings.*** Non-Board members who are members of the Company's Operating Committee regularly attend Board and most committee meetings.[12]

328.   For example, during the Relevant Period Wells Fargo's Operating Committee was comprised of, among others, Defendant Michael Loughlin, whose title was Senior Executive Vice President and Chief Risk Officer and whose responsibilities included overseeing all risk-taking activities at Wells Fargo, including credit, market, operational, compliance, information security (including cyber risk), and financial crimes risk management.  Thus, during the Relevant Period, it is reasonable to infer that Loughlin regularly updated the Board on the significant problems at the Community Banking division and the risks Wells Fargo faced due to such problems.  The Board does not appear to have taken any action to address these material problems that were

---

[12] *See* Wells Fargo Corporate Governance Guidelines, *available at* https://www08.wellsfargomedia.com/assets/pdf/about/corporate/governance-guidelines.pdf (last visited Dec. 17, 2017).

brought to their attention.   Moreover, the problems were repeatedly discussed in newspaper articles, which were credible since the newspaper articles were supported by interviews with current and former Wells Fargo employees and a review of multiple lawsuits filed against Wells Fargo since 2010 alleging fraud at the Community Banking division.   Fraud is always material to a company's operations and the risks faced by a company.

329.   Conscious or reckless disregard of known risks by board members constitutes bad faith and disloyal conduct.   Such conduct cannot be indemnified by Wells Fargo under Delaware law and thus creates a substantial risk of personal liability for all current Board members.   Demand is thus futile as to all directors.

330.   The Director Defendants also face a substantial likelihood of liability for authorizing and implementing the stock repurchase program, under which Wells Fargo spent over $21.3 billion to purchase over 409 million shares of  its own stock at artificially inflated prices.   Specifically, Defendants Chao, Duke, Engel, Hernandez, and James, as members of the Board's Finance Committee, repeatedly recommended to the Board a significant increase in the shares available to be repurchased under the stock repurchase program.   During the Relevant Period, the Director Defendants twice authorized an increase of the Company's authority to repurchase its common stock by 350 million shares.   The Director Defendants did so while knowing that the price of Wells Fargo's common stock was artificially inflated.   As such, the Director Defendants face a substantial likelihood of liability for their bad-faith misconduct.

331.   If Wells Fargo's officers and directors are protected against personal liability for their acts of mismanagement, abuse of control, and breaches of fiduciary duties alleged in this complaint by D&O insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the shareholders.   Upon information and belief, the D&O insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by Wells Fargo against the Individual Defendants, known as the

"insured versus insured exclusion."  As a result, if the Director Defendants were to sue themselves or certain of the officers of Wells Fargo, there would be no D&O insurance protection.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  Therefore, the Board cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under Wells Fargo's D&O insurance policy.

332.  Although Wells Fargo has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing, the Board has not filed any lawsuits against any directors or officers who were responsible for the losses.  Thus, the Director Defendants are breaching their fiduciary duties to the Company and face a substantial likelihood of liability for their breaches.  Indeed, the Director Defendants are more interested in protecting themselves than they are in protecting Wells Fargo by bringing this action.  Thus, demand on the Board is futile.

## CLAIMS FOR RELIEF

### COUNT I
### BREACH OF FIDUCIARY DUTY
### AGAINST ALL INDIVIDUAL DEFENDANTS

333.  Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

334.  Each of the Individual Defendants owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Wells Fargo's business and affairs, particularly with respect to issues regarding the Company's financial reporting and internal controls.

335.  Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, and reasonable inquiry.

336.  The Individual Defendants' misconduct set forth herein was characterized by their intentional, reckless, or negligent breaches of the fiduciary duties they owed to Wells Fargo to protect its rights and interests.

337.    In breach of their fiduciary duties owed to Wells Fargo, the Individual Defendants willfully participated in misrepresentation of the Company's financial condition, failed to correct the Company's public statements, and failed to fully inform themselves prior to making decisions as directors and officers, rendering them personally liable to the Company for breaching their fiduciary duties.

338.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent its financial condition and they failed to correct the Company's public statements.  Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Wells Fargo's securities.

339.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

340.    Moreover, at the same time the price of the Company's common stock was inflated due to the false and misleading statements made by the Individual Defendants, the Individual Defendants caused the Company to repurchase millions of its own stock on the open market at inflated prices.

341.    As a result of such conduct, the Individual Defendants breached their fiduciary duties to Wells Fargo.

342.    As a result of Defendants' misconduct, Wells Fargo has and will suffer damages in that it paid artificially inflated prices for Wells Fargo common stock purchased on the open market.  The Company would not have purchased Wells Fargo common stock at the prices it paid, had it been aware that the market price of Wells Fargo stock was artificially and falsely inflated by Defendants' false and misleading statements.  As a direct and proximate result of Defendants' wrongful conduct, Wells Fargo suffered damages in connection with its purchases of Wells Fargo common stock.

343.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Wells Fargo has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT II
### BREACH OF FIDUCIARY DUTY FOR INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION
### AGAINST THE INSIDER SELLING DEFENDANTS

344.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

345.    At the time of the stock sales set forth herein, the Insider Selling Defendants — Tolstedt, Stumpf, Sloan, and Loughlin — knew the information described above, and sold Wells Fargo common stock on the basis of such information.

346.    The information described above was proprietary non-public information concerning the Company's unlawful conduct associated with the Great 8 and Daily Incentive programs.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Wells Fargo common stock.

347.    The Insider Selling Defendants' sales of Wells Fargo common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

348.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## COUNT III
### ABUSE OF CONTROL
### AGAINST ALL INDIVIDUAL DEFENDANTS

349.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

350.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Wells Fargo, for which they are legally responsible.

351.   As a direct and proximate result of the Individual Defendants' abuse of control, Wells Fargo has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Wells Fargo has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

**COUNT IV**
**GROSS MISMANAGEMENT**
**AGAINST ALL INDIVIDUAL DEFENDANTS**

352.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

353.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Wells Fargo in a manner consistent with the operations of a publicly-held corporation.

354.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duties alleged herein, Wells Fargo has sustained and will continue to sustain significant damages.

355.   As a result of the misconduct and breaches of duties alleged herein, the Individual Defendants are liable to the Company.

356.   Plaintiff, on behalf of Wells Fargo, has no adequate remedy at law.

**COUNT V**
**UNJUST ENRICHMENT**
**AGAINST ALL INDIVIDUAL DEFENDANTS**

357.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

358.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Wells Fargo.

359.   During the Relevant Period, the Individual Defendants either received bonuses, stock options, stock, or similar compensation from Wells Fargo that was tied to the financial performance of Wells Fargo or received compensation that was unjust in light of the Individual Defendants' bad faith conduct, violation of the Company's Code of Ethics, and self-dealing.

360.   Plaintiff, as a shareholder and representative of Wells Fargo, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any salary, options, performance-based compensation and stock, obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary duties.

**COUNT VI**
**CONTRIBUTION AND INDEMNIFICATION**
**AGAINST DEFENDANTS STUMPF,**
**SHREWSBERRY, SLOAN, AND TOLSTEDT**

361.   Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

362.   This claim is brought derivatively by Plaintiff on behalf of the Company against Individual Defendants' Stumpf, Shrewsberry, Sloan, and Tolstedt for contribution and indemnification.

363.   Wells Fargo is alleged to be liable to the putative class in the related Securities Fraud Class Action for misleading the public about the Company's operations and results.  In the event the Company is found liable to those persons for violating the federal securities laws, the Company's liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omissions of some or all of the Individual Defendants as alleged herein, and the Company will be entitled to receive contribution from those Individual Defendants in connection with the securities fraud actions against the Company currently pending in this District.  In the event the Company is found

1   liable to those persons, the Company's liability will result in whole or in part from the

2   intentional, knowing, reckless, or grossly negligent acts or omissions of those Individual

3   Defendants as alleged herein.

4       364.   Plaintiff demands that the Individual Defendants provide the Company

5   with all appropriate contribution or indemnification.

**COUNT VII**
**DECLARATORY RELIEF**
**AGAINST ALL INDIVIDUAL DEFENDANTS**

8       365.   Plaintiff incorporates by reference and realleges each and every allegation

9   contained above, as though fully set forth herein.

10      366.   As alleged herein, the Individual Defendants engaged in willful breaches of

11  fiduciary duties owed to Wells Fargo in bad faith.   In connection with this and other

12  lawsuits, Wells Fargo has advanced or will advance millions of dollars in legal fees and

13  expenses to such defendants based upon its obligations pursuant to, *inter alia*, its

14  certificate of incorporation, bylaws, and indemnification agreements.

15      367.   The Individual Defendants must return all monies advanced to them by

16  Wells Fargo because under applicable law the Company may not indemnify these

17  defendants for acts that: (i) were not in good faith; (ii) were not in the best interests of

18  the Company; and (iii) were unlawful.   As alleged herein, actions taken by the Individual

19  Defendants were in bad faith, not in Wells Fargo's best interests, and were unlawful.

20      368.   Accordingly, Plaintiff seeks a declaration that the Individual Defendants

21  are not entitled to indemnification from Wells Fargo and must therefore return all

22  advanced legal fees, expenses and other monies to the Company.

23      369.   Plaintiff does not concede the validity of any indemnification agreements

24  between Wells Fargo and the Individual Defendants.

**COUNT VIII**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
**AGAINST ALL INDIVIDUAL DEFENDANTS**

27      370.   Plaintiff incorporates by reference and realleges each and every allegation

28  set forth above as though fully set forth herein.

371.    The Individual Defendants all aided and abetted each other in breaching their fiduciary obligations owed to Wells Fargo resulting in the wrongdoing and damages to the Company.  The Individual Defendants knew or should have known that:

(a)    Wells Fargo was engaging in unlawful conduct with respect to the Great 8 and Daily Incentive programs;

(b)    Wells Fargo was intentionally overriding its internal controls;

(c)    Wells Fargo lacked other essential internal controls over its Community Banking division;

(d)    Wells Fargo was unlawfully firing thousands of employees to cover up its own wrongdoing with respect to the Great 8 and Daily Incentive programs;

(e)    the Company's officers and directors, including the Individual Defendants, were earning unlawful and unmerited compensation tied to the unlawful conduct;

(f)    the Individual Defendants were making or causing the Company to make false statements in the Company's SEC filings, press releases, and comments to analysts and the financial markets;

(g)    the Individual Defendants were causing the Company to repurchase hundreds of millions of shares of its stock at inflated prices; and

(h)    the Company was engaging in other unlawful and unethical conduct.

Nevertheless, the Individual Defendants actively prepared the false and misleading information, engaged in the conduct described herein, and thereby aided and abetted each other's breaches of fiduciary duties and their abuse of control, gross mismanagement and violations of their duties of candor, loyalty, and good faith to Wells Fargo complained of herein.

372.    As a direct, foreseeable, and proximate result of the Individual Defendants' aiding and abetting each other's breaches of fiduciary duties, Wells Fargo has been damaged.

**COUNT IX**
**DERIVATIVE CLAIM FOR AIDING AND ABETTING BREACHES**
**OF FIDUCIARY DUTY UNDER CALIFORNIA LAW**
**AGAINST DEFENDANT AMERICAN EXPRESS COMPANY**

373.    Plaintiff repeats and realleges every allegation set forth above.

374.    Defendant American Express aided and abetted the Individual Defendants in breaching their fiduciary duties owed to Wells Fargo.

375.    The Individual Defendants owed to Wells Fargo certain fiduciary duties as fully set out herein.

376.    By committing the acts alleged herein, the Individual Defendants breached their fiduciary duties owed to Wells Fargo.

377.    American Express colluded in or aided and abetted the Individual Defendants' breaches of fiduciary duties, and actively and knowingly participated in the Individual Defendants' breaches of fiduciary duties owed to Wells Fargo.  American Express knew about or recklessly disregarded the Individual Defendants' breaches of fiduciary duties, which were and are continuing, as set forth in particularity herein.

378.    American Express utilized its knowledge of the Individual Defendants' breaches of fiduciary duties to procure to itself significant improper financial advantages and benefits, including but not limited to significant fees and monies from the Wells Fargo American Express credit cards associated with the fake account scandal.

379.    During the Relevant Period, American Express was one of two exclusive providers of credit cards issued to Wells Fargo customers.  The credit cards were an important element of the fake account scandal because they constituted a material percentage of the fake accounts opened and maintained by Wells Fargo during the time period of the conspiracy.

380.    After Wells Fargo belatedly admitted to the fake account scandal, it initially represented that it believed it had opened 2.1 million fake accounts.  However, in preliminarily providing this number, Wells Fargo indicated it had only reviewed a time period of mid-2001 to mid-2015.  As public scrutiny and condemnation of the

scandal intensified, Wells Fargo revised the number of fake accounts to 3.5 million, indicating that this new, larger number of fake accounts had been estimated based on the Company's review of an expanded time period of January 2009 through September 2016.

381.   Because Wells Fargo has made no indication that it has performed an analysis of the opening of fake accounts prior to January 2009, Plaintiff believes that the number of fake accounts will increase.

382.   Defendants agreed to commit and committed multiple and continuous wrongful acts in furtherance of the wrongdoing.   Defendants and their employees engaged in wrongful acts including but not limited to: (a) the opening of millions of "fake" accounts at Wells Fargo on behalf of consumers, under circumstances where the consumers had not requested nor authorized the opening of such accounts; and (b) issuing financial and other products to consumers that the consumers had not requested or authorized, including checking accounts, savings accounts, debit and credit cards issued by Defendant American Express, and other accounts.   Defendants used various methods to unlawfully open and maintain the fake accounts.   The wrongful acts by Wells Fargo employees included:   (a) changing consumers' "PIN" codes to 0000 without the consumers' authorization, after which the employees were able to open new accounts; (b) forging customer signatures; (c) affirmatively entering false and incorrect information on the fake account application (such as false phone numbers and/or email addresses) so that the new fake account would be concealed from the consumer and/or so that it would be difficult or impossible for consumer satisfaction surveys at Wells Fargo to reach the consumer;   and (d) other unlawful and deceitful conduct.   For Defendant American Express, the wrongful conduct included partnering with Wells Fargo with respect to thousands of Wells Fargo American Express credit cards issued to consumers.   American Express licensed the cards to Wells Fargo beginning in August 2013, and continued to do so through the end of the Relevant Period, even after widespread public information became available to American Express indicating the

rampant and unauthorized opening of unauthorized accounts (including credit cards) by Wells Fargo for its customers.

383.   American Express did so to boost its own earnings and profits.  American Express operated this partnership through its Global Network Services segment, which, by partnering with third-party banks to issue American Express credit cards, required lower operating expenses and credit losses than its proprietary card-issuing segment. Because the return on equity in American Express's third-party-card-issuing business was significantly higher than that of its proprietary card-issuing business, American Express's partnership with Wells Fargo generated an attractive earnings stream and risk profile.

384.   From approximately August 7, 2013 through September 8, 2016, Defendant American Express agreed to partner with and cooperate with Wells Fargo's employees and executives with respect to the issuance and operation of Wells Fargo American Express credit cards.  During this time, American Express knew or recklessly disregarded the fact that Wells Fargo employees were opening credit cards for consumers under circumstances where the consumer had not requested the cards and where other indications of fraud were present, such as forged customer signatures or incorrect customer phone numbers.  In entering into the partnership with Wells Fargo and by providing substantial assistance to the Individual Defendants and Wells Fargo in carrying out the partnership, American Express committed an independent tort by aiding and abetting the breaches of fiduciary duties committed by Wells Fargo employees and executives.

385.   American Express provided substantial assistance to the Individual Defendants' breaches of fiduciary duties.  Among other things, Wells Fargo could not issue the American Express credit cards to its customers without American Express's approval and authorization.  American Express licensed the cards to Wells Fargo and as such American Express's authorization and legal permission was required for issuance

of the credit cards.  Both American Express and Wells Fargo repeatedly referred to their joint venture involving the Wells Fargo American Express credit cards as a partnership.

386.   Pursuant to the American Express/Wells Fargo partnership, American Express also provided substantial assistance to the Individual Defendants with respect to their breaches of fiduciary duties by providing key services and assistance to Wells Fargo with respect to the American Express credit cards.  As the August 7, 2013 press release by American Express announcing the partnership stated:

> **As part of the card-issuing partnership, American Express is providing its Partner Advantage capabilities and services to support Wells Fargo in developing a suite of products that will offer a superior set of experiences, exclusive benefits and customized offers from the American Express network, both online and offline. Separately, LoyaltyEdge from American Express will assist in the design of a new Wells Fargo loyalty program** by offering a broad range of merchandise and gift cards that Wells Fargo's consumer credit customers will be able to redeem with their points.

387.   American Express was unjustly enriched because it obtained direct financial benefits from the issuance of the unauthorized credit cards.  It charged and received annual fees for the credit cards, and received a percentage of charges made by consumers using the credit cards from the merchants who accepted the cards.

388.   Wells Fargo employees submitted at least **565,443** applications for credit-card accounts by using consumers' information without their knowledge or consent.  Approximately 14,000 of those accounts incurred $403,145, collectively, in annual fees, overdraft-protection fees, finance or interest charges, and late fees.

389.   After utilizing auditor PWC to examine the opening of credit cards, Wells Fargo announced in October 2016 that 330,000 of the 565,443 cards had been closed and 234,000 accounts were still open.  About 192,000 of these cards were still open but had never been active, while 42,000 were still opened and activated.  According to Wells Fargo's November 3, 2016 Form 10-Q, the PWC review (of data going back only to 2011)

identified 623,000 consumer and small business unsecured credit card accounts.  And as a result of the review, $2.6 million was refunded to customers for the fees associated with the unauthorized accounts.  It was unclear from Wells Fargo's disclosures whether employees or customers activated those accounts.

390.   After receiving the results of the PWC audit, Wells Fargo also said it was investigating the impact on consumers' FICO credit scores.  In turn, Wells Fargo said it would determine if the opening of an unwanted credit card made it more expensive for the customer to receive another financial product because of a lower credit score.

391.   Wells Fargo was injured as a direct and proximate result of the aforementioned acts.

**COUNT X**
**DERIVATIVE CLAIM FOR UNJUST ENRICHMENT**
**UNDER CALIFORNIA LAW**
**AGAINST DEFENDANT AMERICAN EXPRESS**

392.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

393.   By its wrongful acts and omissions, American Express was unjustly enriched at the expense of, and to the detriment of, Wells Fargo.

394.   During the Relevant Period, American Express received licensing fees, revenues, and other payments from Wells Fargo that were unjust in light of American Express's misconduct alleged herein.

395.   Plaintiff, on behalf of Wells Fargo, seeks restitution from American Express and seeks an order from this Court disgorging all profits, benefits, and other payments, including any licensing fees, revenues, and other payments obtained by American Express due to their wrongful conduct and breaches of their fiduciary duties.

**COUNT XI**
**ACCOUNTING**
**AGAINST ALL INDIVIDUAL DEFENDANTS**

396.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

130
Verified Shareholder Derivative Complaint

397.   At all relevant times, the Individual Defendants, as directors and/or officers of Wells Fargo, owed the Company and its shareholders fiduciary duties of good faith, care, candor and loyalty.

398.   In breach of their fiduciary duties owed to Wells Fargo and its shareholders, the Individual Defendants caused Wells Fargo, among other things, to grant options and compensation to themselves and/or certain other officers and directors of Wells Fargo which was unwarranted due to the unlawful conduct alleged herein, and/or allowed certain of the defendants to sell stock while in the possession of material, non-public information.  By this wrongdoing, the defendants breached their fiduciary duties owed to Wells Fargo and its shareholders.

399.   The Individual Defendants possess complete and unfettered control over their stock option grants, compensation, stock sales, and the books and records of the Company concerning the details of such improper benefits to the Individual Defendants.

400.   As a result of the Individual Defendants' misconduct, Wells Fargo has been substantially injured and damaged financially and is entitled to a recovery as a result thereof.

401.   Plaintiff demands an accounting be made of all compensation and benefits realized by the Individual Defendants during the Relevant Period.

402.   Since the use of the Company's proprietary information for their own gain constitutes a breach of the defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits they obtained thereby.

**COUNT XII**
**VIOLATION OF SECTION 14(a) OF THE EXCHANGE ACT**
**AGAINST THE DIRECTOR DEFENDANTS**

403.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein, except for the Counts and causes of action.

404.   The Director Defendants issued, caused to be issued, and participated in the issuance of materially false and misleading written statements and material

131
Verified Shareholder Derivative Complaint

1   omissions to shareholders that were contained in the Company's 2015 and 2016 Proxy

2   Statements.  The 2015 and 2016 Proxy Statements soliciting materials failed to disclose

3   to the Company's shareholders the information alleged herein.  By reason of the conduct

4   alleged herein, the Director Defendants, who caused the issuance of the 2015 and 2016

5   Proxy Statements, violated Section 14(a) of the Exchange Act.  As a direct and proximate

6   result of these Defendants' wrongful conduct, the Company misled and/or deceived its

7   shareholders by falsely portraying the financial results and operations of the Company.

8       405.   Plaintiff, on behalf of the Company, thereby seeks declaratory and

9   injunctive relief in connection with the misleading and incomplete proxy materials.

10  With respect to the "Say on Pay" compensation proposals contained in the 2015 and

11  2016 Proxy Statements, which were approved by shareholders due to the false and

12  misleading statements contained in the Proxies, Plaintiff seeks: (a) a declaration that the

13  Proxies were false and misleading; (b) an order setting aside the shareholder approval of

14  the Say on Pay proposals; (c) an injunction barring the Individual Defendants who

15  received compensation identified in the Proxies from exercising any options or selling

16  any stock component of such compensation pending final adjudication of these claims;

17  (d) an injunction ordering Wells Fargo to prepare new Proxy Statements which disclose

18  all material facts and are not false and misleading, and then submitting the Say on Pay

19  proposals for shareholder reconsideration and voting; and (e) an injunction ordering the

20  Company's HRC to consider the shareholders' votes on such proposals into their

21  compensation decisions, since the Proxies stated that the HRC would consider the

22  shareholders' votes into the next year's compensation decisions.

23      406.   This action was timely commenced within three years of the date of the

24  2015 and 2016 Proxy Statements and within one year from the time that Plaintiff

25  discovered or reasonably could have discovered the facts upon which this complaint is

26  based.

27      407.   This cause of action seeks only declaratory and injunctive relief, not

28  damages.

**COUNT XIII**
**VIOLATION OF SECTION 29(b) OF THE EXCHANGE ACT**
**AGAINST ALL INDIVIDUAL DEFENDANTS**

408.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein, except for the Counts and causes of action.

409.   As a result of their conduct, as alleged herein, the Individual Defendants violated Sections 14(a) of the Exchange Act during the time that they entered into contracts with Wells Fargo regarding their compensation.

410.   As opposed to many companies that limit clawback compensation to situations where a company restates its financial results, Wells Fargo has a very extensive Compensation Clawback policy, pursuant to which compensation can be clawed back based on reputational harm to the Company, failure to supervise, a violation of the Company's Code of Ethics, and other circumstances.

411.   If Wells Fargo attempts to clawback compensation to the Individual Defendants, such defendants may assert a breach of contract claim.

412.   Section 29(b) of the Exchange Act provides equitable remedies which include, among other things, provisions allowing for the voiding of contracts where the performance of the contract involved violation of any provision of the Exchange Act.

413.   Here, the Individual Defendants violated provisions of the Exchange Act while performing their duties arising under various employment and other contracts they entered into with Wells Fargo.

414.   Wells Fargo was and is an innocent party with respect to Defendants' Exchange Act violations.

415.   Plaintiff, on behalf of Wells Fargo, seeks rescission of the contracts between the Individual Defendants and Wells Fargo due to Defendants' violations of the Exchange Act while performing their job duties.

416.   Even if the contracts are not rescinded by the Court as a result of Defendants' Exchange Act violations, the Court can and should award equitable

remedies in the form of injunctive relief barring the Individual Defendants from asserting breach of contract by Wells Fargo in any action by Plaintiff on behalf of Wells Fargo to clawback compensation from the Individual Defendants.

417. Plaintiff seeks declaratory, injunctive, and equitable relief only in this claim.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment in favor of Plaintiff and Wells Fargo and against all Defendants as follows:

A. Declaring that Plaintiff may maintain this action on behalf of Wells Fargo and that Plaintiff is an adequate representative of Wells Fargo;

B. Declaring that the Individual Defendants have breached and/or aided and abetted the breaches of their fiduciary duties to Wells Fargo;

C. Declaring that American Express Company is liable for aiding and abetting breaches of fiduciary duties committed by the Individual Defendants;

D. Determining and awarding to Wells Fargo the damages sustained by it as a result of the violations set forth above from each Defendant, jointly and severally, together with pre-judgment and post-judgment interest thereon;

E. Ordering an accounting of all compensation awarded to the Individual Defendants during the Relevant Period;

F. Issuing a declaration regarding the Individual Defendants' obligation to have certain compensation clawed back by Wells Fargo pursuant to the Company's compensation clawback policy;

G. Ordering rescission of the Individual Defendants' employment contracts with Wells Fargo or, alternatively, declaring that the Individual Defendants may not assert a breach of contract defense against Wells Fargo in any action by Plaintiff on behalf of Wells Fargo to clawback compensation received by the Individual Defendants;

H. Directing Wells Fargo and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to

comply with applicable laws and to protect Wells Fargo and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

(1)    a proposal to clawback all compensation earned by each of the Individual Defendants during the Relevant Period where return of the compensation is determined to be warranted by the Company's compensation clawback policy;

(2)    a proposal to strengthen the HRC's and CRC's oversight functions;

(3)    a proposal to strengthen the Audit Committee's review and approval of financial reporting and internal controls over financial reporting;

(4)    a provision to permit the shareholders of Wells Fargo to nominate at least three candidates for election to the Board;

(5)    a proposal to strengthen the Board's supervision of Wells Fargo's CEO;

(6)    a provision to appropriately test and then strengthen the internal control functions; and

(7)    a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

I.    Awarding Wells Fargo restitution from the Individual Defendants and American Express and each of them, and ordering them to disgorge all inequitable profits, benefits, and other compensation;

J.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

K.    Granting such other and further relief as the Court deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Verified Shareholder Derivative Complaint

1    Dated: December 20, 2017                    Respectfully submitted,

2                                                BOTTINI & BOTTINI, INC.
                                                 Francis A. Bottini, Jr. (SBN 175783)
3                                                Albert Y. Chang (SBN 296065)
                                                 Yury A. Kolesnikov (SBN 271173)
4

5                                                        s/ Francis A. Bottini, Jr.
                                                        Francis A. Bottini, Jr.
6

7                                                7817 Ivanhoe Avenue, Suite 102
                                                 La Jolla, California 92037
8                                                Telephone:    (858) 914-2001
                                                 Facsimile:    (858) 914-2002
9                                                Email:        fbottini@bottinilaw.com
                                                               achang@bottinilaw.com
10                                                             ykolesnikov@bottinilaw.com

11                                               THE SHUMAN LAW FIRM
                                                 Kip B. Shuman (SBN 145842)
12                                               1 Montgomery Street, Suite1800
                                                 San Francisco, California 94104
13                                               Telephone:    (303) 861-3003
                                                 Facsimile:    (303) 536-7849
14                                               Email:        kip@shumanlawfirm.com

15                                               *Counsel for Plaintiff George J. Hannon*

16

17

18

19

20

21

22

23

24

25

26

27

28

Verified Shareholder Derivative Complaint

## VERIFICATION

I, George Joseph Hannon, verify that I am a shareholder of Nominal Defendant Wells Fargo & Company and that I have continuously owned Wells Fargo stock during the Relevant Period, including at all times since June 6, 2008. I have reviewed the allegations in this Verified Shareholder Derivative Complaint (the "Complaint"). As to those allegations of which I have personal knowledge, I believe them to be true; as to those allegations of which I lack personal knowledge, I rely upon my counsel and counsel's investigation, and believe them to be true. Having received a copy of the Complaint and reviewed it with counsel, I authorize its filing.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: December 18th, 2017.

George Joseph Hannon
George Joseph Hannon

# EXHIBIT A

# EXHIBIT A

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | CASE NO. 2012-CP-07-03709 |
| COUNTY OF BEAUFORT | ) | |

| | | |
|---|---|---|
| DEBORAH S. GOVAN, | ) | |
| ERIN CALDWELL, LaTESHIA L. | ) | |
| BARNWELL, ZYLTHIA ATKINS, | ) | |
| GREGORY CHEREWKO, LINDA A. | ) | **AMENDED COMPLAINT** |
| GILLET, AND MARIA OLIVIA | ) | (JURY TRIAL DEMANDED) |
| DULANEY, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| vs. | ) | |
| | ) | |
| WELLS FARGO BANK, N.A. SCOTT | ) | |
| ZAREDENETTA and CHUCK OWENS. | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

The plaintiffs complaining against the defendants allege that:

<u>DEMAND FOR JURY TRIAL</u>

Plaintiffs are informed and believe that one or more of the causes hereinafter alleged are,

by right, triable by jury, and hereby demand a jury trial.

<u>PARTIES AND JURISDICTION</u>

1.     Plaintiffs are all residents of Beaufort or Jasper County, South Carolina.

2.     Upon information and belief, Defendant Wells Fargo Bank. N.A. ("Wells Fargo")

is a banking corporation organized and existing pursuant to the laws of the United States, and is

doing business in  Beaufort County, South Carolina as Wells Fargo.

3.     Defendant Scott Zardenetta ("Scott") is and was at all times pertinent hereto a

resident of Beaufort County, South Carolina an agent and employee of Wells Fargo.

4.     Defendant Chuck Owens ("Owens") is, on information and belief, a resident of

Sumter County, South Carolina, and an employee and agent of Wells Fargo.

5.    This Court has jurisdiction over the parties and subject matter of this action inasmuch as plaintiffs have exhausted all requisite administrative remedies, and have filed this Complaint within 90 days of their receipt of the Notice of Right to Sue from the Equal Employment Opportunity Commission ("EEOC").

6.    Venue is proper because the events giving rise to this claim occurred in Beaufort County, South Carolina, and the defendants are subject to personal jurisdiction in Beaufort County South Carolina.

<u>GENERAL AVERMENTS</u>

7.    Between the dates of  July 17, 2012 and July 23, 2012 the plaintiffs were wrongfully terminated by Wells Fargo, in part in retaliation for their branch manager's whistle blowing activities. The terminations were in violation of Wells Fargo policies. As a consequence, plaintiffs have and continue to suffer damages including, but not limited to lost income, loss of health insurance benefits, damages from emotional distress, and other monetary damages. On or about August 17, 2012 Plaintiffs filed complaints with the EEOC, and on or about October 3, 2012 they received  Notice of Right to Sue from that agency.

8.    Plaintiffs were employees of the Bluffton branch of Wells Fargo. At the time of their termination, Gregory Cherewko was employed as a banker, Deborah Govan as a Service Manager, Zylthia Atkins as a Lead Teller,  LaTeshia L. Barnwell and  Linda A. Gillet as bank tellers and Erin Caldwell and Maria Oliva Dulaney were employed as part-time bank tellers.

9.    At all times relevant hereto, the branch manager for the Bluffton Wells Fargo was Mr. Mark Stroud.

10.    At all times relevant hereto, the district manager for the Bluffton Wells Fargo was

Scott.

11.    On information and belief, Ms. Wendy Baxley, an employee of the Bluffton Wells

Fargo branch, approached Mr. Stroud in 2012 and complained to  him that Scott was using

cocaine with her boyfriend, Mr. Brian Natale, also a Wells Fargo employee. She also informed

him that Scott and her boyfriend were frequenting local "Gentlemen's Clubs" until the early

hours of the morning, and that Scott was having inappropriate sexual relations with one or more

of his employees and/or subordinates who she identified by name and position at the Sea Pines

Wells Fargo location where Scott was employed. Mr. Stroud encouraged Ms. Baxley to contact

the Wells Fargo Human Resources department to inform them of her concerns regarding this

conduct, and he assured her that her complaint/report would be kept confidential.

12.    On information and belief, and on or about April 11th or 12th, 2012 during the

PGA Heritage Golf Tournament, an agitated and very upset Ms. Baxley approached Mr. Stroud

and advised him that Scott was in a hotel room in Hilton Head, had been using drugs, was in

possession of an "eight ball" of cocaine, and that Scott was proposing that he and Mr. Natale

both have intercourse with her (Ms. Baxley), and/or that Mr. Natale provide another "whore"

from the Sea Pines branch[1] with whom he could have intercourse. During that conversation, she

showed Mr. Stroud a text message from Scott  to Mr. Natale which had been forwarded to her,

and which contained the aforesaid demands and suggestions. On further information and belief,

Ms. Baxley shared this information with one or more other employees of the Wells Fargo

Bluffton branch.

---

[1] Which person Ms. Baxley again identified by name and position

Page 3 of  20

13.     In response to this information Mr. Stroud reported it to Wells Fargo's Human Resources department ("HR") as a complaint of proscribed conduct and sexual harassment in violation of Wells Fargo published policies. He furnished the actual names of those involved, and provided detailed information concerning the activities which had been reported to him and other employees of his branch with the understanding that his complaint would remain confidential, and that his identity would not be disclosed to Scott.

14.     After Mr. Stroud had reported the incident to HR, Ms. Baxley became upset and embarrassed. Mr. Stroud then became privy to several communications between Ms. Baxley, Mr. Natale and Mr. Zardenetta regarding Scott's plans to cover-up their conduct, get rid of those who had knowledge, and to deny what had actually transpired.

15.     Shortly thereafter, on information and belief, HR violated the policy of confidentiality and advised Scott as to the identity of the person who had made the complaint against him. Almost immediately thereafter Scott began writing negative personnel memoranda regarding Mr. Stroud, stopped coming to the Bluffton branch, and refused to acknowledge successes of any of the staff of the Bluffton Branch except for Ms. Baxley who he removed from the branch and placed in an advanced training course. Scott continued to write negative memoranda concerning Mr. Stroud and the branch personnel from that point until he terminated Mr. Stroud and plaintiffs as hereinafter set forth.

16.     On or about late May or early June of 2012 Ms. Govan received a call from a Wells Fargo banker in California notifying plaintiffs that there were thirty-one (31) cultural exchange students from China residing in the Bluffton area for Summer internships, all of whom needed local bank accounts, debit cards, and other banking services. The plaintiffs were informed

Page 4 of 20

that all of these interns lived in a single apartment complex, spoke little English, and had a sponsor/interpreter who spoke for the entire group.

17.    Ms. Govan followed up on the call and obtained the requisite information about the group, which she relayed to her manager, Mr. Stroud.

18.    Due to the size of the group, a request was made to meet them all at one time with their sponsor in the common rooms of the apartment complex where the students were staying, and to obtain the necessary information and applications. Such an on-site visit by Wells Fargo representatives is not uncommon for a group of this nature.

19.    Mr. Stroud and Mr. Cherewko were the two bank officials who met with the interns in person to obtain information necessary to open accounts. As part of the process Mr. Stroud instructed Mr. Cherewko to obtain the PIN numbers to be able to set up the student's debit cards at the site visit. Mr. Cherewko verified with Mr. Stroud that he was to do this, and Mr. Stroud affirmed. The two also obtained applications and other information to be processed and inputted by Ms. Govan and her staff of tellers.

20.    Upon receipt of the applications back at the Bluffton Branch in June, 2012, and at Mr. Stroud's direction, Ms. Govan distributed the applications among Ms. Atkins, Ms. Gillet, Ms. Barnwell, Ms. Caldwell and Ms. Dulaney who entered the information for the accounts. Ms. Baxley was not present for either the on site visit or the subsequent data entry as she was at a training site at Scott's initiative.

21.    Each teller is required to achieve a certain number of core credits per month. These credits are obtained by signing an individual up for one of the following services: Checking account, Savings Account, Online Banking, Debit Card, and/or Direct Deposit.

Bankers receive a single credit for each service up to five (5) credits. Tellers are only eligible to receive a maximum of three (3) credits per individual.

22.    At Mr. Stroud's specific authorization and direction, Ms. Govan, Mr. Cherewko, Ms. Atkins, Ms. Gillet, Ms. Barnwell, Ms. Caldwell and Ms. Dulaney each received referral credits commensurate with the actual accounts that they had set up and/or processed for the cultural exchange students/interns. Although they would typically have met with each of these account holders in person to receive credit,  this situation was not typical, and they were assured that it was proper to distribute the referral credits as Mr. Stroud had directed. Further, and on information and belief, this same procedure is customary in such situations and is employed by other Wells Fargo managers throughout the Hilton Head Island and Bluffton areas.

23.    On July 12, 2012, Scott and Wells Fargo 'investigator' Owens, came to the Bluffton Branch unannounced to conduct an "investigation."

24.    Owens, with Scott present, demanded to meet with Mr. Stroud and with each plaintiff individually behind closed doors, and without any other representative or counsel for the plaintiffs being present. Each plaintiff was required to attend this "investigative interrogation," and Owens refused to allow them to have any legal counsel or other representative present, or to leave the room until he permitted it.

25.    At the outset of some meetings Owens quickly flashed a badge in a leather wallet in front of the person being interrogated, and he implied that there would be criminal penalties if that person did not cooperate fully. The plaintiffs felt intimidated and threatened, and that the closed meeting was indeed an interrogation. During several of the interrogations,  Mr. Owens verbally berated and threatened plaintiffs reducing them to tears.

26.    Owens questioned the plaintiffs as to whether they knew what they had done in connection with the opening of the accounts for the cultural exchange students and reporting of credits was illegal and a violation of Wells Fargo rules. Each of the plaintiffs denied that what they did was improper, and they stated that they had followed the express instructions of their Branch Manager and believed that their actions were proper.

27.    Owens then brandished a Wells Fargo Team Member Handbook[2] (referred to sometimes herein as the "Rules"), and in a raised voice told plaintiffs that each person was charged with reading and understanding it. He pressured, berated, demeaned, and harassed the plaintiffs; among other things implying or directly asking some of them if they were "too dumb to read or understand." He then insisted that some plaintiffs write down on a document that he provided what they did in connection with opening the interns' accounts and that they write that their actions were wrong. ` Many of the plaintiffs wrote down an account of the events, but wrote that their actions were not improper as they were directed by management to do what they did.

28.    Upon review of an individual's statement, in several instances Owens yelled at them and berated them, saying their original statement 'was not clear enough' and that it needed 'to clearly admit that they were wrong' or they would be fired or worse. He then coerced the individual to add language acknowledging their actions were wrong [which language he (Owens) dictated to them] to their statement(s) and initial the added language.

29.    Despite this intimidation, plaintiff Dulaney[3] initially refused to alter her statement;

---

[2] The name for Wells Fargo's Employee Manual

[3] Ms. Dulaney is very small, approximately 5' tall, and weighs 98 pounds.

whereupon Mr. Owens added pressure by physically intimidating her, fostering within her a feeling that she was trapped in the room with Owens and Scott, could not leave, and that Owens might physically harm her. Finally, and because of her growing fear of Mr. Owen's anger and physical presence, she succumbed and wrote the words he dictated. Only then was she allowed to leave.

30.    Only Ms. Caldwell who was away on vacation when the initial interrogations were held, and who Owens attempted to interrogate by phone, declined to sign the forced confession, terminated the interview process, and was immediately fired.

31.    On July 13, 2012 Scott issued a termination letter to Mr. Stroud citing as grounds violation of the Wells Fargo Code of Ethics with respect to the handling of the 31 new accounts. On information and belief, and since he could not terminate Mr. Stroud without terminating all employees of the Bluffton branch, on July 17, 2012, Ms. Govan, Mr. Cherewko, Ms. Atkins, Ms. Gillet, Ms. Barnwell, and Ms. Dulaney were individually given a termination letter from Scott stating that they too had violated the Wells Fargo Code of Ethics as set forth in the Rules, they were 'ineligible for re-hire'[4], and they were told to leave the branch immediately. Ms. Caldwell was given her letter the same day as her interrogation on July 23, 2012. All plaintiffs were then escorted by Wells Fargo personnel through the bank lobby in front of customers and the public, and escorted out of the bank.

32.    Upon information and belief, the aforesaid terminations were conducted in retaliation for the complaint made to HR concerning Scott's conduct and sexual harassment of

---

[4] This designation in the banking industry has severe ramifications, and is cause to prevent employment at any other banking institution in the country.

certain Wells Fargo employees including Ms. Baxley. Upon further information and belief, and

subsequent to the plaintiffs' terminations, Ms. Baxley was brought back to the Bluffton branch

and promoted to branch manager by Scott.

33.    Upon information and belief, following plaintiffs' complaints to Wells Fargo over

their termination, Scott was first placed on administrative leave by Wells Fargo and is now on

medical leave.

34.    Since their discharge, only two of the plaintiffs have been able to find other

employment, and none have been able to secure comparable employment in the banking industry.

35.    As a result of their wrongful termination, their humiliation at being escorted by

Wells Fargo personnel from their offices and paraded through the bank lobby during business

hours and in front of customers,  and the tactics of intimidation and coercive interrogation

techniques employed by Scott, Owens, and Wells Fargo, plaintiffs have suffered injuries

including but not limited to post traumatic stress, anxiety, physical injury, lost wages, lost

benefits, and lost health insurance for themselves and family members. In particular, several of

the Plaintiffs individually and their family members that were covered by their health insurance

through Wells Fargo, have serious medical conditions including cancer and seizures which

require continuing treatment and/or monitoring and have significant costs associated with the

same.  The cost of COBRA for these individuals is, in most cases, prohibitive and is in fact more

than the entire annual salary they were being paid by Wells Fargo.

### FOR A FIRST CAUSE OF ACTION AGAINST WELLS FARGO
(Breach of Contract)

36.    Each and every allegation of the preceding paragraphs is realleged as fully if

repeated verbatim herein.

37.    Wells Fargo's published Team Member Handbook which was given to each of the plaintiffs created an employment contract by its terms in that:

      (a)    the handbook sets out procedures and requirements binding on the employee and Wells Fargo

      (b)    those procedures applied to the discharged plaintiffs; and

      ( c)    Wells Fargo violated those procedures.

38.    Plaintiffs reasonably relied on the provisions of the Rules in following the instructions given to them by Mr. Stroud, their manager. Despite reliance and full performance by plaintiffs of all that was required of them, Wells Fargo immediately terminated plaintiffs for following the instructions of their manager when the Rules obligated them to do so.

39.    As a direct result of defendants breach of contract, plaintiffs have suffered actual damages equal to that of lost wages, future lost wages, medical expenses, health insurance costs, lost benefits, and other incidental and consequential damages in such amount as the court may find.

40.    Plaintiffs are informed and believe that they are entitled to recover these damages from Wells Fargo by reason of its breach of contract and failure to adhere to its own written policies

### FOR A SECOND CAUSE OF ACTION AGAINST WELLS FARGO
(Wrongful Discharge)

41.    Each and every allegation of the preceding paragraphs is realleged as fully if repeated verbatim herein.

42.    Wells Fargo through its district manager and employee Scott, embarked upon a

course of action designed to conceal Scott's violations of Wells Fargo policy, to punish Mr. Stroud for his "whistle blowing" complaints to Wells Fargo's Human Resource department concerning Scott's drug use and sexual harassment of Wells Fargo employees, and to eliminate those employees who had knowledge of his conduct or the HR complaint.

43.    On in formation and belief, Scott retaliated against Mr. Stroud and the plaintiffs whom he believed were knowledgeable concerning the allegations of his misconduct by obtaining "confessions" of wrongdoing through coercion, and immediately terminating plaintiffs.

42.    Wells Fargo's termination of plaintiffs was wrongful and in violation of public policy as it was done in retaliation for Mr. Stroud's report of Scott's sexual harassment and drug use to Human Resources, and further as plaintiffs were terminated for following the instructions of their manager as the Rules required them to do.

43.    Plaintiffs have been damaged in the form of lost back pay and future wages; a reduction or elimination of income and benefits; and, expenses associated with finding other work. As a further result of defendant's unlawful actions, plaintiffs have suffered emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, embarrassment, injury to reputation, and other non-pecuniary losses and are informed they are entitled to recover actual damages and consequential damages from Wells Fargo in such amount as the court may find.

<u>FOR A THIRD CAUSE OF ACTION AGAINST WELLS FARGO,
OWENS AND ZARDENETTA</u>
(False Arrest/Imprisonment)

44.    Each and every allegation of the preceding paragraphs is realleged as fully if

repeated verbatim herein.

45.    Acting individually and as agents and employees of Wells Fargo, Owens and Zardenetta's forced interrogation of plaintiffs as aforesaid constituted false imprisonment of the plaintiffs in that they intentionally and unlawfully restrained the Plaintiffs for a period of time against their will so that it interfered with their personal liberty, and that they did not feel they were free to leave the interrogation.

46.    As a consequence of the actions of Owens and Zardenetta culminating in the false imprisonment and the coerced "confessions," plaintiffs were wrongfully terminated, and thereby suffered damages consisting of pecuniary loss, loss of back pay and future wages, physical pain and suffering, physical injury or illness, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, embarrassment, injury to reputation, and other non-pecuniary losses.

47.    The actions of the defendants as aforesaid were negligent, willful, wanton, reckless and grossly negligent, and these actions were the proximate cause of the plaintiffs' injuries and damages.

48.    Plaintiffs are informed and believe that, in addition to their actual damages as aforesaid, they are entitled to recover punitive damages in such amount as the court may determine is necessary to punish Wells Fargo, Owens, and Zardenetta for their grossly negligent conduct and their intentional disregard of the plaintiffs civil rights and personal liberty.

FOR A FOURTH CAUSE OF ACTION AGAINST WELLS FARGO,
OWENS AND ZARDENETTA
(Outrage/Intentional Infliction of Emotional Distress)

Page 12 of  20

49.    Each and every allegation of the preceding paragraphs is realleged as fully if repeated verbatim herein.

50.    These defendants intentionally or recklessly inflicted severe emotional distress upon plaintiffs or were substantially certain that such distress would result from their conduct. Among other things, these defendants:

A.    Deprived plaintiffs of their liberty by forcing them to submit to the aforesaid "interrogation," and misleading plaintiffs into thinking the interrogation was being conducted by a law enforcement official;

B.    Violated the plaintiffs civil rights, and denied them the right to counsel;

C.    Assaulted plaintiffs, yelling at them, belittling them, and using physical intimidation and the threat of harm when plaintiffs refused or failed to make a written confession of any wrongdoing;

D.    Intentionally humiliating and embarrassing plaintiffs by parading them through the bank lobby under guard of Wells Fargo personnel;

E.    Placing plaintiffs under such extreme duress that they would execute "confessions" so as to be allowed to leave the interrogation room.

F.    Fabricating false grounds for dismissal of plaintiffs;

G.    Violating the confidentiality of the Whistle blower complaint process by disclosing the identity of witnesses to the alleged wrongdoer;

H.    In such other and further ways as may be hereafter shown through discovery.

51.    These defendants' conduct was so extreme and outrageous as to exceed all possible bounds of decency and is atrocious and utterly intolerable in a civilized community.

52.     Defendants' actions were negligent and/or intentional, and were the direct and proximate cause of plaintiffs' severe and extreme emotional distress.

53.     The emotional distress suffered by plaintiffs was so severe that no reasonable person could be expected to endure it.

54.     As a proximate result of the negligent or intentional conduct aforesaid, plaintiffs have been damaged, have suffered emotional pain, mental anguish, loss of enjoyment of life, humiliation, embarrassment, and have incurred expenses including expenses for medical and psychological treatment, or other expenses, and have incurred other non-pecuniary losses.

55.     Plaintiffs are entitled to a judgment for actual, compensatory and punitive damages against the defendants jointly and severally as a result of their actions.

<u>FOR A FIFTH CAUSE OF ACTION AGAINST WELLS FARGO</u>
(Defamation)

56.     Each and every allegation of the preceding paragraphs is realleged as fully if repeated verbatim herein.

57.     Wells Fargo elected to terminate plaintiffs' employment by removing them from their offices and parading them through the customer lobby under guard of Wells Fargo personnel and thence out of the bank's doors. Further, when long-time customers of the bank inquired as to what had happened to these long-time employees, Wells Fargo refused to provide any information or explanation.

58.     Implicit in the actions of Wells Fargo was the representation that the plaintiffs had been terminated due to financial impropriety and/or some criminal or illegal act necessitating the presence and escort by an armed guard.

59.    The representations as aforesaid were defamatory, they directly concern the plaintiffs and their professional reputation; they were maliciously published to third parties; the statements taken in context alluded to the plaintiffs being fired for offenses of a criminal or unlawful nature, which were false and published by Wells Fargo with actual knowledge of the falsity and/or with reckless disregard for their truth or falsity; and, the statements have resulted in damages to the Plaintiffs.

60.    Plaintiffs are informed and believe that the actions of Wells Fargo as aforesaid were committed with actual malice and intent to damage the plaintiffs, and/or with intentional and reckless disregard for the consequences to the plaintiffs in that Wells Fargo knew or should have known that these actions and statements in the context they were taken would be construed as termination for criminal and/or other unlawful or unprofessional conduct, and that these allegations would be repeated amongst customers and throughout the small community. Plaintiffs are further informed and believe that the actions of Wells Fargo as aforesaid constitute slander *per se*.

61.    As a consequence of these actions, plaintiffs have been and will likely continue to be unable to find comparable employment in the banking profession, their reputations have been damaged throughout the banking community, and their reputation and character throughout the community has been called into disrepute.

62.    Plaintiffs are further informed and believe that they are entitled to recover of Wells Fargo nominal damages, general damages, actual and special damages for the continuing harm to their reputations, and punitive damages in such amount as the Court may determine is necessary to punish Wells Fargo for the intentional disregard of the plaintiffs' rights.

Page 15 of 20

<u>FOR A SIXTH CAUSE OF ACTION AGAINST WELLS FARGO,
OWENS AND ZARDENETTA</u>
<u>(Civil Conspiracy)</u>

63.    Each and every allegation of the preceding paragraphs is realleged as fully if repeated verbatim herein.

64.    On information and belief, defendants, Baxley, and Natale formed a combination for the improper purpose of concealing Scott's drug use, sexual harassment of Wells Fargo employees, violations of Wells Fargo policies, and the participation of Baxley and Natale in some or all of these activities from the Human Resources investigation, and to obtain through intimidation, coercion, and violation of civil rights admissions of policy violations from plaintiffs in order to terminate Mr. Stroud and plaintiffs whom they believed had knowledge of these matters. Further, they conspired to deny plaintiffs rights and benefits, including unemployment compensation, by fabricating reports to third parties concerning plaintiffs' alleged wrongdoing.

65.    On information and belief and in furtherance of the conspiracy, Owens impersonated a law enforcement officer, and together with Scott intimidated and coerced plaintiffs into signing documents containing forced admissions of policy violations which they could then use as a basis for terminating Mr. Stroud. In the course of doing so, they falsely imprisoned some or all of the plaintiffs, assaulted them, harassed and intimidated them and denied them right to counsel or other representation.

66.    Plaintiffs have suffered special damages in that they have lost their employment and income therefrom, experienced extreme emotional distress,  incurred medical and other expenses, were deprived of their civil rights including their liberty, were deprived of their unemployment compensation, and have suffered additional and incidental and consequential

damages including attorneys' fees and costs.

67.     Plaintiffs are informed and believe that they are entitled to recover damages resulting from the aforesaid civil conspiracy from these defendants, including actual damages in such amount as the court may find together with punitive damages and the costs and disbursements of this action.

FOR A SEVENTH CAUSE OF ACTION AGAINST WELLS FARGO
(Violations of Title VII)

68.     Each and every allegation of the preceding paragraphs is realleged as fully if repeated verbatim herein.

69.     Wells Fargo's actions as aforesaid are unlawful and in violation of Title VII, 42 U.S.C.

70.     Plaintiffs are informed and believes that they are entitled to recover damages of this defendant for their pecuniary losses resulting from the unlawful employment practices described hereinabove, including back pay/lost wages, job search expenses, pre-judgment interest, and such other amounts necessary to make them whole as a result of the unlawful employment practices of this defendant. Additionally, plaintiffs are informed and believes that they are entitled to recover punitive damages for the malicious and reckless conduct of Wells Fargo's agents Owens and Scott as hereinabove described in such amounts as may be determined at trial, together with the costs and disbursements of this action and a reasonable attorney's fee.

FOR AN EIGHTH CAUSE OF ACTION AGAINST WELLS FARGO
(Negligence)

71.     Each and every allegation of the preceding paragraphs is realleged as fully if repeated verbatim herein.

Page 17 of 20

72.    Wells Fargo owed a duty to the plaintiffs who it employed to follow and honor the rules and procedures it set forth and published in its employee manual, to ensure that the rules it published were unambiguous, and to refrain from punishing or disciplining plaintiffs for adhering to those rules and regulations it promulgated. Further, Wells Fargo owed a duty to its employees including the plaintiffs to properly supervise and train its investigators and managers so that they would not falsely imprison, assault, or otherwise coerce false "confessions" from employees during investigations, or otherwise violate their civil rights.

73.    This defendant breached that duty in that it negligently punished and terminated the plaintiffs for following the very rules that it had published. Wells Fargo further breached its duty to plaintiffs in that some of the rules were ambiguous in that they could be construed to allow for flexibility or discretion in a-typical situations. Finally, this defendant failed to properly train or supervise its personnel.

74.    As a direct and proximate result of the defendant Wells Fargo's negligence, willfulness, wantonness, and gross negligence, plaintiffs were damaged in that they were falsely imprisoned, assaulted, subjected to coercion and intimidation, and ultimately fired for following the very rules and regulations that Wells Fargo had published in its employee manual.

75.    Plaintiffs are informed and believe that they are entitled to recover their actual and consequential damages in such amount as the Court may find together with punitive damages in such amount as the Court may determine are necessary to punish Wells Fargo for its negligent, wilful, wanton, and grossly negligent conduct as set forth above.

WHEREFORE, having fully made out their claims against the Defendants herein, Plaintiffs pray that this Court will inquire into the matters aforesaid, and award them damages against the

Defendants as follows:

I.   As to Wells Fargo, damages for its breach of contract in such amount as the Court may find including actual, incidental, and consequential damages and the costs and disbursements of this action; .

II.  As to Wells Fargo, in the alternative, damages for wrongful termination of plaintiffs in violation of public policy;

III. As to all defendants, actual damages and punitive damages in such amount as the Court may determine is necessary to punish the defendants for the false imprisonment of plaintiffs and disregard of plaintiffs' personal liberties;

IV.  As to all defendants, actual and consequential damages for the intentional and/or negligent infliction of emotional distress, and punitive damages in such amount as the Court may determine is necessary to punish the defendants.

V.   As to all defendants, nominal damages, general damages, actual and special damages for harm to the plaintiffs' reputation in their profession and communities, and punitive damages in such amount as the Court may determine is necessary to punish the defendants for defamation and the intentional disregard of the plaintiffs' rights;

VI.  As to all defendants, damages resulting from the civil conspiracy including actual damages in such amount as the court may find together with punitive damages and the costs and disbursements of this action.

VII. As to Wells Fargo, actual damages including back pay/lost wages, job search expenses, pre-judgment interest, and such other amounts necessary to make them whole as a result of the unlawful employment practices of this defendant.

Page 19 of 20

Additionally, plaintiffs are informed and believes that they are entitled to recover punitive damages for the malicious and reckless conduct of defendant's agents Owens and Scott as hereinabove described in such amounts as may be determined at trial, together with the costs and disbursements of this action and a reasonable attorney's fee.

VIII.    As to Wells Fargo, actual and consequential damages and punitive damages in such amount as the Court may determine is necessary to punish the defendants for the negligent and grossly negligent conduct.

IX.    The costs and disbursements of this action and such other relief as the Court may deem just and proper.

LAUGHLIN & BOWEN, P.C.

By: _____
John R C Bowen, SC Bar No. 791
Drew A. Laughlin, SC Bar # 3141
Jennie S. Carat, SC Bar #78012
Attorneys for Plaintiffs
P.O. Drawer 21119
Hilton Head Island, SC 29925
Tel: (843) 689-5700
Fax: (843) 689-9300
E-Mail: john@laughlinandbowen.com

November 7, 2012

# EXHIBIT B

EXHIBIT B

# Wells Fargo's pressure-cooker sales culture comes at a cost



Federal regulators said Wells Fargo employees opened accounts in customers' names without their consent.

  By **E. Scott Reckard**

DECEMBER 21, 2013, 12:00 PM

**W**ells Fargo branch manager Rita Murillo came to dread the phone calls.

Regional bosses required hourly conferences on her Florida branch's progress toward daily quotas for opening accounts and selling customers extras such as overdraft protection. Employees who lagged behind had to stay late and work weekends to meet goals, Murillo said.

Then came the threats: Anyone falling short after two months would be fired.

"We were constantly told we would end up working for McDonald's," said Murillo, who later resigned. "If we did not make the sales quotas ... we had to stay for what felt like after-school detention, or report to a call session on Saturdays."

Wells Fargo & Co. is the nation's leader in selling add-on services to its customers. The giant San Francisco bank brags in earnings reports of its prowess in "cross-selling" financial products such as checking and savings accounts, credit cards, mortgages and wealth management. In addition to generating fees and profits, those services keep customers tied to the bank and less likely to jump to competitors.

But that success has come at a cost. The relentless pressure to sell has battered employee morale and led to ethical breaches, customer complaints and labor lawsuits, a Times investigation has found.

To meet quotas, employees have opened unneeded accounts for customers, ordered credit cards without customers' permission and forged client signatures on paperwork. Some employees begged family members to open ghost accounts.

These conclusions emerge from a review of internal bank documents and court records, and from interviews with 28 former and seven current Wells Fargo employees who worked at bank branches in nine states, including California.

Erick Estrada, a former Wells Fargo personal banker and business specialist at a Canoga Park branch, said managers there coached workers on how to inflate sales numbers.

Employees opened duplicate accounts, sometimes without customers' knowledge, he said. Workers also used a bank database to identify customers who had been pre-approved for credit cards — then ordered the plastic without asking them, Estrada said.

"They'd just tell the customers: 'You're getting a credit card,'" Estrada said. He admitted to opening unneeded accounts, though never without a customer's knowledge, he said.

When customers complained about the unwanted credit cards, the branch manager would blame a computer glitch or say the card had been requested by someone with a similar name, Estrada said.

One former branch manager who worked in the Pacific Northwest described her dismay at discovering that employees had talked a homeless woman into opening six checking and savings accounts with fees totaling $39 a month.

"It's all manipulation. We are taught exactly how to sell multiple accounts," the former manager said. "It sounds good, but in reality it doesn't benefit most customers."

Like many other workers interviewed by The Times, she requested anonymity, citing a fear of retribution from Wells Fargo or difficulty finding employment at other financial institutions.

The former manager said she helped the homeless woman close all but one account, which was needed for direct deposit of her Social Security disability benefits. She said she reported the situation to her boss, but never heard of any action taken by the bank.

Wells Fargo officials said they make ethical conduct a priority and punish or fire employees who don't serve customers properly. They acknowledged the bank's strong focus on selling, but said it is intended to benefit customers by identifying their needs.

"I'm not aware of any overbearing sales culture," Chief Financial Officer Timothy Sloan said in an interview.

The company recently fired about 30 Southern California workers, including Estrada — employees the bank said cheated to hit their sales goals. Employees said other workers in the region were put on administrative leave or let go; the company declined to comment on any additional actions.

Wells Fargo spokesman Oscar Suris said the bank has security procedures to root out employees who violate laws or bank ethics policy.

"This is something we take very seriously," Suris said. "When we find lapses, we do something about it, including firing people."

The bank said this month that it is creating an Ethics Program Office to review standards for employees and handling of conflicts of interest. Spokeswoman Mary Eshet said Wells Fargo's 2008 takeover of Wachovia Bank created a giant with more than 80 lines of business, and Wells wants to ensure that its ethics policies are consistent.

Branch employees receive ethics training and are compensated mainly in salary, not bonuses, Suris said. Tellers earn about 3% in incentive pay linked to sales and customer service, he said, while personal bankers typically derive about 15% to 20% of total earnings from these payments.

The pressure to meet goals starts with supervisors, Wells Fargo staffers said. Branch managers in California have filed five related lawsuits alleging that the bank failed to pay them overtime. The extra hours were spent laboring to meet sales targets, said plaintiffs' attorney John J. Glugoski of San Francisco.

"Wells Fargo sets the goals so high for the sale of products — new accounts, loans, credit cards — that the managers don't have enough staff," he said.

So they regularly stayed late to finish their employees' work, Glugoski said. State law allows some supervisors to be paid fixed salaries, but only if they spend more than half their time managing. The suits are pending in Sacramento County Superior Court. They seek class-action status to represent all California branch managers as far back as 2007.

Wells Fargo has denied the allegations in court filings but declined to comment further.

Two other recent California lawsuits, filed separately by a Wells employee and a customer, allege that Wells Fargo employees opened accounts or credit lines for customers without their authorization. Other suits alleged the bank forced employees to work unpaid overtime, in some cases to meet sales targets. In answers to the complaints the bank has denied wrongdoing.

By some measures, Wells Fargo is the nation's biggest retail bank, with more than 6,300 offices and a market valuation of $237 billion.

In reporting a record $5.6-billion quarterly profit in October, Wells Fargo said it averages 6.15 financial products per household — nearly four times the industry average.

Wells Fargo "is the master at this," said Michael Moebs, an independent bank consultant in Lake Bluff, Ill. "No other bank can touch them."

Meeting those account quotas falls mainly to branch employees.

Bank manager Murillo, 41, now employed by another bank, said she resigned from her Wells Fargo branch in the Fort Myers, Fla., area in 2010, even though she had no other job lined up and her husband wasn't working full time. The couple ended up losing their home.

"It all seemed worth the chance and the risk, rather than to deal with the mental abuse," Murillo said. "Just thinking about it gives me palpitations and a stomachache."

In February, Becky Grimes, 57, quit Wells Fargo after 14 years as a branch manager in Victoria, Texas. She said she retired early because employees were expected to force "unneeded and unwanted" products on customers to satisfy sales targets.

"I could no longer do these unethical practices nor coach my team to do them either," Grimes said.

The bank expects staffers to sell at least four financial products to 80% of their customers, employees said. But top Wells Fargo executives exhort employees to shoot for the "Great 8" — an average of eight financial products per household.

The tracking starts each morning. Managers are asked not only to meet but to exceed daily quotas passed down by regional bosses. Branch managers are expected to commit to 120% of the daily quotas, according to the former Pacific Northwest branch manager, who said results were reviewed at day's end on a conference call with managers from across the region.

"If you do not make your goal, you are severely chastised and embarrassed in front of 60-plus managers in your area by the community banking president," the former branch manager said.

Longer-term quotas included a requirement that tellers generate at least 100 sales of financial services per quarter, either directly or by referring customers to personal bankers, the former manager said.

Internal documents obtained by The Times show how carefully Wells Fargo tracks account openings and lucrative add-ons.

The documents, dated from 2011 through October, include a 10-page report tracking sales of overdraft protection at more than 300 Southland branches from Ventura to Victorville; a spreadsheet of daily performance by personal bankers in 21 sales categories; and widely distributed emails urging laggard branches to boost sales and require employees to stay after hours for telemarketing sessions.

An email from a Southern California district manager in 2011 criticized a dozen branches for signing up only 5% to 38% of new checking accounts for overdraft protection — an opt-in service that charges customers $35 for each overdraft the bank covers.

"This has to come up dramatically," the email said. "We need to make a move toward 80%."

A report this spring from a district in the Southwest provided a count of direct-deposit accounts opened by each of 11 branches during a 15-day period, also with the percentage of customers who signed up for overdraft protection.

Tarzana retiree Bette Hirsh Levy closed her Wells Fargo checking account last year after discovering that a branch employee had approved her for an $8,200 line of credit without her permission.

"I have had a six-figure line of credit with Wells for several years," Levy said. "There was no reason for me to open another."

David Douglas made similar accusations against Wells Fargo in a lawsuit filed Sept. 11 in Los Angeles County Superior Court. He alleges that three Wells Fargo employees in Century City and Beverly Hills used his birth date and Social Security number to open accounts in his name and those of fictitious

businesses. At least one employee forged his signature several times, said Douglas' lawyer, Michael P. Kade of Los Angeles.

"They put their own addresses on the accounts so he wouldn't know about it," Kade said. "It showed up on his credit report — that's how he found out."

Suris, the Wells Fargo spokesman, declined to comment on the suit. Court filings show that Wells Fargo asked for the dispute to be decided in private arbitration.

A lawsuit filed Oct. 3 by former bank employee Jahedeh Zarandian in San Mateo County Superior Court alleges that she was wrongfully fired after following her manager's directions to open accounts in the names of family members. Zarandian's lawyer, N. William Metke of San Francisco, declined to make his client available for comment. Wells Fargo filed a written response in court denying Zarandian's claims.

A Nevada lawsuit filed in 2009 by Amber Salazar, on behalf of Wells Fargo business bankers in the state, won certification as a class action. The suit claimed that Wells misclassified the bankers as managers, failed to pay overtime and required them to work unpaid "call nights" to solicit business.

Wells Fargo settled the case for $100,000 and did not admit wrongdoing.

Prior to his October firing, Wells Fargo business specialist Estrada worked at the Canoga Park branch at Roscoe and Topanga Canyon boulevards. He said the manager would greet the staff each morning with a daily quota for products such as credit cards or direct-deposit accounts. To fail meant staying after hours, begging friends and family to sign up for services, Estrada said.

"He would say: 'I don't care how you do it — but do it, or else you're not going home,'" Estrada recalled.

He said branch and district managers told him to falsify the phone numbers of angry customers so they couldn't be reached for the bank's satisfaction surveys.

Estrada said employees would open premium checking accounts for Latino immigrants, enabling them to send money across the border at no charge. Those accounts could be opened with just $50, but customers were supposed to have at least $25,000 on deposit at Wells Fargo within three months or pay a $30 monthly charge.

To get around those requirements — and keep earning credit toward their quotas — Estrada said employees would downgrade the original accounts and open new premium ones for the customers before the fees kicked in.

Levy, the customer surprised by the unrequested credit line, said she went to complain at the Tarzana branch, where the account was opened without her knowledge. Levy said a manager told her the person responsible was one of the branch's "best employees."

The bank closed the credit line but never gave Levy the apology she requested.

"I said: 'If that's one of your best employees, Wells Fargo is in trouble.'"

*scott.reckard@latimes.com*

*Twitter:* *@ScottReckard*

Copyright © 2016, Los Angeles Times

**This article is related to:** Business, Wells Fargo, Courts and the Judiciary, Crime, Law and Justice, Finance, Banking, Laws and Legislation

# EXHIBIT C

# EXHIBIT C

MICHAEL N. FEUER, City Attorney, SBN 111529
TINA L. HESS, Assistant City Attorney, SBN 143900
SUZANNE V. SPILLANE, Deputy City Attorney, SBN 164476
JESSICA B. BROWN, Deputy City Attorney, SBN 211642
JEREMY BERZON, Deputy City Attorney, SBN 241761
OFFICE OF THE LOS ANGELES CITY ATTORNEY
CRIMINAL BRANCH, COMPLEX & SPECIAL LITIGATION SECTION
200 North Main Street, 500 City Hall East
Los Angeles, California 90012-4131
Telephone (213) 473-6922/Facsimile (213) 978-8112

[NO FEE - Govt. Code § 6103]

**FILED**
Superior Court of California
County of Los Angeles

MAY 0 4 2015

Sherri R. Carter, Executive Officer/Clerk
By _____ Deputy
Cristina Grijalva

Attorneys for Plaintiff, the People of the State of California

DS3 Steven J. Kleifield

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES, CENTRAL DISTRICT**

BC 5 8 0 7 7 8

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA,<br><br>Plaintiff,<br><br>vs.<br><br>WELLS FARGO & COMPANY, a Delaware Corporation; WELLS FARGO BANK, NATIONAL ASSOCIATION, a National Banking Association, and DOES 1-100, inclusive,<br><br>Defendants. | Case No.: ▮▮▮▮▮▮▮<br><br>**COMPLAINT FOR EQUITABLE RELIEF AND CIVIL PENALTIES FOR:**<br><br>**(1) VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW FOR GAMING (Bus. and Prof. Code § 17200, *et seq.*); AND**<br><br>**(2) VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW FOR FAILURE TO PROVIDE NOTICE OF DATA BREACH (Bus. and Prof. Code § 17200, *et seq.*)** |

ORIGINAL

NO FEE GOVT CODE SEC. 6183
AMOUNT RECOVERABLE PURSUANT
TO 6103.5 6C3 $ _____
PLUS A ONE TIME ADMINISTRATIVE FEE UPON JUDGEMENT
IF THE PARTY BECOMES A JUDGEMENT CREDITOR.

**COMPLAINT FOR EQUITABLE RELIEF AND CIVIL PENALTIES**

1    Plaintiff, the People of the State of California ("People"), complaining of the above-

2    named Defendants ("Defendants"), alleges as follows, which allegations are based upon

3    information and belief:

**INTRODUCTION**

4

5    1.    For years, Wells Fargo & Company and Wells Fargo Bank, National Association

6    (collectively "Wells Fargo") have victimized their customers by using pernicious and often

7    illegal sales tactics to maintain high levels of sales of their banking and financial products. The

8    banking business model employed by Wells Fargo is based on selling customers multiple

9    banking products, which Wells Fargo calls "solutions." In order to achieve its goal of selling a

10   high number of "solutions" to each customer, Wells Fargo imposes unrealistic sales quotas on its

11   employees, and has adopted policies that have, predictably and naturally, driven its bankers to

12   engage in fraudulent behavior to meet those unreachable goals. As a result, Wells Fargo's

13   employees have engaged in unfair, unlawful, and fraudulent conduct, including opening

14   customer accounts, and issuing credit cards, without authorization. Wells Fargo has known

15   about and encouraged these practices for years. It has done little, if anything, to discourage its

16   employees' behavior and protect its customers. Worse, on the rare occasions when Wells Fargo

17   did take action against its employees for unethical sales conduct, Wells Fargo further victimized

18   its customers by failing to inform them of the breaches, refund fees they were owed, or otherwise

19   remedy the injuries that Wells Fargo and its bankers have caused. The result is that Wells Fargo

20   has engineered a virtual fee-generating machine, through which its customers are harmed, its

21   employees take the blame, and Wells Fargo reaps the profits.

22   2.    This is a civil law enforcement action brought on behalf of the People by the

23   Criminal Branch of the Los Angeles City Attorney's Office, under the Unfair Competition Law

24   ("UCL") (Business and Professions Code § 17200, *et seq.*).[1] The People seek, *inter alia*: (a) to

25   enjoin the above-named Defendants from engaging in unlawful, unfair, and fraudulent business

26   acts and practices; (b) an order to restore to all persons in interest any money or property the

_____

28   [1] All further references are to California codes, unless otherwise noted.

**COMPLAINT FOR EQUITABLE RELIEF AND CIVIL PENALTIES**

1 above-named Defendants acquired by means of those unfair, deceptive, and fraudulent business

2 acts and practices, pursuant to Business and Professions Code sections 17203 and 17204; (c) an

3 order that above-named Defendants be assessed civil penalties pursuant to Business and

4 Professions Code sections 17206 and 17206.1; and (d) recovery of the costs of this action.

5      3.      Defendant Wells Fargo & Company operates the fourth biggest bank in the

6 United States, and the largest bank headquartered in California. It is California's oldest bank,

7 having begun banking services in 1852. Wells Fargo Bank, National Association is a subsidiary

8 of Wells Fargo & Company, and provides most of the banking products and services that are the

9 subject of this action.

10      4.      Wells Fargo boasts about the average number of products held by its customers,

11 currently approximately six bank accounts or financial products per customer. Wells Fargo

12 seeks to increase this to an average of eight bank accounts or financial products per account

13 holder, a company goal Wells Fargo calls the "Gr-eight" initiative.

14      5.      Wells Fargo's resulting market dominance has come at a significant price to the

15 general public, because it has been achieved in large part through an ambitious and strictly

16 enforced sales quota system. Wells Fargo quotas are difficult for many bankers to meet without

17 resorting to the abusive and fraudulent tactics described further below. Moreover, Wells Fargo

18 enforces its sales quotas by constant monitoring. Daily sales for each branch, and each sales

19 employee, are reported and discussed by Wells Fargo's District Managers four times a day, at

20 11:00 a.m., 1:00 p.m., 3:00 p.m., and 5:00 p.m. Those failing to meet daily sales quotas are

21 approached by management, and often reprimanded and/or told to "do whatever it takes" to meet

22 their individual sales quotas. Consequently, Wells Fargo's managers and bankers have for years

23 engaged in practices called "gaming." Gaming consists of, among other things, opening and

24 manipulating fee-generating customer accounts through often unfair, fraudulent, and unlawful

25 means, such as omitting signatures and adding unwanted secondary accounts to primary accounts

26 without permission. Other practices utilized as part of these "gaming" schemes have included

27 misrepresenting the costs, benefits, fees, and/or attendant services that come with an account or

28 product, all in order to meet sales quotas.

**COMPLAINT FOR EQUITABLE RELIEF AND CIVIL PENALTIES**

6.      Wells Fargo's gaming practices have caused significant stress to, and hardship and financial losses for, its customers.  Specifically, Well Fargo has: (a) withdrawn money from customers' authorized accounts to pay for the fees assessed by Wells Fargo on unauthorized accounts opened in customers' names; (b) placed customers into collections when the unauthorized withdrawals from customer accounts went unpaid; (c) placed derogatory information in credit reports when unauthorized fees went unpaid; (d) denied customers access to their funds while Wells Fargo stockpiled account applications; and (e) caused customers to purchase identity theft protection.

7.      These gaming practices are so pervasive in Wells Fargo's business model that some methods of gaming have even been given their own names.  For example:

a.      *"Sandbagging"* refers to Wells Fargo's practice of failing to open accounts when requested by customers, and instead accumulating a number of account applications to be opened at a later date.  Specifically, Wells Fargo employees collect manual applications for various products, stockpile them in an unsecured fashion, and belatedly open up the accounts (often with additional, unauthorized accounts) in the next sales reporting period, frequently before or after banking hours, or on bank holidays such as New Year's Day.

b.      *"Pinning"* refers to Wells Fargo's practice of assigning, without customer authorization, Personal Identification Numbers ("PINs") to customer ATM card numbers with the intention of, among other things, impersonating customers on Wells Fargo computers, and enrolling those customers in online banking and online bill paying without their consent.

c.      *"Bundling"* refers to Wells Fargo's practice of incorrectly informing customers that certain products are available only in packages with other products such as additional accounts, insurance, annuities, and retirement plans.

8.      While Wells Fargo has ostensibly terminated a small number of employees who have engaged in gaming, other employees have been rewarded for these practices, and even promoted, perpetuating the problem.  Moreover, Wells Fargo has continued to impose the same

1  companywide goals of attaining as many accounts as possible at any expense, thereby fostering

2  the practice of gaming.  Wells Fargo thus puts its employees between a rock and a hard place,

3  forcing them to choose between keeping their jobs and opening unauthorized accounts.

4       9.    Wells Fargo has also failed to inform its customers when their personal

5  information has been accessed or compromised as a result of Wells Fargo's gaming practices, in

6  breach of its statutory duties to do so, thus causing its customers additional harm.

7  **PLAINTIFF**

8       10.    Plaintiff, the People of the State of California, brings this action by and through

9  Michael N. Feuer, City Attorney for the City of Los Angeles.

10       11.    Pursuant to Business and Professions Code sections 17203, 17204, 17206 and

11  17206.1, the Los Angeles City Attorney may bring a civil action in the name of the People of the

12  State of California to enjoin any person who violates, or proposes to violate, the UCL, and to

13  obtain mandatory civil penalties for each act of unfair competition.

14  **DEFENDANTS**

15       12.    Defendant Wells Fargo & Company is, and at all times relevant hereto was, a

16  corporation organized and existing under the laws of the State of Delaware, with its principal

17  place of business in San Francisco, California.  Wells Fargo & Company is a financial services

18  company with $1.5 trillion in assets, and provides banking, insurance, investments, mortgage,

19  and consumer and commercial finance through more than 9,000 locations, 12,000 ATMs, and the

20  Internet.  It has approximately 265,000 full-time employees, and is ranked 29th on Fortune

21  Magazine's 2014 rankings of America's 500 largest corporations.

22       13.    Defendant Wells Fargo Bank, National Association is, and at all times relevant

23  hereto was, a national banking association chartered under the laws of the United States, with its

24  primary place of business in Sioux Falls, South Dakota.  Wells Fargo Bank, National Association

25  provides Wells Fargo & Company's personal and commercial banking services, and is Wells

26  Fargo & Company's principal subsidiary.

27       14.    The true names and capacities of Defendants sued herein as DOES 1 through 100,

28  inclusive, are unknown to the People, who therefore sue said Defendants by such fictitious

**COMPLAINT FOR EQUITABLE RELIEF AND CIVIL PENALTIES**

1   names.  When the true names and capacities of said Defendants have been ascertained, the

2   People will ask leave of the Court to amend this Complaint, and to insert in lieu of such fictitious

3   names the true names and capacities of said fictitiously named Defendants.  The People are

4   informed and believe that DOES 1 through 100 participated in, and in some part are responsible

5   for, the unlawful business acts and practices and other violations of law alleged herein.

6         15.     At all relevant times, each Defendant was acting as an agent, servant, assignee,

7   representative, partner, joint venturer, co-conspirator, or employee of the other Defendants, and,

8   in doing the acts alleged herein, was acting within the course and scope of said agency, service,

9   assignment, representation, partnership, joint venture, conspiracy, or employment.  Due to the

10  relationship between Defendants, each Defendant has knowledge or constructive notice of the

11  acts of each of the other Defendants.

12        16.     Each Defendant is a "person" within the meaning of Business and Professions

13  Code section 17201.

14        17.     In this Complaint, when reference is made to any act or omission of a Defendant,

15  such allegations shall include the acts and omissions of owners, officers, directors, agents,

16  employees, contractors, vendors, affiliates, and representatives of said Defendant while acting

17  within the course and scope of their employment or agency on behalf of said Defendant.

18                          **JURISDICTION AND VENUE**

19        18.     Venue is proper in this county pursuant to Business and Professions Code sections

20  17204 in that violations alleged in this Complaint occurred in the City of Los Angeles and the

21  County of Los Angeles.  The Court has jurisdiction pursuant to Article VI, section 10 of the

22  California Constitution and section 393 of the Code of Civil Procedure.

23                          **GENERAL ALLEGATIONS**

24        19.     To the extent that the following descriptions include specific examples, they are

25  provided for purposes of illustrating the operation of Wells Fargo's illegal activities, with no

26  intention of limiting this action to these specific examples.

27  //

28  //

**COMPLAINT FOR EQUITABLE RELIEF AND CIVIL PENALTIES**

### Wells Fargo's Quota – Driven Business Model

20.     Wells Fargo's *modus operandi* is to attempt to get each customer to maintain numerous accounts with Wells Fargo.  In a brochure published by Wells Fargo called "The Vision & Values of Wells Fargo," Wells Fargo states: "'*Going for gr-eight*.'  Our average retail banking household has about six products with us.  We want to get to eight . . . and beyond.  One of every four already has eight or more.  Four of every 10 have six or more."

21.     In its 2014 Annual Report to the U.S. Securities and Exchange Commission, Wells Fargo boasts about its "products" per customer and its "cross-sell strategy": "Our vision is to satisfy all our customers' financial needs, help them succeed financially, be recognized as the premier financial services company in our markets and be one of America's great companies. Important to our strategy to achieve this vision is to increase the number of our products our customers use and to offer them all of the financial products that fulfill their financial needs." That report further states: "Our cross-sell strategy is to increase the number of products our customers use by offering them all of the financial products that satisfy their financial needs."

22.     Wells Fargo further stated in its 2014 Annual Report to the U.S. Securities Exchange Commission: "we continued to maintain our solid customer relationships across the Company, with retail banking household cross-sell of 6.17 products per household (November 2014); Wholesale Banking cross-sell of 7.2 products per relationship (September 2014); and Wealth, Brokerage and Retirement cross-sell of 10.49 products per retail banking household (November 2014)."  Wells Fargo further stated in that same filing: "We believe there is more opportunity for cross-sell as we continue to earn more business from our customers.  Our goal is eight products per household . . . ."

23.     In order to achieve its goal of eight accounts per household, Wells Fargo puts unrelenting pressure on its bankers to open numerous accounts per customer.

24.     Wells Fargo has strict quotas regulating the number of daily "solutions" that its bankers must reach; these "solutions" include the opening of all new banking and credit card accounts.  Managers constantly hound, berate, demean and threaten employees to meet these unreachable quotas.  Managers often tell employees to do whatever it takes to reach their quotas.

**COMPLAINT FOR EQUITABLE RELIEF AND CIVIL PENALTIES**

1  Employees who do not reach their quotas are often required to work hours beyond their typical

2  work schedule without being compensated for that extra work time, and/or are threatened with

3  termination.

4      25.    The quotas imposed by Wells Fargo on its employees are often not attainable

5  because there simply are not enough customers who enter a branch on a daily basis for

6  employees to meet their quotas through traditional means.

7      26.    Wells Fargo's bankers are thus naturally and predictably forced to resort to

8  alternative means to meet quotas, including using high pressure sales tactics to coerce customers

9  into opening additional accounts or using inaccurate or misleading information about potential

10  accounts to induce customers to open them.

11      27.    Wells Fargo employees also pressure their own family members and friends to

12  sign up for accounts to meet their quotas.  Some employees report that they have "tapped out"

13  every family member and friend for accounts.  Others report that they spend holiday dinners

14  trying to convince family members to sign up for accounts.  Management encourages employees

15  to achieve "solutions" through family members.  Since these accounts are opened by friends and

16  family as favors, they are often unfunded, and can result in fees charged by Wells Fargo to its

17  own employees' families or acquaintances, even for such "zero balance" accounts.

18      28.    Employees thus resort to gaming tactics to increase their "solutions," and meet

19  minimum quotas.  Gaming is so ingrained in the business of Wells Fargo that many of the tactics

20  employed to meet these sky-high quotas have commonly-used names.

21               ***"Bundling"***

22      29.    In the practice known at Wells Fargo as "bundling," its customers are told that the

23  account or product they seek can be obtained only with the purchase of additional accounts or

24  products, when, in fact, the desired product is available on its own.  In many instances,

25  employees are coached by management to ensure that every checking account is sold with three

26  other products also known as a "packed" account.  Employees were, and are, instructed by

27  management to lie to customers by telling them that each checking account automatically comes

7

COMPLAINT FOR EQUITABLE RELIEF AND CIVIL PENALTIES

1  with a savings account, credit card, or other product such as life insurance, and/or "Express

2  Send" (an online program that allows customers to send money to foreign countries).

3      30.    When customers discover an unauthorized account and inquire of Wells Fargo

4  about it, they are often informed that the products and services came with the authorized

5  accounts automatically.  Even in the face of customer complaints, the "bundling" continues.

6      31.    Customers who complain about receiving credit cards they did not request are

7  advised by Wells Fargo to simply destroy the unrequested and unauthorized cards.  However,

8  simply destroying these unauthorized cards does not close the account nor repair the impact to a

9  customer's credit profile.

10                              *"Pinning"*

11     32.    In the practice known at Wells Fargo as "pinning," a Wells Fargo banker obtains

12  a debit card number, and personally sets the PIN, often to 0000, without customer authorization.

13  "Pinning" permits a banker to enroll a customer in online banking, for which the banker would

14  receive a solution (sales credit).  To bypass computer prompts requiring customer contact

15  information, bankers impersonate the customer online, and input false generic email addresses

16  such as 1234@wellsfargo.com, noname@wellsfargo.com, or none@wellsfargo.com to ensure

17  that the transaction is completed, and that the customer remains unaware of the unauthorized

18  activity.

19                              *"Sandbagging"*

20     33.    In the practice known at Wells Fargo as "sandbagging," a banker delays opening

21  new accounts or processing a sale, unbeknownst to the account holder, until a time that is most

22  beneficial, such as when a new sales reporting period commences.

23     34.    "Sandbagging" is common at Wells Fargo.  "Sandbagging" often occurred on

24  New Year's Day, or at the beginning or a sales reporting period.  New Year's Day was an

25  especially common date to open "sandbagged" accounts, because Wells Fargo ran a sales

26  program called "Jump into January."  In this Wells Fargo program, its bankers were required to

27  meet even more aggressive sales goals than usual.  As a result, bankers were encouraged to hold

28  onto, or not to process, new accounts or other requests until January 1.  In fact, some employees

1 | were required to list or confirm the accounts they would open on January 1 before January 1.

2 | This permitted Wells Fargo to report inflated First Quarter sales.

3 | 35.   When customers inquire about why an account was not opened timely, they are

4 | given false explanations including: (a) a computer system failure or similar technical problem;

5 | (b) an oversight and the account would be processed immediately; and/or, (c) a mistake that

6 | would take time to correct.

7 | **Other Gaming Tactics**

8 | 36.   Because of Wells Fargo's on-going setting of unrealistic sales goals, Wells Fargo

9 | employees have engaged in, and continue to engage in, other gaming tactics, including:

10 | a.   Making misrepresentations to customers to get them to open additional

11 | accounts such as falsely stating: "you will incur a monthly fee on your checking

12 | account until you add a savings account."

13 | b.   Misrepresenting that additional accounts do not have monthly fees, when

14 | they actually do incur such fees.

15 | c.   Referring unauthorized, and therefore unfunded, accounts to collections

16 | because Wells Fargo's practices cause the accounts to have negative balances.

17 | d.   Targeting individuals holding Mexican Matriculada Consular cards

18 | because the lack of a Social Security Number makes it easier to open numerous

19 | fraudulent accounts.  Wells Fargo  employees provide false information to

20 | complaining customers, and advise many of these victims to ignore the

21 | unauthorized fees and letters from collection agencies because the lack of a Social

22 | Security number means the debt will not affect them.

23 | e.   Advising customers who do not want credit cards that they will be sent a

24 | credit card anyway, and to just tear it up when they receive it.

25 | **Customers' Discovery of Gaming and the Harm it Causes**

26 | 37.   Customers who have discovered unauthorized accounts often make the discovery

27 | accidentally.  For instance: (a) unexplained money being withdrawn from authorized accounts to

28 | fund unauthorized accounts; (b) mailings from Wells Fargo congratulating a customer on

**COMPLAINT FOR EQUITABLE RELIEF AND CIVIL PENALTIES**

opening a new account the customer does not recognize, or asking a customer to update account information for accounts that the customer does not recognize; (c) calls from collection agencies stating the customer is overdrawn on an account that the customer does not recognize; and (d) discovering that checks a customer intended to be deposited into an authorized account do not appear in monthly statements because the checks had instead been deposited into an unauthorized account.

38.    Customers have been prejudiced in numerous ways by Wells Fargo's gaming: (a) customers lose money to monthly service fees charged for unauthorized accounts; (b) customer accounts are placed into collection, forcing customers to fight with debt collection agencies for fees charged by Wells Fargo on unauthorized accounts; (c) customers' credit reports are affected, impacting job applications, loans for automobiles, and mortgage applications; and (d) customers are forced to purchase costly identity theft protection services to ensure against further fraudulent activities. But for Wells Fargo's quota-based business model, its customers would not have incurred wrongful fees, been put into collections, suffered derogatory references on their credit reports, or forced to purchase identity theft protection.

39.    Customers' unauthorized accounts remain open, despite repeated customer requests to Wells Fargo to close those accounts.

40.    Customers have difficulty reporting unauthorized activity. Reaching the correct representative is no guarantee the unauthorized account will be remedied, as complaining customers often never receive return calls from Wells Fargo.

### *Wells Fargo's Knowledge of Gaming and its Cosmetic Fixes*

41.    Wells Fargo knew, or in the exercise of reasonable care should have known, that its employees open unauthorized accounts. For example:

a.    Customers often enter Wells Fargo's branches to complain about unauthorized accounts; many victims have even contacted Wells Fargo management by telephone.

b.    Wells Fargo has access to, and frequently monitors, actions taken on its computers by employees. Wells Fargo has been put on notice by unusual activity

such as: numerous accounts being opened on January 1, a bank holiday; numerous

unfunded accounts; frequent reopening of closed accounts; and customer accounts

with the only account activity being Wells Fargo fees.

    c.    Wells Fargo requires that all new customer accounts be approved by a

branch manager or assistant manager, thereby providing Wells Fargo management

with a clear record of the number and types of accounts opened for each

customer.

    d.    Wells Fargo is also aware its daily, weekly and monthly quotas are

unrealistic for employees during normal working hours, since they have generated

numerous complaints and lawsuits by employees.

    e.    Online banking accounts are often opened by Wells Fargo with obviously

false customer contact information such as noname@wellsfargo.com.

    f.    Wells Fargo has terminated and/or otherwise disciplined a number of

employees for gaming, but far fewer than have actually engaged in the practices,

given Wells Fargo's widespread imposition of the quota system.

    42.    Despite Wells Fargo's knowledge of gaming by its employees, it has done little, if anything, to terminate these practices, nor to reform the business model it created that has fostered them. While Wells Fargo has made a few minor changes to its policies, and has terminated a handful of employees, those efforts have been, at most, cosmetic, and ultimately benefit Wells Fargo by providing them with plausible deniability. However, the policies that encourage these tactics continue, and employees who engage in them continue to be rewarded monetarily, and even promoted. Wells Fargo has not altered its quota system, nor has it reduced the pressure it has applied to its management and employees to reach their quotas, and the gaming that has been its inevitable result.

## STATUTORY AND REGULATORY BACKGROUND

### *Laws Relating to Identity Theft*

    43.    California has strict laws against making false financial statements.

44.     It is unlawful to use another's personal data for illegal purposes: "[E]very person who willfully obtains personal identifying information . . . of another person, and uses that information for any unlawful purpose, including to obtain, or attempt to obtain, credit, goods, services, real property, or medical information without the consent of that person, is guilty of a public offense . . ." (Penal Code § 530.5(a).)  Pursuant to the Penal Code: "personal identifying information" includes "name, address, telephone number, health insurance number, taxpayer identification number, school identification number, state or federal driver's license, or identification number, social security number, place of employment, employee identification number, professional or occupational number, mother's maiden name, demand deposit account number, savings account number, checking account number, PIN (personal identification number) or password, alien registration number, government passport number, [and] date of birth." (Penal Code § 530.55(b)).

### Laws Relating to Computer Data Breaches

45.     In California, if a business is in possession of "computerized data that includes personal information," that business "shall disclose any breach of the security of the system following discovery or notification of the breach in the security of the data to any resident of California whose unencrypted personal information was, or is reasonably believed to have been, acquired by an unauthorized person." (Civil Code § 1798.82(a)).  "[P]ersonal information" includes: "[a]n individual's first name or first initial and last name," along with one or more of the following: Social Security number; driver's license number or California identification card number; account number, credit or debit card number "in combination with any required security code, access code, or password that would permit access to an individual's financial account;" medical information; or health insurance information.  (Civil Code § 1798.82(h)(1).)  "Personal information" also includes: "[a] user name or email address, in combination with a password or security question and answer that would permit access to an online account." (Civil Code § 1798.82(h)(2).)  For purposes of this law, "breach of the security system" refers to "unauthorized acquisition of computerized data that compromises the security, confidentiality, or integrity of personal information maintained by the person or business." (Civil Code § 1798.82(g).)

46.     It is illegal to knowingly access and without permission use "any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort or (B) wrongfully control or obtain money, property, or data." (Penal Code § 502(c)(1).)

47.     Furthermore, it is unlawful to knowingly access and without permission: "take[], cop[y], or make[] use of any data from a computer, computer system, or computer network . . . whether existing or residing internal or external to a computer, computer system, or computer network." (Penal Code § 502(c)(2).)

48.     Under the California Penal Code "the word 'person' includes a corporation as well as a natural person." (Penal Code § 7).

49.     Pursuant to the Gramm-Leach-Bliley Act, 15 United States Code section 6801, *et seq.*, and the rules and regulations promulgated thereunder, financial institutions have a duty to keep and protect the personal information of their customers from unauthorized access or misuse. When an "institution determines that misuse of its information has occurred or is reasonably possible, it should notify the affected customer as soon as possible. (70 Fed. Reg. 1575; 12 C.F.R. Part 30, App. B.)

## ENFORCEMENT AUTHORITY

### *Business and Professions Code section 17200, et seq.*

50.     "Unfair competition" is defined in Business and Professions Code section 17200 as "any unlawful, unfair or fraudulent business act or practice," and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code.

51.     Pursuant to Business and Professions Code section 17206, any person who engages, has engaged, or proposes to engage in unfair competition shall be liable for a civil penalty not to exceed $2,500 dollars for each violation.

52.     Pursuant to Business and Professions Code section 17203, any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction, and the court may make such orders or judgments to prevent the use of

any practice which constitutes unfair competition, or as may be necessary to restore to any person in interest any money or property which may have been acquired by means of such unfair competition.

53.    Pursuant to Business and Professions Code section 17205, the remedies or penalties provided for violations of the UCL are cumulative to each other, and to the remedies or penalties available under all other laws of the state.

## FIRST CAUSE OF ACTION:
## VIOLATION OF THE UNFAIR COMPETITION LAW ("UCL")
## AGAINST ALL DEFENDANTS ("GAMING")

(California Business and Professions Code § 17200, *et seq.*)

54.    The People reallege and incorporate herein each and every allegation set forth in paragraphs 1 through and including 53 above, as though set forth fully herein.

55.    Beginning on a date unknown to the People, but within the four years preceding the filing of this Complaint, Defendants and Does 1-100, and each of them, have violated and conspired to violate the UCL by engaging in one or more of the following *unlawful* business acts and practices, among others:

a.    Willfully obtaining personal identifying information of another person (which includes name, address, telephone number, health insurance number, taxpayer identification number, school identification number, state or federal driver's license or identification number, Social Security number, place of employment, employee identification number, professional or occupational number, mother's maiden name, demand deposit account number, savings account number, checking account number, PIN or password, alien registration number, government passport number, and date of birth), and using that information for an unlawful purpose, including to obtain or attempt to obtain credit, goods, services, real property, or medical information without the consent of that person, in violation of Penal Code section 530.5, subdivision (a).

b.      Being a party to any fraudulent conveyance of any contract or conveyance had, made, or contrived with intent to deceive and defraud others, or while being a party to any fraudulent conveyance of any contract or conveyance, wittingly and willingly putting in, using, avowing, maintaining, justifying, or defending the fraudulent conveyance of any contract or conveyance as true and done, had or made in good faith, or upon good consideration, in violation of Penal Code section 531.

c.      Knowingly accessing and without permission using data, computers, computer systems, or computer networks to execute a scheme to defraud or wrongfully obtain money, property, or data, in violation of Penal Code section 502, subdivision (c)(1).

d.      Knowingly accessing, and without permission taking, copying, or making use of customer information, in violation of Penal Code section 502, subdivision (c)(2).

e.      Knowingly accessing, and without permission taking, copying, or making use of customer information, in violation of 15 United States Code section 680, *et seq.*, and the rules and regulations promulgated thereunder.

56.     Beginning on a date unknown to the People, but within the four years preceding the filing of this Complaint, Defendants and Does 1-100, and each of them, have violated and conspired to violating the UCL by engaging in one or more of the following *unfair* business acts and practices, among others:

a.      Threatening incipient violations of the aforementioned California laws and violated the public policy embodied in and spirit of those laws.

b.      Violating the established public policy of the State of California, which, among other things, seeks to ensure that: all monetary contracts are duly authorized by each party; all bank accounts are authorized and agreed to by the customer in whose name the bank account is opened; residents of the state are not harmed in their credit reports by acts not actually performed, or debts not actually

COMPLAINT FOR EQUITABLE RELIEF AND CIVIL PENALTIES

incurred, by that resident; personal information of an individual is not improperly obtained and used for an unlawful purpose; and that when personal information is obtained without authority, that the person whose information was obtained is informed immediately.

c.      Defendants' conduct as described in this Complaint has been immoral, unethical, oppressive and unscrupulous in that Defendants: (1) profit by improperly signing customers up for bank accounts to which the customers did not agree; (2) boast about the average number of accounts per customer they have achieved, knowing that many of those accounts were unauthorized; (3) expose the consumer to financial hardships involving unjustified debt collection and negative credit reporting, thus jeopardizing those customers' ability to obtain mortgages, automobile loans, and employment; and (4) otherwise garnered an unfair advantage over lawfully competing businesses.

d.      Wells Fargo's acts and practices alleged in this Complaint have had, and continue to have, a substantial detrimental impact upon its customers and the community. This detrimental impact is not outweighed by any countervailing reasons, justifications, and motives of Wells Fargo. In short, the harm experienced by the customers and the surrounding community far outweighs the utility of Wells Fargo's conduct.

57.      Beginning on a date unknown to the People, but within the four years preceding the filing of this Complaint, Defendants and Does 1-100, and each of them, have violated and conspired to violate the UCL by engaging in one or more of the following *fraudulent* business acts and practices, among others:

a.      Using misrepresentations, deception, and concealment of material information to open unauthorized accounts in customers' names.

b.      Using misrepresentations, deception, and concealment of material information to view customers' personal information, and then failing to reveal to the customers that their personal information was compromised.

COMPLAINT FOR EQUITABLE RELIEF AND CIVIL PENALTIES

**SECOND CAUSE OF ACTION:**
**VIOLATION OF THE UNFAIR COMPETITION LAW ("UCL")**
**AGAINST ALL DEFENDANTS**
**(FAILURE TO PROVIDE NOTICE OF DATA BREACH)**

(California Business and Professions Code § 17200, *et seq.*)

58.   The People reallege and incorporate herein each and every allegation set forth in paragraphs 1 through and including 53 above, as though set forth fully herein.

59.   Beginning on a date unknown to the People, but within the four years preceding the filing of this Complaint, Defendants and Does 1-100, and each of them, have violated and conspired to violate the UCL by engaging in one or more of the following *unlawful* business acts and practices, among others:

   a.   Being a business that owns or licenses computerized data that includes personal information, and failing to disclose breaches of the security of the system containing that data following discovery or notification of the breach by an unauthorized person, in violation of Civil Code section 1798.82, subdivision (a).

   b.   Failing to provide their customers with notice of any misuse of their customer information, as required by 15 United States Code section 6801, *et seq.*, and the rules and regulations promulgated thereunder.

60.   Beginning on a date unknown to the People, but within the four years preceding the filing of this Complaint, Defendants and Does 1-100, and each of them, have violated and conspired to violate the UCL by engaging in one or more of the following *unfair* business acts and practices, among others:

   a.   Threatening incipient violations of the aforementioned California laws, and violating the public policy embodied in, and the spirit of, those laws.

   b.   Violating the established public policy of the State of California, which, among other things, seeks to ensure that: all monetary contracts are duly authorized by each party; all bank accounts are authorized and agreed to by the customer in whose name the bank account is opened; residents of the state

17

COMPLAINT FOR EQUITABLE RELIEF AND CIVIL PENALTIES

are not harmed in their credit reports by acts not actually performed, or debts not actually incurred, by that resident; personal information of an individual is not improperly obtained and used for an unlawful purpose; and that when personal information is obtained without authority, that the person whose information was obtained is informed immediately.

c.  Defendants' conduct as described in this Complaint has been immoral, unethical, oppressive and unscrupulous in that Defendants: (1) profit by improperly signing customers up for bank accounts to which the customers did not agree; (2) boast about the average number of accounts per customer they have achieved, knowing that many of those accounts were unauthorized; (3) expose the consumer to financial hardships involving unjustified debt collection and negative credit reporting, thus jeopardizing those customers' ability to obtain as mortgages, automobile loans, and employment; and (4) otherwise garnered an unfair advantage over lawfully competing businesses.

d.  Wells Fargo's acts and practices alleged in this Complaint have had, and continue to have, a substantial detrimental impact upon its customers and the community. This detrimental impact is not outweighed by any countervailing reasons, justifications, and motives of Wells Fargo. In short, the harm experienced by the customers and the surrounding community far outweighs the utility of Wells Fargo's conduct.

61.  The acts of unfair competition of Defendants and Does 1-100, and each of them, present a continuing threat to the public's health, safety, and welfare, and the People have no adequate remedy at law. Accordingly, unless Defendants and Does 1-100 are permanently enjoined and restrained by order of this Court, they will continue to commit acts of unfair competition, and thereby continue to cause irreparable harm and injury to the public's health, safety, and welfare.

### PRAYER FOR RELIEF

Wherefore, the People pray that:

COMPLAINT FOR EQUITABLE RELIEF AND CIVIL PENALTIES

1.      Pursuant to Business and Professions Code sections 17203 and 17204, and the equitable powers of the Court, Defendant Wells Fargo and DOES 1 through 100, together with their officers, employees, servants, agents, partners, associates, representatives, contractors, and all persons acting on behalf of or in concert with them, be enjoined from engaging in the unlawful, unfair, and fraudulent business acts and practices described in this Complaint; be ordered to comply with all laws and regulations concerning the opening and maintaining of bank accounts; and be required to take such actions, and adopt such measures, as are necessary to prevent Defendants from engaging in further such acts or practices.

2.      Pursuant to Business and Professions Code sections 17203 and 17204, Defendants be ordered to restore to all persons in interest any money or property they acquired by means of the unlawful, unfair, and fraudulent business acts and practices in this Complaint.

3.      Pursuant to Business and Professions Code section 17206, Defendants be assessed a civil penalty of $2,500 for each violation of the UCL that they committed, caused, aided and abetted, or conspired to commit.

4.      Pursuant to Business and Professions Code section 17206.1, Defendants also be assessed a civil penalty of $2,500 for each violation of the UCL that they committed, caused, aided and abetted, or conspired to commit, against senior citizens or disabled persons.

5.      The People recover the costs of this action.

6.      The People be granted such other and further relief as the Court may deem to be just and proper.

Dated: May 4, 2015

MICHAEL N. FEUER, City Attorney
TINA HESS, Assistant City Attorney
SUZANNE V. SPILLANE, Deputy City Attorney
JESSICA B. BROWN, Deputy City Attorney
JEREMY BERZON, Deputy City Attorney
OFFICE OF THE LOS ANGELES CITY ATTORNEY
CRIMINAL BRANCH
COMPLEX & SPECIAL LITIGATION SECTION

By: _____
     SUZANNE SPILLANE
     Attorneys for Plaintiff,
     The People of the State of California

**COMPLAINT FOR EQUITABLE RELIEF AND CIVIL PENALTIES**

# EXHIBIT D

EXHIBIT D



September 13, 2007

Wells Fargo & Company
Audit and Examination Committee
420 Montgomery St
San Francisco CA 94301

CC: John Stumpf

Sirs,

I request that this information remain confidential and my identity anonymous to those not in the direct service of this committee or the CEO of Wells Fargo.  My name is ▮▮▮▮▮▮▮▮; I have been an employee of Wells Fargo Bank since 1992 and have spent the last 12 consecutive years working at the ▮▮▮▮▮▮, CA store (branch).  I am reporting activity which I believe violates Federal and State laws and regulations as well as Federal laws protecting shareholders from internal fraud.

In February 2007, I filed a complaint with OSHA alleging illegal retaliation by Wells Fargo; the OSHA investigation is ongoing.  In the complaint, I allege managers of Wells Fargo Regional Bank (WFB) illegally retaliated in violation of provisions established within Sarbanes-Oxley ACT in response to a report I made in December 2006 to senior managers of WFB, wherein I documented this illegal and unethical activity and fraud. The activities remain ongoing to this day.

I recognize it is not the duty of the committee to assure compliance with laws and regulations or the Company's Code of Ethics and Business Conduct, however in the course of the OSHA and inevitable DOL investigations, the data and allegations will become subject to public scrutiny via the Freedom of Information Act, unearthing internal fraud, failures in the strength of internal reporting mechanisms and invariably subjecting Wells Fargo to civil litigation (PSLRA or similar class action lawsuits).  In that this is the only body independent from management, empowered with the oversight to ensure complaints are handled independent of management and investigated in a professional and effective manner, I am hoping it to be incumbent upon this body to review and investigate the activity contained herein.  At the core this is internal fraud and remains a significant and ongoing risk to Wells Fargo and its shareholders.  I can only assume WFB management has sanctioned these actions, as to date I have never been contacted by any investigator, independent or otherwise, which leaves little reason to believe the full scope of data reported has been fairly evaluated.

I am unable to separate actions which violate Federal and State regulations, Wells Fargo Bank Account Policies & Procedure, Sales & Ethics compensation plans, however cumulatively this data should present the ability of an independent investigator to gain a robust perspective of the activity and adequately measure the liability represented.

I have enclosed all pertinent documents and correspondence initially sent to managers of Wells Fargo Retail Bank, Wells Fargo Investments, Human Resources and subsequent correspondence with OSHA, organized by sections, appendices and synoptic foreword.

I respectfully request to receive acknowledgement as to receipt and status of this information; I have refrained from engaging legal representation through the preliminary stages of the OSHA investigation, so that I would be directly accessible by any person or group interested in defusing and rectifying these activities without public exposure.

Sincerely,

# EXHIBIT E

EXHIBIT E



September 13, 2007

John Stumpf
Wells Fargo & Company
420 Montgomery St
San Francisco CA 94301

Dear Sir,

I sincerely regret the circumstances under which I am corresponding.

Nine months ago, I reported unethical (and illegal) activity to Wells Fargo Regional Bank.  Regional Bank Management informed the banker of my report, the banker immediately responded claiming my report to be harassment, upon which Regional bank demanded my immediate removal from the office for seven months to conduct an investigation.

The activity reported directly violates established, written Wells Fargo policy and is conducted under fraudulent pretense for the sole and singular purpose of acquiring sales and bonus compensation, a direct violation of Wells Fargo's Sales and Ethics policies.  At no point has Wells Fargo Bank earned revenue or do our customers receive benefit from these activities.  In Northern California's Greater Bay Region the activity is widespread and so highly encouraged that it has become a normal sales practice. Left unchecked, the inevitable outcome shall be one of professional and reputational damage, consumer fraud and shareholder lawsuits, coupled by regulatory sanctions.  All attempts to utilize traditional channels to report this information have been met with immediate and lasting retaliation and having exhausted all other options, I am forwarding this information directly to the audit committee as a final hope for internal resolution.

I consider myself to be a loyal and devoted employee.  I have been a team member since 1992, the last 12 consecutive years spent in one store.  It is unconscionable to allow the routine deception and fraudulent exploitation of our clients, a belief which was ingrained upon me by Wells Fargo.  At great personal cost, I also believed in the strident promises of professionalism, confidentiality, fair consideration and absolute protection against retaliation.  Despite having been slandered, publicly discredited and effectively blacklisted, I have remained loyal to Wells Fargo, taking only actions requisite to protecting my career. I have not engaged a lawyer to sue Wells Fargo, disclosed details to colleagues, to the media, to the public nor made a single demand.  I have simply asked to be made whole.

My intention to avoid litigation and public spectacle has seemingly been interpreted as weakness rather than a loyalty to Wells Fargo; what I have reported is accurate and public disclosure can only damage shareholder value and endanger the livelihoods of 150,000 team members.  Inexorably, Regional Bank has drawn me down this path, without reason and complete fiat: "*Employment is At-Will; staffing decisions are under the complete and arbitrary discretion of Regional Bank.  We have not retaliated, you will not be reinstated.  If OSHA determines we have retaliated, you will not be reinstated; you will never be allowed back in the same office, sue us if you disagree.*"  This is an imprudent position and clearly an attempt to escape individual accountability with inside the shield of a "flawless" bureaucracy.  To openly invite a lawsuit, prefaced by outside government investigation, wherein guilt is statutorily defined in absolutes rather than gradients even more imprudent, in that I have labored to remain open to any frank and candid discussion.

I remain committed and loyal to Wells Fargo; I am not a traitor, I am not impetuous, I am not some hyper-malcontent.  I want what is right, what is best and what is fair for Wells Fargo, for our customers and for myself.  It is my hope that this information will be fairly evaluated without vested interest, concerned with protecting the integrity and values of Wells Fargo and it's customers.  Seemingly if our aims are identical, any differences which may have existed should no longer, and any remaining issues should be easily resolved, but the evidence thus far suggests this would be optimism to the point of foolishness.

Sincerely,

# EXHIBIT F

EXHIBIT F

December 27, 2005


Carrie Tolstedt
Wells Fargo Bank
420 Montgomery St. 12ᵗʰ Floor
San Francisco, CA

Dear Carrie,

As a now retired 35 year employee I feel compelled to write this letter.

If you truly believe in PACA you will read this letter and if so you are the only person in upper management in the Washington Region that believes in PACA.

There have been numerous excellent employees leave the company, however, they would have stayed many more years. It would behoove someone to survey these employees as to the true reason they left the company and not accept that they simply retired or decided to move on.

For example, ▓▓▓▓▓▓▓, a Senior Vice President with 35 years "retired" at age 54, ▓▓▓▓▓▓ with 20 years, ▓▓▓▓▓▓▓▓ with 27 years, ▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓, ▓▓▓▓▓▓▓ and myself with 35 years, to mention a few, would have stayed much longer with the company. There are many more employees in Western Washington that also left due to duress. The Washington Region must certainly have a very low retention rate.

I, for instance, was transferred to the West Yakima Washington Branch after 23 years at the Ellensburg Washington Branch. I was told that Ellensburg would become a HUB and that I would not be included in the HUB. ▓▓▓▓▓▓▓▓ hired a much younger person (also the future brother-in-law of ▓▓▓▓▓▓, a Seattle District Manager) and raised the position from a Manager 1 to a Manager 4 to justify a healthy pay increase and only adding one branch to the so-called HUB. The West Yakima Branch was opened in the fall of 2002 and has not performed to expectations under the previous manager. I was given an action plan in April 2005 to bring the branch to 100% in core sales, profit and cross-sell by June 30, 2005 which was impossible.

On June 10, 2005 I was given a 35 year service award by ▓▓▓▓▓▓▓, Central Washington District Manager, and at the very same time informed that he was going to proceed with the termination process because the action plan would not be met. He then proceeded to invite me to the anniversary dinner hosted by ▓▓▓▓▓▓▓ (The previous occurred in that order) I was embarrassed and humiliated and needless to say I did not attend. ▓▓▓▓▓▓▓ did not have the decency to call me, as I know he did others. This was PACA at its finest. I was also eliminated from the article 25-year spotlight. (see attached)